**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

Federal Trade Commission,

　　　　　　　　　　*Plaintiff,*

　　v.                                                    1:25-cv-10371-KPF

Henkel AG & Co., KGaA, *et al.*,

　　　　　　　　　　*Defendants.*

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFFS' MOTION TO EXCLUDE TESTIMONY
OF DR. ELIZABETH BAILEY**

# TABLE OF CONTENTS

I.    Dr. Bailey's Qualifications and Opinions...........................................................1

II.    Exclusion Under Daubert is the "Exception" and Especially in Bench Trials, Expert Testimony Should be "Freely Admitted".......................................................2

III.  Dr. Bailey's Opinions on Bidding Competition Are Well-Supported and Based on Sound Economics.................................................................................................4

IV.   Dr. Bailey's Opinions on Repositioning and Expansion Are Well-Supported and Based on Sound Economics ..........................................................................12

V.    Conclusion .....................................................................................................20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Empire Surplus Lines Ins. v. J.R. Contracting,*
  743 F. Supp. 3d 530 (S.D.N.Y. 2024) ................................................................. 3

*Apica Sellers Representative, LLC v. Abbott Lab'ys,*
  No. 23-CV-01034 (MMG), 2026 WL 879162 (S.D.N.Y. Mar. 31, 2026) ................. 3

*Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.,*
  769 F. Supp. 2d 269 (S.D.N.Y. 2011) ................................................................. 2

*Daubert v. Merrell Dow Pharms., Inc.,*
  509 U.S. 579 (1993) ........................................................................................... 3

*F.T.C. v. IQVIA Holdings Inc.,*
  710 F. Supp. 3d 329 (S.D.N.Y 2024) ................................................................ 16

*F.T.C. v. Procter & Gamble Co.,*
  386 U.S. 568 (1967) ......................................................................................... 10

*F.T.C. v. RAG-Stiftung,*
  436 F. Supp. 3d 278 (D.D.C. 2020) ................................................................... 7

*F.T.C. v. Tempur Sealy Int'l,*
  768 F. Supp. 3d 787 (S.D. Texas 2025)............................................................ 19

*In re AMR Corp.,*
  No. 1:21-cv-02163-KPF (S.D.N.Y Apr. 21, 2022), Dkt. No. 38, *aff'd* No. 22-
  901, 2023 WL 2563897 (2d Cir. Mar. 20, 2023)................................................ 15

*In re Joint E. & S. Dist. Asbestos Litig.,*
  52 F.3d 1124 (2d Cir. 1995)................................................................................ 3

*In re Manhattan by Sail, Inc.,*
  436 F. Supp. 3d 803 (S.D.N.Y. 2020) ................................................................. 3

*Kirk-Mayer, Inc. v. Pac Ord, Inc.,*
  626 F. Supp. 1168 (C.D. Cal. 1986).................................................................... 7

*Nat'l Reporting Co. v. Alderson Reporting Co.*,
  763 F.2d 1020 (8th Cir. 1985) ...................................................................... 7

*New York v. Deutsche Telekom AG*,
  439 F. Supp. 3d 179 (S.D.N.Y 2020) ......................................................... 16

*Town & Country Linen Corp. v. Ingenious Designs LLC*,
  No. 18-cv-5075 (LJL), 2022 WL 2757643 (S.D.N.Y. July 14, 2022)........................ 3

*United States v. Baker Hughes, Inc.*,
  908 F.2d 981 (D.C. Cir. 1990) ...................................................... 7, 11, 15

*United States v. Falstaff Brewing Corp.*,
  410 U.S. 526 (1973) ................................................................................ 10

*United States v. JetBlue Airways Corp.*,
  712 F. Supp. 3d 109 (D. Mass. 2024) ........................................................ 18

*United States v. Penn-Olin Chem. Co.*,
  378 U.S. 158 (1964) ................................................................................ 10

*United States v. Syufy Enters.*,
  903 F.2d 659 ...................................................................................... 7, 15

*United States v. UnitedHealth Grp. Inc.*,
  630 F. Supp. 3d 118 (D.D.C. 2022) ........................................................... 19

*United States v. Waste Mgmt., Inc.*,
  743 F.2d 976 (2d Cir. 1984)................................................................... 7, 10

*Yang v. United States*,
  745 F. Supp. 3d 60 (S.D.N.Y. 2024) ............................................................ 3

**Other Authorities**

Gregory J. Werden, *Assigning Market Shares*, 70 Antitrust L.J. 67 (2002) .............. 6

Jeremy Sandford, Loren Smith & Nathan Edward Wilson, *Common Ground
  or Political Football: The Role of Guidelines in Merger Analysis*, The
  Antitrust Source (Feb. 2025)............................................................................. 15

R. Preston McAfee & John McMillan, *Auctions with a Stochastic Number of
  Bidders* 43 J. Econ. Theory 1 (1987).............................................................. 6

U.S. Dep't of Justice & Fed. Trade Comm'n, Horizontal Merger Guidelines
   (1992, *revised* 1997, *revised* 2023) ............................................................. 6, 17, 18

The FTC has moved to exclude certain opinions that defense expert Dr. Elizabeth Bailey might offer at trial: "(i) that competition in construction adhesives should be assessed through the lens of the 'threat of replacement,' and relatedly that all 'credible' competitors should be seen as equal to each other with equal market shares; and (ii) that barriers to expanding construction adhesive supply are low." In doing so, the FTC mischaracterizes what Dr. Bailey has said, raises at most credibility issues that should be left for trial, and mistakenly suggests that testimony by a defendant's employees cannot be considered by a defense expert. The FTC's motion is without merit and should be denied.[1]

## I.    Dr. Bailey's Qualifications and Opinions

The FTC does not dispute that Dr. Bailey is highly qualified. She has a Ph.D. in economics from MIT and over 25 years of experience as an economic expert. She has testified in five merger trials. Her opinions have never been excluded. Bailey Dep. 16:12–17:9.

Here, Dr. Bailey's assignment was to assess the competitive effects of Henkel's acquisition of Liquid Nails and to evaluate the opinions of the FTC's expert, Dr. Marc Luppino. She submitted a 189-page report supported by 68 exhibits, an economic model of wholesale competition, and extensive evaluation of the evidentiary record. Dr. Bailey's key opinions include:

---

[1] To assist the Court, Defendants attach the following exhibits: the opening report of the FTC's expert Dr. Luppino (Ex. A), the reply report of Dr. Luppino (Ex. C), the expert report of Defendants' expert Dr. Bailey (Ex. B), and Dr. Bailey's exhibits updated after the submission of Dr. Luppino's reply report (Exs. D, E).

- The construction adhesives industry is characterized by competition to get on retail shelves and the threat of being replaced on those shelves.

- Many other suppliers exist and routinely compete for shelf placement.

- Retailers are large and sophisticated, with substantial negotiating leverage. They run bidding processes and threaten to switch to alternatives to obtain the lowest wholesale prices. They also use rigorous cost justification processes to ensure that wholesale price increases reflect cost increases.

- Dr. Luppino's market shares based on sales to end consumers are unreliable for predicting competitive effects for multiple reasons. One is that Dr. Luppino and his retail shares do not capture the significance of the competition that occurs to get on the shelves in the first place.

- Dr. Luppino's empirical analyses are flawed in multiple ways.

In short, Dr. Bailey's testimony will assist the Court by filling the holes left by the FTC and its expert's myopic assessment of the construction adhesives industry. She will do so based on well-established economic principles, and the FTC will have an opportunity to cross-examine her at trial.

## II.    Exclusion Under Daubert is the "Exception" and Especially in Bench Trials, Expert Testimony Should be "Freely Admitted"

The "rejection of expert testimony … is 'the exception rather than the rule.'" *Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.*, 769 F. Supp. 2d 269, 283 (S.D.N.Y. 2011). The purpose of *Daubert* is for judges to exercise a "gatekeeping" function before juries hear potentially prejudicial expert testimony. *Daubert* is not a vehicle to resolve factual disagreements about expert opinions, but rather asks only

2

whether expert testimony "rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 580 (1993); *see also, e.g., In re Joint E. & S. Dist. Asbestos Litig.*, 52 F.3d 1124, 1131 (2d Cir. 1995) (explaining that "proscribed practices" in *Daubert* analyses include "assess[ing] the weight of conflicting evidence" and "pass[ing] on the credibility of the witnesses").

Particularly in a bench trial, expert evidence should be "freely admitted," *Yang v. United States*, 745 F. Supp. 3d 60, 66 (S.D.N.Y. 2024), because courts can "separate helpful conclusions from ones that are not grounded in reliable methodology," *Am. Empire Surplus Lines Ins. v. J.R. Contracting*, 743 F. Supp. 3d 530, 536–37 (S.D.N.Y. 2024). There is "no need for the Court to gate-keep expert testimony from itself," so excluding the testimony has no benefit. *In re Manhattan by Sail, Inc.*, 436 F. Supp. 3d 803, 810 (S.D.N.Y. 2020); *see also Apica Sellers Representative, LLC v. Abbott Lab'ys*, No. 23-CV-01034 (MMG), 2026 WL 879162 at *10 (S.D.N.Y. Mar. 31, 2026) ("[When] the Court is the factfinder, 'the trial judge is presumed to be able to exclude improper inferences" so "[c]ourts are 'especially reluctant to exclude expert testimony in a bench trial'"). Admitting the expert testimony, on the other hand, provides "the benefit of live testimony and cross-examination" and allows the Court "to evaluate the experts' opinions in the context of a full record." *Yang*, 745 F. Supp. 3d at 66.

The only case the FTC cites excluding expert testimony in a bench trial is an unpublished one, *Town & Country Linen Corp. v. Ingenious Designs LLC*, No. 18-cv-5075 (LJL), 2022 WL 2757643, at *3, 17 (S.D.N.Y. July 14, 2022), where the court excluded testimony that was "devoid of any reasoning" and "non-helpful." Mot. at 6-

7. Dr. Bailey's testimony is hardly "devoid of any reasoning," and it will be helpful to the Court in assessing the core issues in this case.

### III. Dr. Bailey's Opinions on Bidding Competition Are Well-Supported and Based on Sound Economics

The FTC mischaracterizes what Dr. Bailey has said about wholesale-level bidding competition. For example, the FTC says she opines that every construction adhesive supplier "must be counted as exactly equal to all others." Mot. at 7. Dr. Bailey has not opined that every supplier must be counted "as exactly equal to all others." To the contrary, Dr. Bailey demonstrates that Loctite and Liquid Nails are far from equal to each other, including because they have different product line-ups and different strengths and weaknesses. Dr. Bailey will, however, explain that suppliers participating in bids for shelf space play an important role in the competitive process – and will continue to do so after the acquisition – that is not reflected in retail shares even if those bidders are not exactly equal.

The FTC focuses on footnote 295 of Dr. Bailey's report and a half-page of deposition testimony. Mot. at 7, nn. 19 & 20. But that footnote did nothing more than make the uncontroversial point that credible bidders are competitive constraints even if they do not have a large share of retail sales at a given time. Dr. Bailey has explained that one way to think about who the credible bidders are would be to look at "participants in Dr. Luppino's relevant market," *i.e.*, competitors already supplying retailers. Bailey Dep. 145:7–8. Another would be "those participants that are invited to a retailer's PLR." Bailey Dep. 145:10–11. Another would be the entities that ██████ ███████████████████████████████████████████████████████████████████ Bailey

4

Dep. 145:13–15. Dr. Bailey also noted that " ███████████ [are] examples of that kind of an entity that would be a credible threat." Bailey Dep. 145:1–18. These points are self-evident and cannot support exclusion.

Dr. Bailey does not just assert these things. She analyzes extensive evidence about the capabilities of competing suppliers. For example, ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████. Other suppliers bid on major retailer business and either currently have or recently had retailer sales. Ex. B (Bailey Rep.) ¶¶ 70, 81–83, 91–92; Ex. A (Luppino Rep.) Tables 10-11. All that is typical, well-reasoned economic expert testimony, and the FTC's suggestion that Dr. Bailey should not even be allowed to opine on the competitive threat these suppliers pose defies logic.

The FTC seems particularly agitated about Dr. Bailey's reference in footnote 295 to a "1/n" approach to analyzing competition. But "1/n" is a well-known concept in antitrust economics: in a bid market where each bidder has a chance of winning, a possible measure of shares could be dividing the market by the number of bidders rather than the amount of their current sales. Thus, for example, if there are ten bidders, each one could be assigned a 10% share.

Contrary to the FTC's suggestion, Dr. Bailey does not opine that this approach is exactly what should be done here. Instead, she uses it as an illustration of an alternative way of thinking about competition because basing shares purely on retail

5

sales, as Dr. Luppino does, ignores the bidding competition to get on the shelves in the first place. Bailey Dep. 175:15–176:1. In other words, Dr. Bailey opines that the FTC's approach ignores a key issue and that Dr. Luppino should have considered other metrics to measure market shares that would have been more informative. The FTC disagrees, but that is what trials are for.

Moreover, the FTC's assertion that the "1/n" approach is unsupported, Mot. at 8, is remarkable, as the FTC's own Merger Guidelines explain that the FTC "may instead measure market concentration using the number of significant competitors in the market." 2023 Merger Guidelines at 5, n.12. Each iteration of the Merger Guidelines for the last 30-plus years has recognized this approach as an appropriate way to measure market shares in bidding situations. *See* 2010 Merger Guidelines, §§ 5.3 (similar to 2023 guidelines), 6.2 (in bargaining context, explaining anticompetitive effects are "likely to be small if there are many equally placed bidders"); 1992 Merger Guidelines, n.15 ("Where all firms have, on a forward-looking basis, an equal likelihood of securing sales, the Agency will assign equal market shares.").

The antitrust economic literature also explains the "1/n" concept. *See*, *e.g.*, Werden, *Assigning Market Shares*, 70 Antitrust L.J. 67 (2002) (discussing "scenario … referred to by the antitrust cognoscenti as a 'one-over-n market'" where "with n competitors, their shares [are] 1/n"); McAfee & McMillan, *Auctions with a Stochastic Number of Bidders*, 43 J. Econ. Theory 1 (1987).

The case law also recognizes that market shares based on current sales are misleading when they do not consider bidding competition. For example, in *Waste*

*Management*, the Second Circuit explained that "a market definition artificially restricted to existing firms competing at one moment may yield market share statistics that are not an accurate proxy for market power when substantial potential competition able to respond quickly to price increases exists." 743 F.2d 976, 982 (2d Cir. 1984). It further explained that potential competitors "bidding on contracts … can hardly be ignored by [the Defendants] or other [competitors] (not to mention their customers) in arriving at contract bids." *Id.* at 983. Other leading circuit court cases are in accord. *See also United States v. Syufy Enters.*, 903 F.2d 659, 662 n.1, 664 n.6, 666 (9th Cir. 1990) (explaining in film distribution market involving "competitive bidding" that "the nature of competition is to make winners and losers" and that "it is not market share that counts"); *United States v. Baker Hughes, Inc.*, 908 F.2d 981, 986 (D.C. Cir. 1990) (rejecting merger challenge because "the government's statistics were misleading" because customers received "multiple, confidential bids" and "at any given point in time an individual seller's future competitive strength may not be accurately reflected" by current sales). The FTC also lost a recent merger case where the court explained that "three competitors are well positioned to check [the merged firm] during the bidding process" and that the "pitting of suppliers against each other lowers price, even when there are only two competing suppliers." *F.T.C v. RAG-Stiftung*, 436 F. Supp. 3d 278, 314, 320 (D.D.C. 2020); *see also Nat'l Reporting Co. v. Alderson Reporting Co.*, 763 F.2d 1020, 1023 (8th Cir. 1985) ("Competition was alive and well" despite a dominant firm's market share because "numerous other [firms could] bid and try to undercut" it); *Kirk-Mayer, Inc. v. Pac Ord, Inc.*, 626 F. Supp.

7

1168, 1171 (C.D. Cal. 1986) ("in open bidding against a number of other bidders ... [a firm] does not have the power to control prices or exclude competition").

Next the FTC argues Dr. Bailey did not assess which construction adhesive suppliers are "credible" and relied only on "self-interested" deposition testimony from the Defendants. Mot. 8–9. Even aside that the bias and reliability of testimony is an issue for trial, the suggestion that Dr. Bailey relied only on testimony of Defendants' employees is simply not true. She looked at extensive record evidence about other suppliers. For example:

- Many suppliers compete in bidding processes. Ex. B (Bailey Rep.) ¶¶ 63, 70, 72, 77, 81–83; DX301 (█████████████████████████████████); DX297 (███████████████); DX257 (███████████); DX276 (█████████████ █████████); DX296 (██████████████████████████████).

- Many suppliers currently have or recently had shelf space at major retailers. ████████████████████████████████████████████████████. Ex. B (Bailey Rep.) ¶¶ 12–25, 62, n.173; DX263; DX277.

- ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ██████████████████. Ex. B (Bailey Rep.) Ex. 34, ¶¶ 91–92; DX250-0001; DX291-0005; ████████ Dep. 63:17–18 █████████████████████ ████████████████████ Dep. 87:15–20 █████████████████ ████████████████████████████ Dep. 51:25–52:5 ████████

149:5–11 ███████████████████████████

███████████ Dep. 157:21–158:12 ███████████████

- ███████████████████████████████████████

  ███████████████████████████████████████

  ███████████████████████ Ex. B (Bailey Rep.) ¶¶ 67, 76; ███████

  ███████████ Dep. 181:5–22, 186:9–24.

- Lowe's sells construction adhesives in-store from Gorilla, Titebond, Sika,

  Quikrete, Sakrete, and Leech and ███████████████████

  ███████████████████████████████████████

  ███████████████████ Ex. B (Bailey Rep.) ¶¶ 12, 13, 15–17, 63; ███████

  ███████ Dep. 64:17–25, 114:16–25, 118:12–15, 138:5–15.

- Menards, the third largest home improvement retailer, ███████████

  ███████████████████████████████████████

  ███████████████████████████████████████

  ███████████████ . Ex. B (Bailey Rep.) ¶ 62; ███████████████ Dep.

  11:15–20, 69:5–7, 73:2–13, 193:3–12; DX263-0001; DX277-0001; DX262.

- Ace Hardware also had ███████████████████████████

  ███████████████████████████████████████

  ███████████████ Ex. B (Bailey Rep.) ¶¶ 12–14, 63; ███████████ Dep.

  59:1–9, 62:3–5, 64:19–65:2, 69:7–69:18, 84:13–21 .

- ███████████████████ have excess capacity that they could use to expand.

  Ex. B (Bailey Rep.) ¶¶ 90, 155; ███████████ Dep. 45:24–46:4, 46:17–24;

 Dep. 242:16–243:6; <span>Dep. 107:17–109:14.</span>

- <span>. Ex. B (Bailey Rep.) ¶ 15;</span> Dep. 31:21–32:3.

Moreover, Defendants' beliefs about competitive threats matter. Mot. at 8. As the Second Circuit explained in *Waste Management,* even if entry never occurs, merging parties cannot increase prices if they "would then face lower prices charged by all existing competitors as well as entry by new ones, a condition fatal to its economic prospects if not rectified." 743 F.2d at 983–84. *Waste Management* grounded this view in Supreme Court precedent, discussing, for example, *United States v. Falstaff Brewing Corp.*, 410 U.S. 526 (1973), where "the very existence of Falstaff as a potential entrant [could] constrain brewers in the northeast to maintain competitive price levels as a means of forestalling entry by Falstaff." 743 F.2d at 982. *See also F.T.C. v. Procter & Gamble Co.*, 386 U.S. 568, 581 (1967) (explaining that the "behavior of [market participants] was influenced by each firm's predictions of the … behavior of its competitors"); *United States v. Penn-Olin Chem. Co.*, 378 U.S. 158, 173 (1964) (highlighting the competitive constraint provided by "the potential competition of the corporation that might have remained at the edge of the market, continually threatening to enter"). The FTC might not believe that the Defendants worry about other competitors, but the Court can assess their credibility at trial.

10

The FTC cites a few cases where courts excluded experts that relied on "conclusory evidence" rather than the "ordinary course factual record." Mot. at 9–10. But Dr. Bailey did not offer "conclusory" opinions or ignore the "ordinary course factual record." She offers extensive analysis across a 189-page report that includes 68 exhibits and, in addition to documents and depositions, analyzes over 75 data sets from the parties and a score of third parties. Further, all but one of the FTC's cases involve jury trials where the concern is that an expert's imprimatur on poor evidence would mislead the jury. That concern does not exist here, as the Court can determine what weight to give to about Dr. Bailey's opinions and the evidence she relies on. The FTC then cites merger cases where courts gave limited weight to certain defense evidence. Mot. at 10. But such cases do not support excluding evidence entirely; rather, they demonstrate that courts are fully capable of giving evidence what weight it is due after full consideration. The FTC also ignores that other courts have relied on evidence from Defendants in rejecting merger challenges. *See*, *e.g.*, *Baker Hughes*, 908 F.2d at 986–87 ("defendants … provided compelling evidence on ease of entry into this market" that rebutted government's prima facie case).

In any event, whether competitors are credible is a factual dispute that should not be pre-judged, and not a basis for exclusion. The FTC's motion itself shows as much. The FTC contends that Dr. Bailey's opinions "conflict with the overwhelming ordinary course evidence," Mot. at 10, reflecting that it is a fact issue that requires an assessment of the evidence at trial.

11

The FTC then provides a long, tendentious description of evidence that it says indicates other competitors are not credible. Mot. at 11-14. In doing so, the FTC ignores voluminous contrary evidence. This *Daubert* motion is not the place to present all of that evidence or for the Court to pre-decide which witnesses it will find credible. As one example why the Court cannot rely on the FTC's "say-so," the FTC calls out

███████████████████████████████████████████████████████████

███████████████████████. Mot. at 11, 13. ███████████████████████

███████████████████████. Ex. B (Bailey Rep.) ¶ 63; DX263; DX277.

## IV. Dr. Bailey's Opinions on Repositioning and Expansion Are Well-Supported and Based on Sound Economics

The FTC also argues that Dr. Bailey's opinions about the ability and incentive of construction adhesive suppliers to reposition and expand should be excluded because she does not apply the law to the facts to opine that entry would be "timely, likely, and sufficient." Mot. at 15. This argument misapprehends the role of an economic expert and also is flawed because competitors are already in this market and not entrants, and Dr. Bailey's testimony is highly relevant and admissible regardless of the applicable legal standard.

First, this case is not about entry. Key competitors – ███████████████

██████████████████████████████████████████ – are already in the market. They actively bid for shelf space and many already sell to major retailers.

Second, as an economic expert, Dr. Bailey's role is not to apply the law to the facts and opine on whether the evidence meets the FTC's purported legal standard of "timely, likely, and sufficient." Instead, her role is to evaluate how the potential for

repositioning and expansion impacts the competitive effects of the transaction. Among other things, Dr. Bailey's opinions are based on:

- Many competitors already producing construction adhesives. *See* Ex. B (Bailey Rep.) ¶¶ 12–26. The FTC and its expert admit ███████ companies currently produce construction adhesives. That alone should dispose of any argument that entry is hard. *See* Ex. B (Bailey Rep.) ¶ 8; FTC Responses and Objections to Defendants' Second Set of Interrogatories, at 19; Ex. A (Luppino Rep.) ¶ 251, Table 12.

- Many competitors participating in bidding processes and having an on-shelf presence. *See supra.*

- Data showing that competitors sell the same construction adhesive products both in FTC's retail-only market and to professional customers, meaning products from one channel could readily be sold in the other. *See* Ex. B (Bailey Rep.) ¶¶ 162–63, Exs. 45, 46. ████████████████ ████████████████████████████████ ███████████████████████████████████. *See* Ex. B (Bailey Rep.) ¶ 163, Ex. 46; Bailey Dep. 49:8–50:17.

- The price points of competitor products versus Defendant products showing ████████████████████████████████ ████████████████████████████████ ████████████████████████████████

██████████████████████████████████████████████████. *See* Ex. B (Bailey Rep.) ¶¶ 57–60, Exs. 18–25; Bailey Dep. 132:16–133:6.

- Competitors having excess capacity in construction adhesives and acknowledging that they could readily expand production. *See* Ex. B (Bailey Rep.) ¶ 90; ████████████████ Dep. 107:17–109:14; ████████ Dep. 45:9–46:9, 46:17–24; ████████ Dep. 242:16–243:6; ████████ 30(b)(6) Dep. 10:11–11:21.

- Third-party contract manufacturing making repositioning and expansion especially easy. For example, ████████████████████████ █████████████████████████████████████ ██████████████. *See* Ex. B (Bailey Rep.) ¶¶ 10, 15; ██████ Dep. 340:14–21; ████████ Dep. 29:5–15, ██████████ Dep. 22:6–15, 105:15–106:3.

- Competitors innovating by introducing new products. *See* Ex. B (Bailey Rep.) ¶¶ 154–57 (██████████████████████████████); DX301-0025 (████████████████████████ ████████); DX255-0018 (██████████████████████████); DX298-0002 (████████████████████████ ████████████████████); DX265-0021–0022 (████████████ ██████████████).

Third, the Court does not need to address the legal standard for entry because Dr. Bailey's testimony is highly relevant and admissible under any standard. But the

14

FTC's favored standard that "entry by other firms would be timely, likely, and sufficient to replace the lost competition" is not the law. That standard originated from the FTC's own Merger Guidelines. The Merger Guidelines do not reflect any rulemaking; rather, they are an explanation of how the antitrust agencies approach their analysis. The current 2023 Merger Guidelines also have been widely criticized as not grounded in law or economics. *See, e.g.*, Sandford, Smith & Wilson, *Common Ground or Political Football: The Role of Guidelines in Merger Analysis*, The Antitrust Source (Feb. 2025) ("The 2023 Guideline[s] read as less grounded in principles and more like a litigation position brief for plaintiffs" and "stand out for their departure from accepted economic consensus").

In this circuit, *Waste Management* is the controlling precedent and it does not adopt the FTC's "timely, likely, and sufficient" standard. Nor do the other leading cases on entry. *Baker Hughes*, 908 F.2d at 987 ("Neither *Waste Management* nor any other case purports to establish a categorical 'quick and effective' entry requirement"); *Syufy*, 903 F.2d at 666–67 (rejecting merger challenge due to lack of "structural barriers to entry" such as "government regulation or licensing requirements," "onerous front-end investments," "a scarce commodity," or a "network of exclusive contracts or distribution arrangements"). *See also* Transcript of March 25, 2022 Remote Decision, *In re AMR Corp.*, No. 1:21-cv-02163-KPF, (S.D.N.Y. April 21, 2022), Dkt. No. 38 (this Court relying upon *Waste Management* and affirming bankruptcy court rejecting of airline merger challenge in part due to entry and expansion by low cost carriers), *aff'd*, No. 22-901, 2023 WL 2563897, at *2 (2d Cir. Mar. 20, 2023)

15

(affirming this Court, citing *Waste Management*, and endorsing evaluation of "rebuttal evidence showing why the market-share data in fact gave an inaccurate account of the merger's probable effects on competition"). The FTC does not cite *Waste Management* in its pre-trial brief or conclusions of law or anywhere else for that matter. The FTC agrees *Baker Hughes* establishes the legal framework, but sets aside what *Baker Hughes* says about entry. The Merger Guidelines also do not cite *Waste Management* or the other leading circuit precedents rejecting merger challenges on entry grounds.

The FTC cites to one district court case in a preliminary injunction proceeding, *F.T.C. v. IQVIA Holdings Inc.*, 710 F. Supp. 3d 329, 393 (S.D.N.Y 2024), that applied the "timely, likely, and sufficient" standard in rejecting an entry argument. But again *Waste Management* is the binding precedent. In any event, the *IQVIA* court was evaluating whether generalist digital advertising companies not currently in the market could overcome the "technical and regulatory complexity," "talent scarcity," and "deep agency and client integrations and contracts" to enter an alleged market for specialized types of healthcare digital advertising, 710 F. Supp. 3d at 393, while here competitors already sell the relevant product and face no similar barriers. The FTC also cites to *New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179 (S.D.N.Y 2020), but that case does not help the FTC, as it recognized *Waste Management* and accepted the entry arguments the defense raised in rejecting the merger challenge.

Moreover, the Merger Guidelines distinguish between (1) new entrants (in Section 3.2), the source of the FTC's "timely, likely, and sufficient" language, and (2)

16

"rapid entrants" (in Section 4.4), which the FTC ignores and does not adopt a "timely, likely, and sufficient" standard. Here, other construction adhesive suppliers are already in the market, so they are the most rapid "entrants" imaginable. The Merger Guidelines define "rapid entrants" as "[f]irms that are not currently active in a relevant market, but that very likely would rapidly enter … without incurring significant sunk costs" and firms "with efficient idle capacity, or readily available 'swing' capacity" that can "easily and profitably be shifted to serve the relevant market." 2023 Merger Guidelines § 4.4. Again Dr. Bailey's testimony is highly relevant as to whether competitors are "rapid entrants."

Regardless, the "timely, likely, and sufficient" standard is readily satisfied and again Dr. Bailey's testimony goes directly to these points.

- As to likelihood, multiple suppliers already compete and currently have or recently had shelf space at retailers. *See supra.* Retail customers have explained that they could switch to alternatives and use the threat of switching to obtain lower prices. *See, e.g.*, Ex. B (Bailey Rep.) ¶¶ 63–68;



Dep. 186:9–24 ▮▮▮▮▮▮ Dep. 122:21–123:2, 124:11–125:12 ▮▮▮▮▮▮ Dep. 75:18–23 (▮▮▮▮▮▮ ). Suppliers can shift sales into the FTC's retail-only market and can increase production. *See, e.g.*, Ex. B

17

(Bailey Rep.) ¶¶ 111, 163, Ex. 46; Bailey Dep. 49:9–50:17; ███████

Dep. 45:24–46:4, 46:17–24 ███████████████████████



██████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████         Dep. 242:16–243:6 ██

██████████████████████████████████████

██████████████████████████████████████

██████  Dep. 107:17–109:14 (████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████████████████). 

- As to timeliness, customers and suppliers can quickly expand. In the past, the government has agreed that entry within 2–3 years is timely. *See, e.g.*, *United States v. JetBlue Airways Corp.*, 712 F. Supp. 3d 109, 155–56 (D. Mass. 2024); 1992 Merger Guidelines § 3.2 (entry within "two years" is "timely"). Customers can switch suppliers within months. *See* Ex. B (Bailey Rep.) ¶¶ 67, 110; ████████████ Dep. 193:16–194:24 ████████

██████████████████████████████████████

Dep. 58:10–16, 126:6–13 ███████████████████████

███████████████████████ Dep. 195:4–16 (██████████

████████████████████████████████). Suppliers

already have capacity to expand and can increase production quickly. *See* Ex. B (Bailey Rep.) ¶ 90; ██████████ Dep. 45:24–46:4 (██████████ ██████████████████████████); DX273-005 (██████████ ██████████████████████████); DX251-0002 (██████████████████████████████ ██████████████████████████████ ██████████); DX296-0052 (██████████████████ ██████████████████████████████).

- As to sufficiency, Dr. Bailey's analysis shows that ██████████ ██████████ of Defendant sales would be enough to defeat a hypothetical post-merger price increase. *See* Ex. B (Bailey Rep.) ¶¶ 93–96. This replacement could come from one competitor or multiple competitors. Moreover, as a legal matter, "the FTC must show substantial harm to competition," confirming that replacement need not be complete but only needs to be enough to eliminate "substantial" harm. *F.T.C. v. Tempur Sealy Int'l*, 768 F. Supp. 3d 787, 832 (S.D. Tex. 2025), *see also United States v. UnitedHealth Grp. Inc.*, 630 F. Supp. 3d 118, 133, 152 (D.D.C. 2022) (rejecting merger challenge including because government made "no attempt to show that the lessening of innovation and competition would be *substantial*").

In any event, whatever the legal standard, Dr. Bailey's testimony goes directly to the issues of whether the many existing competitors are active market participants

19

and whether, to what extent, and on what time frame they might reposition, expand, or enter. These are factual questions, not grounds for excluding expert testimony.

## V.    Conclusion

In short, the Court should deny the FTC's *Daubert* motion. Especially in bench trials, expert testimony should be freely admitted, and in any event, the issues the FTC raises are at best factual disputes that come nowhere close to the types of fundamental errors that justify exclusion. The FTC will have every opportunity to cross-examine Dr. Bailey at trial and argue whatever it wishes about the weight the Court should give to her testimony.

June 22, 2026                                      Respectfully submitted,

*/s/ David I. Gelfand*
David I. Gelfand
Ryan A. Shores
Kenneth S. Reinker
Jacob M. Coate
Clotilde Le Roy
Jeremy Newman
CLEARY GOTTLIEB STEEN & HAMILTON LLP
2112 Pennsylvania Ave., NW
Washington, D.C. 20037
(202) 974-1500
dgelfand@cgsh.com
rshores@cgsh.com
kreinker@cgsh.com
jcoate@cgsh.com
cleroy@cgsh.com
jenewman@cgsh.com

Polina Bensman
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, NY 10006
(212) 225-2000
lbensman@cgsh.com

20

*Counsel for Defendants Henkel AG & Co. KGAA, Henkel of America, Inc., and Henkel US Operations Corp.*

<u>*/s/Edward W. Duffy with permission*</u>
Edward W. Duffy
Paul C. Cuomo
Erik T. Koons
Andrew L. Lucarelli
Rachel Rasp
BAKER BOTTS L.L.P.
700 K Street, NW
Washington, D.C. 20001
Tel: (202) 639-7700
Facsimile: (202) 639-7890
ed.duffy@bakerbotts.com
paul.cuomo@bakerbotts.com
erik.koons@bakerbotts.com
drew.lucarelli@bakerbotts.com
rachel.rasp@bakerbotts.com

Linda H. Martin
BAKER BOTTS L.L.P.
30 Rockefeller Plaza
New York, N.Y. 10112
Tel: (212) 408-2500
linda.h.martin@bakerbotts.com

*Attorneys for Defendants AIP, LLC, A-Paint Holding LP, and A-Paint Topco, Inc.*

21

## CERTIFICATE OF WORD COUNT

Pursuant to Local Civil Rule 7.1(c), I hereby certify that, according to Microsoft Word, this brief has 5,123 words.

/s/David I. Gelfand
David I. Gelfand