**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| FEDERAL TRADE COMMISSION, | |
| Plaintiff, | |
| v. | |
| HENKEL AG & CO. KGAA, | Case No. 1:25-cv-10371-KPF |
| HENKEL OF AMERICA, INC., | **PUBLIC VERSION** |
| HENKEL US OPERATIONS CORP., | |
| AIP, LLC d/b/a AMERICAN INDUSTRIAL PARTNERS, | |
| A-PAINT HOLDING LP, | |
| and | |
| A-PAINT TOPCO, INC., | |
| Defendants. | |

**PLAINTIFF'S REPLY MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION TO EXCLUDE TESTIMONY OF DR. ELIZABETH BAILEY**

**TABLE OF CONTENTS**

I.    Defendants Provide Misleading Statements to Salvage Dr. Bailey's Opinion that Suppliers Should be Treated Equally and Her Reliance on Self-Serving Executive Testimony ......... 2

II.   Defendants Mis-State the Applicable Economic and Legal Standards Governing Market Shares and Entry or Expansion ........................................................................ 7

III.  The FTC Seeks the Exclusion of a Limited Set of Dr. Bailey's Opinions ........................... 9

**TABLE OF AUTHORITIES**

**Cases**

*Am. Empire Surplus Lines Ins. Co. v. J.R. Contracting*, 743 F. Supp. 3d 530

(S.D.N.Y. 2024) ............................................................................................................ 10

*AMPAT/Midwest, Inc. v. Ill. Tool Works Inc.*, 896 F.2d 1035 (7th Cir. 1990) ............................ 3

*Apica Sellers Representative, LLC v. Abbott Labs,* No. 23-CV-01034 (MMG),

2026 WL 879162 (S.D.N.Y. Mar. 31, 2026) .......................................................... 10

*Chicago Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410 (5th Cir. 2008) .................................... 8

*FTC v. IQVIA Holdings Inc.*, 710 F. Supp. 3d 329 (S.D.N.Y. 2024) ..................................... 8, 9

*FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278 (D.D.C. 2020) ............................................. 7

*FTC v. Sanford Health*, 926 F.3d 959 (8th Cir. 2019) .................................................. 8

*FTC v. Tapestry, Inc.*, 755 F. Supp. 3d 386 (S.D.N.Y. 2024) ............................................ 8

*FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27 (D.D.C. 2018) .............................. 9

*Hoffman v. Palmer*, 129 F.2d 976 (2d Cir. 1942) ....................................................... 3

*In Re Manhattan By Sail, Inc.*, 436 F. Supp. 3d 803 (S.D.N.Y. 2020) ..................................... 10

*New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179 (S.D.N.Y. 2020) .............................. 8

*Park v. Thomson Corp.*, No. 05 Civ. 2931(WHP), 2007 WL 119461

(S.D.N.Y. Jan. 11, 2007) ................................................................................................. 8

*Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421 (9th Cir. 1995) .............................................. 8

*States v. Waste Management, Inc.*, 743 F.2d 976 (2d Cir. 1984) ........................................ 7, 8

*United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322 (S.D.N.Y. 2001) .................................. 8

*Yang v. United* States, 745 F. Supp. 3d. 60 (S.D.N.Y. 2024) .................................................... 10

ii

**Statutes**

Federal Rule of Evidence 702.................................................................................................. 1, 10

Federal Rule of Evidence 703.................................................................................................. 1, 10

**Other Authorities**

1984 U.S. Dep't of Justice & Fed. Trade Comm'n Merger Guidelines.................................... 7, 8

1992 U.S. Dep't of Justice & Fed. Trade Comm'n Merger Guidelines......................................... 8

2023 U.S. Dep't of Justice & Fed. Trade Comm'n Merger Guidelines.............................. *passim*

Gregory J. Werden, *Assigning Market Shares*, 70 Antitrust L.J. 67 (2002)................................ 6

R. Preston McAfee & John McMillan*, Auctions with a Stochastic Number of*

    *Bidders* 43 J. Econ. Theory 1 (1987) ........................................................................................ 6

According to Defendants' expert Dr. Bailey, the proposed merger of the two largest construction adhesive brands in the United States should cause no concern because an alternative construction adhesive supplier will be able to threaten the combined firm— comprising ▮ percent of 2024 construction adhesive sales to retailers—and fill the competitive void.[1] Under Dr. Bailey's theory, the threat of replacement is viable because there are low barriers to expansion in the market of construction adhesive cartridges sold in the retail channel, allowing all competitors or would-be competitors to be equally able to take the spot of Loctite or Liquid Nails. Defendants' opposition brief,[2] however, does not address the fundamental problem of Dr. Bailey's opinion: the self-interested, subjective "belief" of the Defendants' executives stated in post-investigation depositions is the underpinning of her "threat of replacement" theory despite years of contrary sales data, ordinary course emails and presentations, and third-party evidence available to Dr. Bailey. This naked adoption of the executives' "belief" that Loctite or Liquid Nails could be easily replaced in a post-merger environment is not economic evidence that survives even a relaxed inquiry under Rules 702 and 703.

Instead, Defendants' opposition brief recycles the assertions that the FTC's expert Dr. Marc Luppino—by relying on the well-established and conventional analytical approach of the FTC and Justice Department's Merger Guidelines (2023)—has somehow misapprehended the likely competitive effects of Henkel's acquisition of A-Paint (the "Proposed Transaction"). This reply brief corrects where the Defendants' opposition brief has made inaccurate

---

[1] Saw Dec. Ex. A ("Luppino Expert Report") at ¶ 242, Table 10.

[2] ECF No. 153, Defendants' Memorandum of Law in Opposition to Plaintiff's Motion to Exclude Testimony of Dr. Elizabeth Bailey (hereinafter "Opp.").

1

statements, misleading omissions, or mischaracterizations of the record evidence, the Merger Guidelines, and the relevant case law.

**I.    Defendants Provide Misleading Statements to Salvage Dr. Bailey's Opinion that Suppliers Should be Treated Equally and Her Reliance on Self-Serving Executive Testimony**

*First,* although Defendants claim that Dr. Bailey "has not opined that every supplier must be counted 'as exactly equal to all others,'"[3] the very mathematical expression Dr. Bailey uses—"1/N"—says the exact opposite. To remove any doubt, Dr. Bailey explains 1/N is ████ ████████████████████████████████████████████████████████ ███████████████████████[4] Defendants' response that 1/N is simply an "illustration of an alternative way of thinking about competition" and not "exactly what should be done here" admits that Dr. Bailey's approach is fundamentally mistaken.[5] Defendants concede that the suppliers participating in the product line review process are "not exactly equal" to each other.[6] In her opinions attacking Dr. Luppino's market share analysis, Dr. Bailey claims that a market share analysis should capture the future competitive significance of different suppliers,[7] but her "alternative" approach merely flattens the competitive significance of different suppliers. Only Dr. Luppino's analysis considers how differences in brand strength and sales

---

[3] Opp. at 4.

[4] Saw Dec. Ex. B, ("Bailey Expert Report") at ¶ 109 n. 295 (emphasis added). *See also* Saw Dec. Ex. C, ("Bailey Dep.") at 165:10-166:1 (███████████████████████████ ████████████████████ )

[5] Opp. at 5.

[6] Opp. at 4.

[7] Bailey Expert Report at ¶ 99.

velocity—aspects of the retail channel that are competitively significant—affect the likelihood that third-party suppliers are able to offset the competitive harm of the Proposed Transaction.[8]

Dr. Bailey treats all "credible" threats of replacement from suppliers as equal to one another, which highlights the unreliability of how Dr. Bailey defines "credible." Defendants ignore the argument that Dr. Bailey's ███████████████████████████ is derived from the subjective beliefs of the Defendants' executives. In her deposition, Dr. Bailey

███████████████████████████████████████████

████████████████████████████[9] Put simply, it is not just the absence of factual support that renders Dr. Bailey's analysis unreliable. By its very terms, her opinion just restates ████████████████████████[10] *Cf.*

*AMPAT/Midwest, Inc. v. Ill. Tool Works Inc.*, 896 F.2d 1035, 1044-45 (7th Cir. 1990) (affirming inadmissibility of "documents prepared specifically for use in litigation" because such evidence is "'dripping with motivations to misrepresent'") (quoting *Hoffman v. Palmer*, 129 F.2d 976, 991 (2d Cir. 1942) (Posner, J.)). Thus, Defendants' bulleted list of "extensive record evidence about other suppliers" is a *non sequitur*.[11] Even if Dr. Bailey considered this other evidence, none of it clarifies which suppliers are credible threats and which are not because ████████████████ what Henkel and A-Paint executives subjectively believe.

---

[8] *E.g.*, Saw Dec. Ex. D, ("Luppino Reply Report") at ¶¶ 165, 181.

[9] Bailey Dep. at 153:9-19, 176:6-15.

[10] Bailey Dep. at 152:18-153:8 ████████████████████████████
████████████████████████ . But ██████████ will be called to testify by both the FTC and Defendants and the Court may evaluate his opinions straight from the source.

[11] Opp. at 8-10.

***Second,*** in an attempt to bolster claims that Dr. Bailey considered evidence other than Henkel and A-Paint executives' self-serving testimony, Defendants argue that ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮—an entirely different market.[12] Under this argument, Defendants urge the Court to pay attention to the pro channel to infer the ease of expansion in the retail channel. It is undisputed, however, that Dr. Luppino's analysis accounted for ▮▮▮▮ and ▮▮▮ sales in the pro channel, and thus their competitive significance, in his share estimates of a market of construction adhesive cartridges sold in any channel. In fact, Dr. Bailey's reliance on ▮▮▮ and ▮▮▮ sales in the pro channel alone is a misleading picture because the retail channel is significantly larger than the pro channel.[13] While Dr. Bailey estimates that ▮▮▮ has a market share of ▮ percent and ▮▮ has a share of ▮ percent by revenue in the pro channel,[14] ▮▮▮ has only ▮ percent market share and ▮▮ has only ▮ percent market share by revenue when considering all channels.[15]

***Third,*** Defendants misrepresent both the Merger Guidelines and the economic literature to salvage Dr. Bailey's "1/N" opinion. Although Defendants deride the Merger Guidelines as "widely criticized as not grounded in law or economics,"[16] Defendants rely on a footnote of the Merger Guidelines to insist Dr. Bailey's "1/N" approach has a foundation in merger analysis.[17]

---

[12] Opp. at 8-9 (emphasis added).

[13] Based on wholesale sales data, 2024 sales of construction adhesive cartridges in the retail channel in the United States were ▮▮▮▮▮▮ and sales for all construction adhesive cartridges sold in the United States were ▮▮▮▮. The difference of ▮▮▮▮ is approximately the size of the pro channel by wholesale sales. *Compare* Luppino Expert Report at ¶ 242, Table 10 *with* ¶ 244, Table 11.

[14] Bailey Expert Report at ¶ 111, Ex. 34.

[15] Luppino Expert Report at ¶ 244, Table 11.

[16] Opp. at 15.

[17] Opp. at 6.

Even then, Defendants omit the portions of the Merger Guidelines' footnote that undermine Dr. Bailey's application: "**The Agencies** may instead measure market concentration using the number of significant competitors in the market. **This measure is most useful when there is a gap in market share between significant competitors and smaller rivals or when it is difficult to measure shares in the relevant market.**"[18] The full text shows that the Merger Guidelines instruct the economist to count the number of significant competitors when conventional market shares are difficult to calculate, which is not the case here since Dr. Luppino was able to use three different methods and data sources to calculate consistent market share estimates.[19] Even then, the Merger Guidelines instruct the economist to count *significant* competitors and exclude "smaller rivals," which is the opposite of how Dr. Bailey suggests to apply the "1/N" approach.[20] Dr. Bailey had the opportunity and data to conduct a market share estimate under either the approach within Footnote 12 described above or any of the approaches in Section 4.4.B. ("Market Shares") of the Merger Guidelines, but she did not.[21] It is Dr. Luppino's analysis that ensures all significant competitors—Loctite, Liquid Nails, and [redacted]—are accounted for in the market of construction adhesive cartridges sold in the retail channel. Moreover, Dr. Luppino does not stop there. He includes the smaller rivals in his

[18] Merger Guidelines (2023) § 2.1 n. 12 (bold emphases added to text omitted by Defendants).

[19] Luppino Expert Report at ¶ 231, Appendix II (¶¶ 13-19) (measuring market share via wholesaler data, retailer data, and industry data source [redacted]).

[20] Dr. Luppino's expert report shows across multiple measures of market share that Loctite, Liquid Nails, and [redacted] are the suppliers with significant market shares in the market of construction adhesive cartridges sold in the retail channel. Luppino Expert Report at ¶¶ 242 (Table 10), 251 (Table 12), Appendix II ¶ 18 (Table A13).

[21] Bailey Dep. at 143:16-144:6 [redacted].

analyses as well, including ████████████████████████████████████ ████████████████████████████████████ and many others.[22]

Similarly, Defendants misleadingly imply that Werden, *Assigning Market Shares*, 70 Antitrust L.J. 67 (2002), supports Dr. Bailey's usage of "1/N" here.[23] The Werden article actually states that 1/N is appropriate only if "(1) a finite number of entities possess a readily identifiable set of assets essential for successful competition; and (2) the extent of ownership or control over the essential assets does not distinguish among these entities in any important way. . . . [A]ll competitors have the same costs, and each can supply the entire market demand." *Id.* at 85. According to Werden, these circumstances are typically found in markets for technology, innovation, or "in the extreme case of highly infrequent transactions and significantly changing market conditions." *Id.* 86, 92. This hardly describes the █████████ ████████████████████████████████████ ████████████████████████████████████ █████████████████████[24] Likewise, McAfee & McMillan, *Auctions with a Stochastic Number of Bidders*, 43 J. Econ. Theory 1 (1987), merely identifies various auction types wherein the results may be affected by whether each bidder knows how many bidders there are; it is silent as to market shares or calculating them. *Id.* at 2.

---

[22] *See* Opp. at 4-5, 8-10, 12 for suppliers mentioned in Defendants' opposition brief; all were included within Dr. Luppino's market share calculations. Luppino Expert Report at ¶¶ 244 (Table 11), 251 (Table 12).

[23] Opp. at 6.

[24] Luppino Reply Report at ¶¶ 171-73.

## II.    Defendants Mis-State the Applicable Economic and Legal Standards Governing Market Shares and Entry or Expansion

Defendants misapply the holdings of the merger cases considering market shares and entry or expansion, particularly *FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278 (D.D.C. 2020).[25] In *RAG-Stiftung*, the court was not considering the merger of the two largest and closest competitors. Rather, there were five similarly situated suppliers of hydrogen peroxide. 436 F. Supp. 3d at 287, 320. And the merging companies in *RAG-Stiftung* were not the closest competitors because one of them was incapable of making pre-electronics grade hydrogen peroxide and was therefore absent from any competition for that product specification. 436 F. Supp. 3d at 288, 294. By contrast, as Dr. Luppino observed and Dr. Bailey acknowledges, Loctite and Liquid Nails both offer the full breadth of products at a range of price points and chemistries, and these Loctite and Liquid Nails products compete head-to-head for shelf placement and among end-consumers.[26]

In a similar vein, Defendants misleadingly imply that the Second Circuit in *United States v. Waste Management, Inc.*, 743 F.2d 976 (2d Cir. 1984), considered and rejected the "timely, likely, and sufficient" standard in favor of a different rule.[27] But *Waste Management* cited the 1984 version of the Merger Guidelines, *see Waste Mgmt.* 743 F.2d at 982-83, which

---

[25] Opp. at 7.

[26] Luppino Reply Report at ¶ 85; Bailey Expert Report at ¶ 53 (████████████████████████████ ████████████████████ ).

[27] Opp. at 15 ("[*Waste Management*] does not adopt the FTC's 'timely, likely, and sufficient standard'"). Defendants also cite *Waste Management* to suggest that it is inappropriate to calculate market shares based on current sales. Opp. at 6-7. *Waste Management* says no such thing and only holds that post-merger market shares establish a *rebuttable* presumption that defendants may overcome. *Waste Mgmt.*, 743 F.2d at 981. This is fully consistent with the FTC's position that the market shares here exceed the thresholds for a structural presumption, the reams of ordinary course documents and witness testimony establish that the Proposed Transaction will likely cause a substantial lessening of competition, and other evidence show mitigating factors, such as entry or expansion, are unlikely to offset the harm to competition and consumers.

included guidance to "consider the likelihood and probable magnitude of entry" under a "two-year time period"—essentially the "timely, likely, and sufficient standard" and not a rejection of it.[28] More importantly, the Second Circuit was still evaluating the barriers to entry and effectively the likelihood, sufficiency, and timeliness of competitors to offset the effects of the merger. *Waste Mgmt.*, 743 F.2d at 983. And since the Second Circuit decided *Waste Management*, district courts within this Circuit have applied the "timely, likely, and sufficient" standard, often to give further definition to the precedent laid out in *Waste Management*. *See FTC v. Tapestry, Inc.*, 755 F. Supp. 3d 386, 465 (S.D.N.Y. 2024); *FTC v. IQVIA Holdings Inc.*, 710 F. Supp. 3d 329, 393 (S.D.N.Y. 2024); *New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 226 (S.D.N.Y. 2020); *Park v. Thomson Corp.*, No. 05 Civ. 2931(WHP), 2007 WL 119461 at *7 (S.D.N.Y. Jan. 11, 2007); *United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322, 342 (S.D.N.Y. 2001).

Defendants misleadingly suggest that expansion of current competitors is evaluated under a different set of criteria than entry.[29] In doing so, Defendants claim that the Merger Guidelines only applies the "timely, likely, and sufficient" standard to "new entrants" while "rapid entrants," whom Defendants claim are construction adhesives suppliers already in the market, are not subject to this standard.[30]

---

[28] Merger Guidelines § 3.3 (1984), *available at* https://www.justice.gov/archives/atr/1984-merger-guidelines. The precise "timely, likely, and sufficient" language was introduced in the 1992 version of the Merger Guidelines and has been expressly adopted by multiple Circuits since its introduction. *FTC v. Sanford Health*, 926 F.3d 959, 965 (8th Cir. 2019); *Chicago Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410, 429-30 (5th Cir. 2008); *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1440 (9th Cir. 1995); Merger Guidelines (1992), available at https://www.justice.gov/archives/atr/1992-merger-guidelines.

[29] Opp. at 12 ("competitors are already in this market and not entrants . . . this case is not about entry").

[30] Opp. at 16-17.

Neither case law nor the Merger Guidelines support the Defendants' position. "The expansion of current competitors is regarded as 'essentially equivalent to new entry,' and is therefore evaluated according to the same criteria." *IQVIA*, 710 F. Supp. 3d at 393 (quoting *FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 67 (D.D.C. 2018)). And again, the Defendants selectively omit key surrounding language to distort the Merger Guidelines' description of "rapid entrants":

> **In markets for relatively homogeneous goods where a supplier's ability to compete depends predominantly on its costs and its capacity, and not on other factors such as experience or reputation in the relevant market, a supplier** with efficient idle capacity, or readily available "swing" capacity" **currently used in adjacent markets** that can easily and profitably be shifted to serve the relevant market**, may be a rapid entrant. However, idle capacity may be inefficient, and capacity used in adjacent markets may not be available, so a firm's possession of idle or swing capacity alone does not make that firm a rapid entrant.**[31]

As Dr. Bailey acknowledges in her own report, [redacted] and do not come close to the description of "homogeneous goods."[32] Moreover, experience and reputation, especially brand strength, in the market for construction adhesive cartridges sold in the retail channel matter immensely even for Dr. Bailey's opinions regarding competition to "get on retail shelves."[33] Defendants' attempt to escape the "timely, likely, and sufficient" standard by recasting third-party suppliers as "rapid entrants" contradicts the express caveats within the Merger Guidelines.

## III. The FTC Seeks the Exclusion of a Limited Set of Dr. Bailey's Opinions

The cases that Defendants cite where courts denied *Daubert* motions in a bench proceeding sought much broader exclusions than what the FTC seeks here or are generally

---

[31] Merger Guidelines § 4.4.A (bold emphasis added to text omitted by Defendants).

[32] Bailey Expert Report at ¶ 164, Appendix A.

[33] Opp. at 2, 5 ([redacted]).

inapposite.[34] And one case cited by Defendants—*Am. Empire Surplus Lines Ins. Co. v. J.R. Contracting*, 743 F. Supp. 3d 530, 544-45 (S.D.N.Y. 2024)—was a bench hearing in which the court in fact excluded much of the defense expert's opinion. In this case, to exclude Dr. Bailey's opinions in ¶¶ 93-97, 99-102, 109-110, and 112-122 of her report, a mere 22 paragraphs out of ▮ paragraphs, is a distinctly different request than what the movants sought in those cases. These paragraphs reflect the narrowly tailored request to exclude Dr. Bailey's threat of replacement and barriers to entry opinions.

<div align="center">***</div>

The Court should exclude, under Rules 702 and 703, Dr. Bailey's opinions that competition for construction adhesives should be assessed through the lens of the "threat of replacement" and, relatedly, that all "credible" competitors are deemed equal to each other with equal market shares; and (ii) that barriers to expanding construction adhesive supply are low.

---

[34] Opp. at 3; *Yang v. United* States, 745 F. Supp. 3d. 60, 67-68 (S.D.N.Y. 2024) (seeking exclusion of opinions of causation and damages in a tort injury case); *In Re Manhattan By Sail, Inc.*, 436 F. Supp. 3d 803, 806 (S.D.N.Y. 2020) (both plaintiff and defendant seeking to exclude the entirety of the opposing expert's opinions); *Apica Sellers Representative, LLC v. Abbott Labs,* No. 23-CV-01034 (MMG), 2026 WL 879162 at *9-10 (S.D.N.Y. Mar. 31, 2026) (denying the exclusion of plaintiff's expert rebuttal witnesses addressing the significance of intellectual property rights at the heart of the contract dispute while noting "inadmissible evidence must not hold sway even at a bench trial").

Dated: June 26, 2026                Respectfully submitted,

                                     /s/ Edmund Y. Saw
                                    Edmund Y. Saw (*pro hac vice*)
                                    Federal Trade Commission
                                    600 Pennsylvania Avenue, N.W.
                                    Washington, DC 20580
                                    Phone: 202-326-2174
                                    Email: esaw@ftc.gov

                                    Abby L. Dennis (DC Bar No. 994476) (*pro hac vice*)
                                    Peggy Femenella (DC Bar No. 4727700) (*pro hac vice*)
                                    Nicole Lindquist (DC Bar No. 975593) (*pro hac vice)*
                                    Joseph Alexander Ansaldo (VA Bar No. 75870) (*pro hac vice*)
                                    Nathan Brenner (IL Bar No. 6317564) (*pro hac vice*)
                                    Maria Cirincione (DC Bar No. 999496) (*pro hac vice*)
                                    Christopher D'Silva (NY Bar No. 6085070) (*pro hac vice*)
                                    Justin Epner (DC Bar No. 1028431) (*pro hac vice*)
                                    Sean Hughto (DC Bar No. 421224) (*pro hac vice*)
                                    Frances Anne Johnson (MD Bar No. 1412170060) (*pro hac vice*)
                                    Sarah Kerman (DC Bar No. 90017957) (*pro hac vice*)
                                    Timothy Singer (DC Bar No. 1048769) (*pro hac vice*)
                                    Edmund Saw (NY Bar No. 5680293) (*pro hac vice*)

                                    *Counsel for Plaintiff Federal Trade Commission*

11

**<u>WORD COUNT CERTIFICATION</u>**

I certify that this computer-generated Memorandum of Law was prepared using

Microsoft Windows and Microsoft Word. The total number of words in this Memorandum,

exclusive of the caption, table of contents, table of authorities, the signature block, and this

certificate of compliance is 2,285, which is in accordance with the maximum 3,500 words as

permitted under Local Civil Rule 7.1.

<div align="right">

*/s/ Edmund Y. Saw*
Edmund Y. Saw

</div>

12