UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FEDERAL TRADE COMMISSION,

Plaintiff,

-v.-

HENKEL AG & CO. KGAA; HENKEL OF AMERICA, INC.; HENKEL US OPERATIONS CORP.; AIP, LLC, *doing business as* AMERICAN INDUSTRIAL PARTNERS; A-PAINT HOLDING LP; and A-PAINT TOPCO, INC.,

Defendants.

25 Civ. 10371 (KPF)

**REDACTED**
**~~SEALED~~**

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

KATHERINE POLK FAILLA, District Judge:

American consumers looking to purchase construction adhesives for their next home improvement project — perhaps to install a bathtub or mount a mirror — are likely to encounter two familiar brands while shopping at their neighborhood home center: Loctite and Liquid Nails. By almost any metric, they are the largest and most powerful brands in the construction adhesives space. Loctite is owned by Henkel AG & Co. KGaA and its U.S. subsidiaries, Henkel of America, Inc. and Henkel US Operations Corporation (collectively, "Henkel" or the "Henkel Defendants"), while Liquid Nails is held as an asset by A-Paint Topco, Inc. ("A-Paint"), a subsidiary of A-Paint Holding LP that is owned by the private equity firm AIP, LLC, doing business as American Industrial Partners ("AIP") (together with Henkel and A-Paint, "Defendants"). Henkel now wants to acquire A-Paint from AIP, but the Federal Trade Commission ("FTC") has sued to permanently enjoin the acquisition, alleging that the merging of the

entities behind those two iconic brands would violate Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C. § 45.

Following a seven-day trial, at which fact witnesses and experts from both sides testified, the Court has concluded that the proposed transaction would leave American consumers worse off. The FTC has shown that the acquisition is presumptively illegal because the combined entity would hold a more-than-80-percent share of the market for construction adhesives in cartridge form sold in the retail channel in the United States. Moreover, Defendants have failed to rebut the FTC's *prima facie* case — that is, the FTC's market-share analysis is valid and appropriate; the threat of replacement by other suppliers is insufficient to prevent the transaction's anticompetitive effects; and retail "power buyers" are unlikely to protect American consumers from the anticompetitive harms. Even if Defendants could successfully rebut the presumptive illegality of the transaction, the FTC would still carry its ultimate burden by showing that the transaction is likely to result in additional anticompetitive effects, including significant upward price pressure, elimination of substantial head-to-head competition, and reduction in consumer choice through portfolio rationalization.

For the reasons set forth below, the Court permanently enjoins Henkel from acquiring A-Paint.

## PROCEDURAL HISTORY[1]

The procedural history of this antitrust case is relatively straightforward. In late 2025, the FTC sued to enjoin an impending acquisition in the construction adhesives space, and the parties agreed to take matters swiftly to trial to settle the antitrust issue before the deal's termination date in the fall of 2026.

On December 15, 2025, the FTC filed a Complaint in this Court seeking a permanent injunction to prevent the Henkel Defendants from acquiring A-Paint from AIP. (Dkt. #1 ("Compl.") at 1).[2] Defendants filed their answers to the FTC's Complaint on January 26, 2026. (Dkt. #68-70).

---

[1] The facts set forth in this Opinion are drawn from the Complaint ("Compl." (Dkt. #1)); the testimony, exhibits, and deposition designations entered into evidence at the bench trial from July 13 to July 21, 2026; and the parties' pretrial and post-trial proposed findings of fact and conclusions of law (Dkt. #145, 148, 180, 182).

For ease of reference, the Court refers to the various exhibits entered into evidence at trial as "PX[ ]" if offered by the FTC and "DX[ ]" if offered by Defendants, and to their stipulations or agreed statements of fact or law to which all parties consent as "Joint Stip." (Dkt. #172). It refers to the transcript of the July 7, 2026 final pretrial conference as "FPTC Tr." Similarly, it refers to the transcript of a particular trial day as "[Date] Tr." and to individual lines of testimony within the transcript as "[Date] Tr. [ ]:[ ] ([Name] Testimony)." In addition, it refers to the FTC's pretrial proposed findings of fact and conclusions of law as "FTC Pretrial FFCL" (Dkt. #145); to Defendants' pretrial proposed findings of fact and conclusions of law as "Def. Pretrial FFCL" (Dkt. #148); to the FTC's pretrial memorandum of law in support of the permanent injunction as "FTC Pretrial MOL" (Dkt. #147); to Defendants' pretrial memorandum of law in opposition to the permanent injunction as "Def. Pretrial MOL" (Dkt. #146); to the FTC's post-trial proposed findings of fact and conclusions of law as "FTC Post-Trial FFCL" (Dkt. #180); and to Defendants' post-trial proposed findings of fact and conclusions of law as "Def. Post-Trial FFCL" (Dkt. #182). The Court frequently references the direct declarations of the witnesses, which statements were submitted in advance of, and entered as exhibits at, the trial. It also references deposition excerpts designated and counter-designated by the parties as "[Name] Dep. [ ]:[ ]."

The Court pauses to commend both sides on truly excellent advocacy. It acknowledges with appreciation the parties' efforts at working collaboratively to streamline the pretrial and post-trial submission processes and the trial itself. The Court also thanks the parties for their cordial treatment of Court staff.

[2] In the Complaint filed on December 15, 2025, the FTC also sought a temporary restraining order (Compl. at 1), but it clarified in a letter filed later that day that "the

In a joint letter dated December 23, 2025, the parties requested a bench trial in mid-2026 for this Court to evaluate the FTC's merger challenge. (Dkt. #63). Upon further discussion with the parties, the Court ordered that trial to begin on July 13, 2026. (Dkt. #66). In the same Order, which was issued on January 7, 2026, the Court also set dates for the submission of the parties' joint pretrial order, motions *in limine*, pretrial memoranda of law, and proposed findings of fact and conclusions of law; the submission of any opposition papers; as well as the final pretrial conference. (*Id.*). Thereafter, on January 28, 2026, the Court entered the parties' proposed Civil Case Management Plan and Scheduling Order, in which the parties agreed to follow an expedited schedule for fact and expert discovery, pretrial submissions, and post-trial submissions. (Dkt. #74). After resolving a few discovery disputes involving third parties (*see* Dkt. #118, 129; April 28, 2026 Minute Entry), the Court adopted the parties' additional proposals on limitations on their pretrial

---

FTC confirmed with Defendants that entry of a temporary restraining order "[wa]s not necessary at this time" (Dkt. #6). Nevertheless, in a letter filed on February 25, 2026, the FTC informed the Court that it "may seek temporary injunctive relief from the Court prior to August 28, 2026 to preserve the status quo while the Court adjudicates the litigation and to protect the FTC's ability to consider the Court's decision and potentially seek an appeal if necessary." (Dkt. #83). The parties agreed that Defendants would not close, consummate, or otherwise complete the acquisition before August 28, 2026. (*Id.*).

The Court notes that in past merger reviews, the FTC has typically sought preliminary injunctive relief in federal court while pursuing its own administrative proceedings. *See, e.g.*, *FTC* v. *IQVIA Holdings Inc.*, 710 F. Supp. 3d 329, 340 (S.D.N.Y. 2024). However, nothing in the FTC's organic statute prevents it from seeking permanent injunctive relief and pursuing the entire merger review process in federal court. *See AMG Cap. Mgmt., LLC* v. *FTC*, 593 U.S. 67, 78 (2021) ("[T]he Commission may use § 13(b) [of the FTC Act] to obtain injunctive relief while administrative proceedings are foreseen or in progress, or when it seeks only injunctive relief.").

and post-trial submissions as well as certain procedures in preparation for trial (Dkt. #131, 133).

Abiding by the Court's schedule, the parties made timely pretrial submissions. On June 8, 2026, the FTC filed a motion to exclude the testimony of Dr. Elizabeth Bailey, Defendants' sole expert, along with supporting papers. (Dkt. #136-141). Defendants filed their opposition and supporting papers on June 22, 2026. (Dkt. #153-156). The FTC filed its reply and supporting papers on June 26, 2026. (Dkt. #162-165). In addition, the parties filed their respective pretrial proposed findings of fact and conclusions of law and pretrial memoranda of law, as well as their proposed joint pretrial order, on June 15, 2026. (Dkt. #143-148). The Court held a final pretrial conference on July 7, 2026, at which conference the Court denied the FTC's motion to exclude Dr. Bailey's expert testimony. (July 7, 2026 Minute Entry; FPTC Tr. 28). On the same day, the Court also entered the parties' joint pretrial order, a trial procedures order, and a set of stipulations or agreed statements of fact or law to which all parties consented. (Dkt. #170-172).

Trial began on July 13, 2026, and took place over the course of seven business days, concluding on July 21, 2026. During that time, the Court heard from 18 fact witnesses and two expert witnesses, approved a list of preadmitted exhibits to which the parties stipulated (Dkt. #173), and admitted additional exhibits, declarations, and deposition testimony into evidence. On July 28, 2026, the parties submitted their respective post-trial proposed findings of fact and conclusions of law. (Dkt. #180, 182).

On August 14, 2026, the Court filed and provided to the parties an unredacted copy of these Findings of Fact and Conclusions of Law under seal and allowed the parties to propose redactions in accordance with *Lugosch* v. *Pyramid Co. of Onondaga*, 435 F.3d 110 (2d Cir. 2006). On or before September 11, 2026, the parties shall file a joint letter suggesting redactions to the Findings of Fact and Conclusions of Law. Taking the parties' suggestions into consideration, the Court will then file a redacted version of the Findings of Fact and Conclusions of Law on the public docket.

**APPLICABLE LAW**

Under Section 13(b) of the FTC Act, the FTC may seek a permanent injunction to prevent the violation of "any provision of law enforced by the [FTC.]" 15 U.S.C. § 53(b); *see FTC* v. *RCG Advances, LLC*, 695 F. Supp. 3d 368, 396 (S.D.N.Y. 2023); *FTC* v. *Bronson Partners, LLC*, 654 F.3d 359, 365 (2d Cir. 2011). One such provision is Section 7 of the Clayton Act, which prohibits mergers and acquisitions "where in any line of commerce ... the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18; *see FTC* v. *Tapestry, Inc.*, 755 F. Supp. 3d 386, 408 (S.D.N.Y. 2024). Another related provision is Section 5 of the FTC Act, which prohibits "[u]nfair methods of competition in or affecting commerce[.]" 15 U.S.C. § 45; *see FTC* v. *Ind. Fed'n of Dentists*, 476 U.S. 447, 454 (1986). Here, the FTC invokes both provisions in seeking a permanent injunction. (Compl. ¶ 83). Nevertheless, because an acquisition that violates Section 7 of the Clayton Act necessarily violates Section 5 of the FTC Act, *see FTC* v. *Lancaster*

*Colony Corp.*, 434 F. Supp. 1088, 1096 (S.D.N.Y. 1977), the Court focuses its analysis on the Clayton Act.

Through Section 7 of the Clayton Act, Congress tasked the FTC with "arresting mergers at a time when the trend to a lessening of competition in a line of commerce was still in its incipiency." *Brown Shoe Co.* v. *United States*, 370 U.S. 294, 317 (1962); *see also F. & M. Schaefer Corp.* v. *C. Schmidt & Sons, Inc.*, 597 F.2d 814, 816 (2d Cir. 1979) (per curiam). Indeed, Congress's concern "was with probabilities, not certainties." *Brown Shoe*, 370 U.S. at 323. Accordingly, "[a]lthough Section 7 requires more than a 'mere possibility' of competitive harm, it does not require proof of certain harm." *United States* v. *AT&T, Inc.*, 916 F.3d 1029, 1032 (D.C. Cir. 2019) (quoting *Brown Shoe*, 370 U.S. at 323 n.39); *see id.* (explaining that the standard "encompasses a concept of 'reasonable probability' (quoting *Brown Shoe*, 370 U.S. at 323 n.39)). In addition, courts must engage in "not merely an appraisal of the immediate impact of the merger upon competition, but [also in] a prediction of its impact upon competitive conditions in the future[.]" *United States* v. *Phila. Nat'l Bank*, 374 U.S. 321, 362 (1963). In other words, "[c]ourts must judge the likelihood of anticompetitive effects in the context of the 'structure, history, and probable future' of the particular markets that the merger will affect." *New York* v. *Deutsche Telekom AG*, 439 F. Supp. 3d 179, 198 (S.D.N.Y. 2020) (quoting *United States* v. *Gen. Dynamics Corp.*, 415 U.S. 486, 498 (1974)).

Section 7 claims are analyzed under a three-step burden-shifting framework. *Tapestry*, 755 F. Supp. 3d at 408 (citing *United States* v. *Baker*

*Hughes Inc.*, 908 F.2d 981, 982-83 (D.C. Cir. 1990) (Thomas, J., joined by R.B. Ginsburg & Sentelle, JJ.)); *see also In re AMR Corp.* No. 22-901, 2023 WL 2563897, at *2 (2d Cir. Mar. 20, 2023) (summary order) (collecting cases). *First*, the FTC must establish a *prima facie* case by defining a relevant market and showing that the effects of the merger are likely to be anticompetitive in that market. *Tapestry*, 755 F. Supp. 3d at 408; *see also FTC* v. *IQVIA Holdings Inc.*, 710 F. Supp. 3d 329, 350 (S.D.N.Y. 2024). Anticompetitive effects can include "undue market concentration in an area of effective competition," *Deutsche Telekom*, 439 F. Supp. 3d at 199, as well as elimination of "head-to-head competition between close competitors … result[ing] in a substantial lessening of competition," *FTC* v. *Sysco Corp.*, 113 F. Supp. 3d 1, 61 (D.D.C. 2015). *Second*, once the FTC makes out a *prima facie* case, the burden shifts to the defendants to present evidence that "the *prima facie* case 'inaccurately predicts the relevant transaction's probable effect on future competition' … or to 'sufficiently discredit' the evidence underlying the *prima facie* case." *AT&T*, 916 F.3d at 1032 (quoting *United States* v. *Anthem*, 855 F.3d 345, 349 (D.C. Cir. 2017)); *see also IQVIA*, 710 F. Supp. 3d at 350. *Third*, if the defendants successfully rebut the FTC's *prima facie* case, then the burden shifts back to the FTC, which must produce additional evidence of anticompetitive effects and carry its ultimate burden of persuasion, which remains with the FTC at all times. *IQVIA*, 710 F. Supp. 3d at 350; *Tapestry*, 755 F. Supp. 3d at 409.

## FINDINGS OF FACT

The findings of fact that follow are based on the Court's careful review of the trial record. Further factual findings — especially with respect to the parties' expert testimony — are contained in the ensuing Conclusions of Law section.

### A. Defendants and the Proposed Acquisition

Henkel AG & Co. KGaA is a German multinational chemical and consumer goods company headquartered in Düsseldorf, Germany. (Joint Stip. ¶ 1). It has two business units: Adhesives Technologies and Consumer Brands. (*Id.* ¶ 3). In 2025, the company generated approximately €20.5 billion in sales, with Adhesives Technologies accounting for slightly more than half of the company's revenue at €10.7 billion in sales. (*Id.* ¶¶ 2-3). Henkel of America, Inc. and Henkel US Operations Corporation are both subsidiaries of Henkel AG & Co. KGaA that are headquartered in Connecticut. (*Id.* ¶ 4). Henkel sells construction adhesives in the United States, primarily under the Loctite brand as Loctite PL and Loctite Power Grab. (*Id.* ¶¶ 5-6).[3]

AIP is a private equity firm headquartered in New York, New York. (Joint Stip. ¶ 7). In December 2024, through its affiliated funds, AIP acquired the U.S. and Canadian architectural coating business of PPG Industries, Inc.

[3] The business unit responsible for construction adhesives (as well as other products like sealants) in the United States was known as Consumer and Craftsmen, North America ("ACC NA") until April 2026. (July 15 Tr. 680:13-22 (Brogan Testimony); July 15 Tr. 601:2-10 (Dorn Testimony)). In addition, Henkel owns the OSI brand and used to sell OSI-branded construction adhesives, but it has decided to wind down OSI-branded sales of construction adhesives and focus exclusively on Loctite. (July 15 Tr. 682:14-24 (Brogan Testimony); July 14 Tr. 440:19-21 (Reginelli Testimony); July 13 Tr. 65:14-21 (Jones Testimony); PX15 at 9).

("PPG") for $550 million and renamed it the Pittsburgh Paint Company ("PPC"). (*Id.* ¶¶ 8-9, 16; July 15 Tr. 646:11-647:2 (Nealon Testimony); PX1420 at 2). PPC supplies paints, coatings, and certain specialty products. (Joint Stip. ¶ 16). Those specialty products are sold through several brands, including Liquid Nails, another construction adhesives brand sold in the United States; Homax, a repair-and-remodeling brand that primarily focuses on wall and ceiling repair products; and Mulco, a sealant brand sold in Canada. (*Id.*; Dorn Decl. ¶ 21; Brogan Decl. ¶ 75). Unlike Liquid Nails, Homax and Mulco do not offer construction adhesives for sale in the United States. (Joint Stip. ¶ 15). From a corporate structure perspective, AIP owns Liquid Nails, Homax, and Mulco through its indirect ownership interests in A-Paint Holding LP, which has as its indirect subsidiary A-Paint Topco, Inc., which in turn holds the three brands as assets. (*Id.* ¶¶ 9, 11-12). Both A-Paint Holding LP and A-Paint Topco, Inc. are headquartered in New York, New York. (*Id.* ¶¶ 10-11).

When PPG first announced its intention to sell the architectural coating business in February 2024, Henkel became interested in acquiring the adhesives and sealants portfolio (but not the paints and coatings portfolio). (Dorn Decl. ¶¶ 21-22). Henkel launched an assessment of the potential acquisition in March 2024, which assessment was known internally as Project Clipper. (*Id.* ¶ 22). In June 2024, Henkel submitted an indicative bid to PPG for only the adhesives and sealants assets, but its negotiations with PPG quickly ended when Henkel learned that PPG wanted to sell its entire architectural coating business to a single buyer. (*Id.* ¶ 32; PX1003 at 2).

Nevertheless, Henkel remained interested in those assets and began discussions with the leading bidders, including AIP, about a possible back-to-back sale — wherein the winning buyer would purchase the architectural coating business from PPG and then turn around and sell the adhesives and sealants portfolio to Henkel. (Dorn Decl. ¶ 33; PX1003 at 2).

Therefore, shortly after AIP acquired PPG's architectural coating business, Henkel and AIP began exploring a potential carve-out of the Liquid Nails, Mulco, and Homax brands. (Dorn Decl. ¶ 34; Brogan Decl. ¶ 76). According to Henkel's internal documents, AIP received "high inbound interest from multiple strategics" in the specialty business because of the "rare opportunity … [to acquire] equitable brands that have strong presence in big-box retailers." (PX1420 at 2). Nevertheless, negotiations proceeded quickly between Henkel and AIP, because on April 15, 2025, Henkel agreed to purchase those three brands from AIP by acquiring all of the issued and outstanding shares of capital stock of A-Paint Topco, Inc. for $725 million, which is the transaction at issue in this case (the "Transaction" or "Acquisition"). (Joint Stip. ¶ 19; Dorn Decl. ¶ 49; PX2008 at 6, 16; PX1420 at 27). Henkel and AIP's codenames for the Acquisition are Project Clipper and Project Longhorn, respectively. (Joint Stip. ¶ 20; Brogan Decl. ¶ 76; Nealon Decl. ¶ 28; *see generally* PX1420).

The Transaction includes a [redacted] "break up" fee if it is not consummated (PX2008 at 113), and its termination date is September 6, 2026, at which time either party can terminate the agreement unilaterally as long as

certain conditions are satisfied (Dorn Decl. ¶ 49). At the time of the agreement, both Henkel and AIP were aware that potential antitrust issues, which are at the center of this case, could impede the deal's successful closing. (*See, e.g.*, PX1331 at 2 (AIP partner conveying to Henkel's Executive Vice President that "just as [redacted] was your hot button, regulatory approval topics is mine..."); PX2008 at 87 ([redacted])).

## B. The Construction Adhesives Industry

### 1. Overview of Construction Adhesives

Construction adhesives are used to bond various materials — including drywall, molding, trim, paneling, and subfloors — in home improvement projects as well as residential and light commercial construction. (Brogan Decl. ¶ 18; Bowen Dep. 8:5-9; PX2025 at 18; PX2179 at 23; PX3059 at 1). They form a distinct class of products from adjacent categories, such as paints, sealants, superglues, and other types of general adhesives. (July 15 Tr. 687:19-688:21 (Brogan Testimony); *see* PX21 at 1-2). Specifically, construction adhesives are known for creating high-strength, long-lasting bonds and offering characteristics such as ease of extrusion, quick hold, and limited to no bracing. (July 15 Tr. 687:13-688:20 (Brogan Testimony); PX10 at 1; PX1467 at 10, 12-13; PX2025 at 16-17, 32-33; PX2179 at 22; PX2200 at 40; PX3003 at 42-43). For example, construction adhesives might be used to install subflooring in a house, construct an outdoor landscape block, or mount a mirror. (Reginelli Decl. ¶ 19; Bowen Dep. 18:17-19:4; *see* PX3059 at 1). In

addition, they can be offered for multiple purposes or project-specific applications, though most construction adhesives are marketed and sold as general-purpose products. (July 16 Tr. 904:12-19 (Shoate Testimony); PX1467 at 37; PX2025 at 39; PX2182 at 3-5; PX3059 at 2; PX3060 at 14-17).[4]

Construction adhesives come in four main technologies or chemistries: latex, solvent, polyurethane, and Silyl-Modified Polymer ("SMP"), the last of which is also referred to as modified silane or hybrid. (St. Marie Decl. ¶ 8; Condie Decl. ¶ 60). Each technology has its own benefits and disadvantages. (*See* Bowen Dep. 31:2-17; 49:10-21; Condie Decl. ¶¶ 30-38). For example, different technologies have different curing mechanisms. (St. Marie Decl. ¶¶ 9-11). As a result, the technologies are suitable for different applications based on their specific qualities and are priced accordingly. (*Id.* ¶ 8).

Specifically, latex and solvents are often "lower-quality in opening price points," while polyurethane and SMPs tend to be "higher quality and in higher price points." (St. Marie Decl. ¶ 8). Indeed, latex and solvents are on the lower end of the pricing spectrum because of their more restrictive qualities and limited use cases. They both cure through evaporation, which causes the adhesive to shrink during curing and may leave gaps or air pockets in the cured product. (*Id.* ¶ 10). Latex is water-based and can be used for interior

---

4 Construction adhesives are considered to be "attachment" products, meaning that end consumers generally buy them as part of larger projects and are unlikely to visit a store for the sole purpose of buying construction adhesives. (July 14 Tr. 253:12-22 (Blackwell Testimony); July 14 Tr. 395:19-22, 425:10-14 (Reginelli Testimony)). While this particular product characteristic was mentioned at trial, it does not impact the Court's antitrust analysis.

and all-purpose jobs, but it is not recommended for exterior use, in part because it should be used only at temperatures above 50 degrees. (St. Marie Decl. ¶¶ 14, 22; DX80 at 45). Unlike latex, solvents can be used in a wider temperature range and on wet surfaces, but they are conversely not recommended for interior use because of the evaporation process when curing and the risk that solvents might dissolve certain materials, such as plastic and foamboard. (St. Marie Decl. ¶¶ 15, 21; Condie Decl. ¶ 32; DX80 at 44). For these reasons, solvents are particularly well-suited for subflooring and outdoor landscape blocks. (St. Marie Decl. ¶ 15).

On the higher end of the pricing spectrum are polyurethane and SMP, which are more advanced technologies with versatile qualities and broader use cases. Both cure via chemical reaction, which prevents gaps or air pockets in the cured product. (*See* St. Marie Decl. ¶ 11). Polyurethane yields a stronger bond than latex and solvents and can be used across a variety of building materials both indoors and outdoors. (*Id.* ¶ 16; DX80 at 46). Nevertheless, polyurethane is not suitable for colder temperatures because of the lack of moisture in the air for curing, and it can be more challenging to use on finishing materials such as trim boards. (St. Marie Decl. ¶ 17; DX80 at 46). Finally, SMP is the newest and most advanced technology, combining attributes from both polyurethane and latex and demonstrating versatility as a result. (St. Marie Decl. ¶ 18; Condie Decl. ¶ 37). It can be used in a wide temperature range and on multiple surfaces. (July 14 Tr. 478:1-3 (St. Marie Testimony); St. Marie Decl. ¶ 18; Condie Decl. ¶ 38). In addition, it is easy to

use and matches the bond strength of polyurethane. (St. Marie Decl. ¶ 18; Condie Decl. ¶ 38).

Construction adhesives are most frequently packaged in the form of cartridges for use with a caulking gun. (July 15 Tr. 547:5-11 (Schneider Testimony); July 21 Tr. 1426:3-5 (Oakes Testimony); Brogan Decl. ¶ 18; PX3060 at 14; PX6101 ("Luppino Initial Report") ¶ 44, Table 1 (cartridge form accounting for 96 percent of 2024 sales of U.S. construction adhesives at major retailers)). This form primarily comes in three sizes: 9-, 10-, and 28-ounce cartridges. (PX1467 at 89-96; PX2025 at 39; PX2182 at 3-5; *see* Brogan Decl. ¶ 18). Applied in this form with the use of a caulking gun, the construction adhesive product comes out as precise beads, providing the benefit of ease of extrusion. (July 13 Tr. 79:14-16 (Jones Testimony); July 15 Tr. 547:12-548:1 (Schneider Testimony); PX2025 at 33).

Other forms of construction adhesives include small handheld squeeze tubes (usually three to six ounces), gallon- or multi-gallon buckets or pails, and foam. (July 15 Tr. 548:14-24, 549:20-550:12 (Schneider Testimony); PX1467 at 89-96; PX3059 at 1). None of those forms requires the use of a caulking gun. The handheld squeeze tubes are self-explanatory; buckets or pails are typically applied with a mason's trowel (July 15 Tr. 548:14-24 (Schneider Testimony); PX3059 at 1); and foam tends to be more expensive and applied with a foam gun (July 15 Tr. 550:5-12 (Schneider Testimony)). Fiberglass reinforced paneling ("FRP"), for example, is a type of project-specific adhesive that is typically sold in buckets or pails because it must be troweled

onto a surface to ensure complete coverage. (July 13 Tr. 79:7-13 (Jones Testimony); July 15 Tr. 548:14-24 (Schneider Testimony); Bowen Dep. 35:14-36:25). Taken together, these other formats accounted for less than four percent of annual sales of U.S. construction adhesives at major retailers in 2024. (Luppino Initial Report ¶ 44, Table 1).

Finally, sales of construction adhesives differ by country. (PX1004 at 5-6; PX1199 at 34-36). Because of regional differences in brand awareness, competition, and sales strategies, the parties in this case agree that the appropriate geographic market for evaluating any potential anticompetitive effects of the Transaction should be the United States. (PX1 at 1; PX4 at 5; *see* July 16 Tr. 943:3-24 (Luppino Testimony)).

### 2. The Retail and Pro Sales Channels

There are two primary sales channels for construction adhesives: retail and pro. (PX15 at 9; PX18 at 7). Each serves different end users of construction adhesives, including general contractors, residential remodelers, and do-it-yourselfers ("DIYers"). (July 13 Tr. 84:5-85:2 (Jones Testimony); PX1463 at 45; PX1625 at 2-3; PX2025 at 26). The retail channel includes home centers, independent hardware stores, and mass merchants, while the pro channel is comprised generally of distributors, lumberyards, and specialty dealers. (Luppino Initial Report ¶¶ 47-50, 136; PX15 at 9-10; PX18 at 7-8; PX2025 at 18).

The retail channel accounts for the majority of construction adhesives sales in the United States. In 2024, for example, the retail channel constituted

about [redacted] out of total wholesale sales of about [redacted] for construction adhesive cartridges sold in the United States, or approximately 68 percent of the total dollar amount sold by suppliers of construction adhesives. (*See* Luppino Initial Report ¶¶ 242, Table 10, & 244, Table 11). Within the retail channel, home centers — which are sometimes referred to as "big-box retailers" — play a critical role. (July 13 Tr. 98:20-99:7 (Jones Testimony) (discussing PX1482 at 4 and confirming that according to the document, big box retailers represented 58 percent of the U.S. market for construction adhesives in 2021); July 13 Tr. 188:21-24 (Blackwell Testimony); July 15 Tr. 693:19-23 (Brogan Testimony)). They focus on selling products and services for home improvement projects at their brick-and-mortar locations, though many also offer the option of online shopping. (Luppino Initial Report ¶ 48; July 15 Tr. 541:21-22 (Schneider Testimony); July 20 Tr. 1167:21-25 (Waits Testimony); July 21 Tr. 1415:9-14 (Oakes Testimony)). The brick-and-mortar stores are generally open from 6:00 a.m. to after 5:00 p.m. every day, including on weekends. (*See, e.g.*, July 20 Tr. 1206:1-8 (Waits Testimony)). The three largest and most well-known home centers in the country are Home Depot, Lowe's, and Menards. (Luppino Initial Report ¶ 48). In addition, the retail channel also consists of independent hardware stores, including thousands of franchisees of Ace Hardware, Do It Best, and True Value across

the country, as well as mass merchants like Walmart. (July 13 Tr. 87:10-11 (Jones Testimony); Woods Dep. 51:20-52:3; Luppino Initial Report ¶ 48).[5]

The pro channel, on the other hand, is a smaller and distinct channel comprised of different intermediaries that sell construction adhesives to end users. (July 13 Tr. 159:6-8 (Blackwell Testimony); PX15 at 9-10; PX18 at 7-8; PX2025 at 18; PX2027 at 19; PX2203 at 3-4, 6; PX2213 at 10). Within the pro channel, distributors like Steel & Wire and Orgill are true intermediaries, in the sense that they purchase construction adhesives from suppliers like Henkel and A-Paint and then resell the products to contractors, builders, home centers, hardware stores, dealers, lumberyards, and tradespeople. (July 15 Tr. 690:20-25 (Brogan Testimony); Dardick Dep. 37:17-22, 38:1-15, 46:11-47:5; Luppino Initial Report ¶ 48; PX2025 at 18; PX2203 at 6). They typically do not have storefronts and operate instead out of warehouses so that they can cater to specific product requests made by customers. (July 15 Tr. 692:14-19, 693:2-7 (Brogan Testimony); PX2203 at 6). Lumberyards specialize in selling lumber and other building materials, which can include construction adhesives, to contractors and builders. (Brosius Dep. 7:25-8:10, 37:8-23; Luppino Initial Report ¶ 48). A good example is 84 Lumber, which is Henkel

---

5 The franchisees operate independently in selling a variety of hardware products, but they obtain those products from larger corporate entities such as Ace Hardware, Do It Best, and True Value, which act as distributors in this retail cooperative ("co-op") model. (Woods Dep. 53:5-9, 54:1-55:3; PX 2203 at 4; Luppino Initial Report ¶ 48). Furthermore, mass merchants like Walmart typically operate large-format retail stores that combine a supermarket with a department store to serve as a one-stop shop for customers. (Luppino Initial Report ¶ 48).

Do It Best acquired True Value in 2024. (Woods Dep. 50:8-15).

and A-Paint's largest lumberyard customer with approximately 270 locations. (Brosius Dep. 6:8-13; Luppino Initial Report ¶ 48). And specialty dealers are "specialized supplier[s] of building materials, lumber, and construction products that sell[] directly to professional contractors and builders," such as White Cap and Sherwin-William's paint supply stores. (Luppino Initial Report ¶ 48; PX45 at 1).

The two channels are primarily distinguished by their target end users. Indeed, as Defendants are quick to point out, there is little to no product differentiation between the two sales channels. That is, construction adhesives suppliers like Henkel and A-Paint sell the same brands and products in both the retail and pro channels. (July 14 Tr. 424:23-425:3 (Reginelli Testimony); July 15 Tr. 516:22-517:5 (St. Marie Testimony)). Nevertheless, the channels are distinct because they attract different end users: most DIYers as well as small and medium pros tend to shop for construction adhesives in the retail channel, while large pros usually go through the pro channel. (July 15 Tr. 543:8-20 (Schneider Testimony); July 20 Tr. 1206:12-25 (Waits Testimony); July 21 Tr. 1437:11-1439:25 (Oakes Testimony); PX1433 at 16; PX1481 at 9; PX1622 at 4; PX1625 at 3). DIYers are unlikely to shop outside of the retail channel because the distributors, lumberyards, and specialty dealers that make up the pro channel cater almost exclusively to pros. (July 15 Tr. 690:20-25 (Brogan Testimony); Dardick Dep. 64:24-65:1; Brosius Dep. 9:10-15; DX237 at 1).

There is more crossover between channels among pros, but they, too, are differentiated by size and purpose. (*See, e.g.*, July 13 Tr. 148:23-25 (Jones Testimony) (observing that the lines are "blurring")). Small and medium pros are independent contractors or contractors with relatively small teams that are more likely to be hired for repair and remodel projects. (July 21 Tr. 1439:8-15 (Oakes Testimony); PX2035 at 23). Large pros, on the other hand, are more likely to work on new construction projects and can include national firms with thousands of employees. (PX1433 at 16; PX1481 at 9). Because of their need for larger volumes of product and contractor-centric services, large pros typically buy construction adhesives directly from wholesale distributors or shop for them at lumberyards and specialty dealers. (July 13 Tr. 189:25-191:4 (Blackwell Testimony); Brosius Dep. 11:2-9, 13:16-23; PX18 at 8; PX1127 at 3; PX1481 at 4, 6). However, they can and do shop in the retail channel, but mostly for "fill in" and emergency supplies. (July 13 Tr. 97:4-8 (Jones Testimony); July 15 Tr. 688:22-689:6 (Brogan Testimony); July 20 Tr. 1206:23-25 (Waits Testimony); PX1110 at 3; PX1481 at 6; PX1433 at 16; PX1625 at 2).

**3. The Role of "Big-Box Retailer" Home Centers**

As the Court has already previewed, home centers, or big-box retailers, play a critical role in the construction adhesives industry. Specifically, Home Depot, Lowe's, and Menards, the three largest home centers in the United States, are important both in terms of their significant sales volume of construction adhesives to end users and because they serve as the largest individual customers that purchase from construction adhesives suppliers like

Henkel and A-Paint. (July 21 Tr. 1416:1-8 (Oakes Testimony); Luppino Initial Report ¶¶ 48-50; DX333 ("Bailey Report") ¶ 28, Ex. 1).

Recall that sales in the retail channel accounted for approximately 68 percent of total construction adhesive cartridges sales in the United States in 2024. (*See* Luppino Initial Report ¶¶ 242, Table 10, & 244, Table 11). Within retail, Home Depot, Lowe's, and Menards constituted approximately 91 percent of total sales in 2024. (*See* Luppino Initial Report ¶ 227, Table 8). By multiplying those two percentages, one can calculate the rough share that the three big-box retailers took of sales across all channels in the country — that is, Home Depot, Lowe's, and Menard accounted for roughly 62 percent of all construction adhesives sold in cartridge form in the United States in 2024.[6] Moreover, from the suppliers' perspective, the three home centers also constitute their three most important individual customers. For example, in terms of dollar sales, Home Depot, Lowe's, and Menards accounted for [redacted], respectively, of A-Paint's construction adhesives sales in 2024. (Luppino Initial Report ¶ 50, Table 3).

The three big-box retailers have different physical and geographic footprints. Home Depot has the largest one, boasting 2,298 brick-and-mortar stores across the United States. (July 20 Tr. 1167:21-1168:6 (Waits Testimony); Luppino Initial Report ¶ 48). Lowe's comes in second with over 1,700 brick-and-mortar stores in every state of this country. (July 21

6 The Court acknowledges that its own calculations may not precisely capture the combined shares of the three big-box retailers given the different data sources, namely wholesale versus retail data.

Tr. 1415:9-20 (Oakes Testimony); Luppino Initial Report ¶ 48). And Menards is primarily focused on the Midwest, with over 300 physical locations "spanning as far west as Wyoming, east West Virginia, south Missouri, and up to the Canadian border." (July 15 Tr. 541:21-542:4 (Schneider Testimony); Luppino Initial Report ¶ 48).

As sellers of construction adhesives, however, the home centers share similar characteristics with each other and with other retailers like Ace Hardware, Do It Best, and True Value. Indeed, the retailers all sell construction adhesives in their brick-and-mortar stores, typically on dedicated shelves or bays within the paint department. (July 13 Tr. 160:16-24 (Blackwell Testimony); July 15 Tr. 545:11-14 (Schneider Testimony); July 20 Tr. 1177:2-10 (Waits Testimony); July 21 Tr. 1413:25-1414:2 (Oakes Testimony); PX3013; PX3123 at 68; PX4167 at 89-96).[7] Each shelf is in turn organized by a planogram, which is "a map of the shelf and how … product[s] should be placed." (July 21 Tr. 1429:13-20 (Oakes Testimony); *see* July 15 Tr. 551:13-16 (Schneider Testimony)). The planogram gives direction to store associates regarding product placement and ensures that construction adhesives shelves are set consistently across stores. (July 13 Tr. 160:25-161:3 (Blackwell Testimony); July 21 Tr. 1429:25-1430:5 (Oakes Testimony)). Furthermore, at

[7] Construction adhesives are also sold outside the paint department, such as in the building materials department and in off-shelf locations near the entrance or pro services desk at retailers. (July 14 Tr. 381:8-19 (Reginelli Testimony); Blackwell Decl. ¶ 39). Nevertheless, because the paint department is where end consumers expect to find construction adhesives (*e.g.*, July 15 Tr. 545:11-14 (Schneider)), the Court's analysis in this case focuses on construction adhesives located on shelves in the construction adhesive bay within the paint department at retailers.

home centers and other retailers, end users typically purchase construction adhesives in brick-and-mortar stores — as opposed to online e-retail platforms — out of convenience. (July 15 Tr. 544:9-545:2 (Schneider Testimony); July 15 Tr. 693:24-694:4 (Brogan Testimony); Oakes Dep. 23:15-25; PX2025 at 25).

Home centers serve both DIY and pro end users, with small and medium pros accounting for most of the pro sales there. (July 20 Tr. 1206:12-25 (Waits Testimony); July 21 Tr. 1437:11-13, 1439:4-7, 1439:16-25 (Oakes Testimony); Luppino Initial Report ¶ 174 (estimating that about half of Home Depot's sales in 2025 came from small pros)). Recently, however, several of the home centers have been targeting the pro channel and looking to expand their presence there. (*See, e.g.*, July 13 Tr. 148:24-25 (Jones Testimony)). For example, Home Depot and Lowe's recently acquired pro-distribution businesses and launched specific initiatives to appeal to more pro end users. (*Id.*; July 14 Tr. 383:5-13 (Reginelli Testimony); Oakes Dep. 142:7-143:1; Brogan Decl. ¶ 59; Zambataro Decl. ¶ 69; *see* DX19 at 2). Both also have pro sales forces in the field to help pros place large orders for construction adhesives. (July 14 Tr. 382:18-23 (Reginelli Testimony)).[8]

[8] In April 2026, in part because of the blurring of the line between the pro and retail channels as well as the home centers' targeting of the pro distribution space, Henkel collapsed its retail and pro sales teams in a global reorganization effort. (July 13 Tr. 148:20-149:2 (Jones Testimony); July 15 Tr. 691:1-20 (Brogan Testimony)).

#### 4. The "Good, Better, Best" Spectrum of Construction Adhesives

Retailers implement pricing for construction adhesives according to a "good, better, best" spectrum of construction adhesives. (July 20 Tr. 1188:3-1189:4 (Waits Testimony); July 21 Tr. 1435:9-16 (Oakes Testimony); Luppino Initial Report ¶ 340; Bailey Report ¶ 51). "Good" refers to the lowest or value price option, "better" refers to the mid-range price option, and "best" refers to the higher or highest price option. (Bailey Report ¶ 51). For example, at Home Depot, Lowe's, Menards, and Ace Hardware, "good" construction adhesives are typically $2 to $6 in retail price, "better" ones retail for roughly $6 to $8, and the "best" products usually carry a retail price tag of over $8. (July 16 Tr. 847:5-20 (Shoate Testimony)). The "better" and "best" categories often correlate with higher-quality products, which are in turn more expensive. (Luppino Initial Report ¶ 340). This "good, better, best" spectrum applies to the placement and assortment of construction adhesives in a planogram, especially given limited shelf space at brick-and-mortar retail stores. (Bailey Report ¶ 51).

In addition, the "good, better, best" spectrum also informs a "trade-up" strategy shared by retailers and suppliers. (July 14 Tr. 351:6-13 (Reginelli Testimony); July 15 Tr. 546:18-547:4 (Schneider Testimony); Oakes Dep. 91:17-23; Luppino Initial Report ¶ 341). Also known as "up the continuum," the trade-up strategy aims to move end consumers from lower-priced commodity products to higher-priced hybrid construction adhesives. (July 14 Tr. 351:6-13 (Reginelli Testimony); Luppino Initial Report ¶ 341). This

strategy benefits retailers because it drives higher average unit retail prices. (July 13 Tr. 200:17-19 (Blackwell Testimony); July 20 Tr. 1188:3-9 (Waits Testimony); July 21 Tr. 1436:19-25 (Oakes Testimony)). It also provides advantages to suppliers like Henkel, which are able to sell higher-priced construction adhesives with higher margins in the "better" and "best" categories. (Luppino Initial Report ¶ 342).

**5. Brands in the Construction Adhesives Industry**

In addition to Loctite and Liquid Nails, which are owned by Henkel and A-Paint, respectively (Joint Stip. ¶¶ 5, 13), there are many brands with varying degrees of penetration in the U.S. construction adhesives industry. (July 13 Tr. 138:7-18 (Jones Testimony); Luppino Initial Report ¶¶ 387-411; Bailey Report ¶ 8; *see* Luppino Initial Report ¶ 251, Table 12). They include Gorilla Glue, Titebond, DAP, Sika, Bostik, Red Devil, Sherwin-Williams, Leech, and Flex Glue. (July 20 Tr. 1309:15-17, 1310:7-15, 1321:10-15, 1398:5-6 (Bailey Testimony); Burroughs Decl. ¶¶ 41-51; Luppino Initial Report ¶¶ 387-411; Bailey Report ¶¶ 17, 26; DX326). Below, the Court provides a brief overview of four other brands that were discussed by both sides' experts and mentioned frequently at trial. (*See, e.g.*, Henkel Defendants' Opening Statement 13).

Gorilla Glue is a newcomer in the construction adhesives space, though it is growing rapidly. (July 13 Tr. 140:3-8 (Jones Testimony); Parten Dep. 90:1-9). It currently offers three different SMP construction adhesives at premium price points, and it has plans underway to develop and sell project-specific products, including one for wood paneling. (Blackwell Decl. ¶ 27; Parten

Dep. 14:2-14, 18:17-23, 21:2-3, 21:5-7, 27:5-28:20, 147:9-18, 147:20-21). [redacted]. (Parten Dep. 14:2-14, 21:2-3, 21:5-7, 18:17-23, 147:9-18, 147:20-21). Gorilla Glue construction adhesives have placements in all three major home centers as well as other retailers, lumberyards, and pro distributors. (Bailey Report ¶ 12). In addition to construction adhesives, Gorilla Glue sells traditional glues, tapes, sealants, and adhesives. (Parten Dep. 16:4-13, 90:10-91:14).

Titebond, which is owned by Franklin International, offers a dozen or so construction adhesive products. (Bowen Dep. 12:2-21, 13:8-12; DX291 at 5-7; July 21 Tr. 1460:5-19 (Oakes Testimony); Burroughs Decl. ¶ 49). Many of Titebond's products, including both multi-purpose and project-specific construction adhesives, are at the opening price point. (July 16 Tr. 898:9-14, 900:9-901:2 (Shoate Testimony); PX2182). Titebond also offers a popular FRP product sold in pail form. (Reginelli Decl. ¶ 55). As a brand, Titebond has a strong following among pro shoppers. (July 20 Tr. 1324:9-13 (Bailey Testimony); Condie Decl. ¶ 57; Bailey Report ¶ 91). It is also sold at the three home centers and other major retailers. (Bailey Report ¶ 13).

DAP, a brand name under RPM International, is a leading supplier of caulks, sealants, adhesives, foams, and repair products. (Luppino Initial Report ¶ 388; Bailey Report ¶ 14). It offers about eight different products in construction adhesives. (July 16 Tr. 899:2-5 (Shoates Testimony); Blackwell Decl. ¶¶ 41-46; PX2182). However, none of DAP's construction adhesive

products is currently sold at the three main home centers. (July 15 Tr. 558:20-22 (Schneider Testimony); July 20 Tr. 1228:13-18 (Waits Testimony); July 20 Tr. 1250:20-1251:3 (Wirth Testimony); Luppino Initial Report ¶ 388; *see* PX3012 at 3). In fact, in 2024, Lowe's tested three of DAP's construction adhesives in its highest-selling stores, but it did not select any of DAP's products for placement in Lowe's brick-and-mortar stores. (July 20 Tr. 1263:21-1264:10 (Wirth Testimony); PX3009 at 1-2).[9] DAP estimates that it would take [redacted] to offer a new product. (Wirth Dep. 120:19-121:21; Luppino Initial Report ¶ 388).

Sika is a chemicals company that sells a limited assortment of construction adhesives under its own brand. (July 14 Tr. 408:14-22 (Reginelli Testimony) (discussing a Sika polyurethane product); Walther Dep. 6:12-16; Brogan Decl. ¶ 25; Luppino Initial Report ¶ 394; DX249 at 15). [redacted] (Walther Dep. 45:22-46:9). [redacted]

9 According to Defendants, the reason that Lowe's did not stock DAP's construction adhesives was not because of their underperformance, but because they failed to increase overall category sales. (July 21 Tr. 1465:13-1466:15 (Oakes Testimony)). Regardless of the reason, the DAP test at Lowe's demonstrates that even a well-known caulks-and-sealants brand was unable to leverage its reputation in adjacent categories to penetrate the construction adhesives space.

[redacted]

### C. Henkel and A-Paint Are Giants in the Construction Adhesives Industry

#### 1. Loctite and Liquid Nails Are Leading Construction Adhesives Brands

Despite the presence of many brands, Henkel's Loctite and A-Paint's Liquid Nails are the true behemoths of the industry — indeed, one competitor has described the two brands as "the Coke and the Pepsi of the construction adhesive brands world." (July 20 Tr. 1257:16-1258:5 (Wirth Testimony)). In 2024, Loctite and Liquid Nails accounted for approximately [redacted] and [redacted] respectively, of construction adhesives wholesale sales in the United States. (Luppino Initial Report ¶¶ 49, Table 2, & 50, Table 3). Most of the sales — approximately [redacted] percent for Henkel and [redacted] percent for A-Paint — came from the three home centers. (*Id.*). In comparison, wholesale sales attributable to the next two largest suppliers, Titebond and Gorilla Glue, were approximately [redacted] and [redacted], respectively, in 2024 — each [redacted] of Loctite and Liquid Nails's individual sales. (*Id.* ¶ 244, Table 11).[10]

---

[10] The wholesale revenues for Titebond and Gorilla Glue represented here are underestimates because the numbers come from wholesale manufacturer data for construction adhesives sold in cartridge form in the United States in 2024, meaning that they do not account for construction adhesives sold in other forms. (*See* Luppino Initial Report ¶ 244, Table 11).

In addition to strong sales performance, Loctite and Liquid Nails's leading positions in the construction adhesives industry are exemplified by their brand recognition among competitors, retailers, and end consumers alike. Wisely, "Defendants do not deny that they have strong brands." (Def. Post-Trial FFCL 65). Henkel markets Loctite as "the #1 Construction Adhesive Brand" and the "Trusted Brand for 20+ Years." (July 13 Tr. 72:8-73:3 (Jones Testimony); July 15 Tr. 681:15-18 (Brogan Testimony); PX1021 at 94, 97). Similarly, A-Paint boasts that Liquid Nails is the "#1 brand with Pros across key brand metrics" with "[m]ore than 50 years of experience," "deliver[ing] outstanding long-term durability and adhesion with products formulated to tackle the toughest challenges" since 1968. (PX2025 at 26; PX2200 at 40). In its due diligence on the Liquid Nails asset, AIP described the brand as "the 'Kleenex' of construction adhesives given its ubiquity and brand equity in the space," while Henkel has referred to it as "an iconic brand" with high unaided brand awareness among shoppers at big-box retailers. (July 15 Tr. 611:15-19, 615:5-10 (Dorn Testimony) (discussing PX1403 at 43, PX1005 at 9); PX2245 at 25). Indeed, big-box retailers recognize the importance of branding among end consumers and organize their shelf space and sales strategy accordingly. (*See, e.g.*, July 15 Tr. 567:10-568:3 (Schneider Testimony) (Menards merchant describing construction adhesives as "a bit of a trust-based category" and explaining that "the current brands that take up most of the category today, such as Loctite, PL, and Liquid Nails … resonate with our consumers")).

### 2. Loctite and Liquid Nails Directly Compete with Each Other

Both Loctite and Liquid Nails offer products across the "good, better, best" spectrum. (July 21 Tr. 1435:9-16 (Oakes Testimony); PX1467 at 37 (presenting Loctite's current lineup); PX2045 at 1, 3-5 (presenting Liquid Nails's products in "base," "mid-tier," and premium" price points)). In fact, they are the *only* two suppliers with a full suite of multi-purpose and project-specific construction adhesives. (PX2182 at 3-5). Loctite, for one, offers opening-price-point products such as PL200 and Power Grab All Purpose; mid-tier products such as PL Premium 3x and Power Grab Ultimate; premium products such as PL Premium 8x, Power Grab Ultimate Clear, and PL Premium Max All Purpose; as well as project-specific products for foamboard, subfloor, landscape, and molding and paneling. (PX9162 at 9-13; PX2182 at 3-5; *see* PX2045 at 1). Liquid Nails, for another, offers opening-price-point products such as Heavy Duty and Projects; mid-tier products such as Flex 5x and Fuze*It; premium products such as Fuze*It Max; as well as project-specific products for subfloor, drywall, landscape, and molding and paneling. (PX9162 at 9-13; PX2025 at 39; PX2182 at 3-5; *see* PX2045 at 1).

To be sure, Loctite's business strategy focuses on higher-quality technologies like SMP at premium price points (July 15 Tr. 518:20-25 (St. Marie Testimony); St. Marie Decl. ¶ 28; Blackwell Decl. ¶¶ 79-82; Brogan Decl. ¶ 72), while Liquid Nails is known for its commodity opening-price-point products made primarily of latex and solvents (July 16 Tr. 898:16-20 (Shoate Testimony)). For example, Loctite's best-selling products — PL Premium and

PL Premium Fast Grab, both of which use the polyurethane technology and together account for over [redacted] percent of Henkel's annual construction adhesives sales in the United States — retail between $7.48 and $10.98. (St. Marie Decl. ¶ 30). On the other hand, Liquid Nails's best-selling product is Liquid Nails Heavy Duty, which is sold in either a latex or solvent formula and typically retails for around $3.48 to $3.58. (St. Marie Decl. ¶ 31; Shoate Decl. ¶ 15).

Despite differences in their price-segment focus and relative product strength, Loctite and Liquid Nails compete with each other along the pricing continuum. (July 21 Tr. 1435:9-16 (Oakes Testimony)). That is, as Henkel's long-time consumer adhesives executive acknowledged at trial, there are Loctite and Liquid Nails products that generally "do[] the same thing at the same price." (July 15 Tr. 702:18-20 (Brogan Testimony); Brogan Decl. ¶ 12 (explaining that he led Henkel's consumer adhesives business in North America for approximately 25 years and was recently promoted to Corporate Vice President of Consumer & Construction Americas)).

Among commodity products, Loctite Power Grab, a latex construction adhesive, competes with Liquid Nails Heavy Duty and other opening-price-point offerings. (July 14 Tr. 461:3-462:9 (St. Marie Testimony); PX1535 at 3 (Henkel internal discussion on how to "take more share from LN Projects/Heavy Duty")).[11] In the "better" category, Loctite's best-selling PL

---

[11] [redacted] are other Loctite offerings that compete with Liquid Nails's commodity products, but in discussions predating the Transaction, Henkel considered exiting those products, in part because of challenges in profitability for Henkel and because those products represent less than [redacted] of Henkel's construction adhesives business. (July 20 Tr. 1317:14-19 (Bailey Testimony); Zambataro Decl. ¶ 67).

Premium 3x, a polyurethane product, faces challenges from Liquid Nails's Flex 5x, a hybrid product that A-Paint launched in 2023 specifically to go "head to head" with PL Premium 3x. (PX2184; PX2189; PX2195 at 4-6, 11). For example, A-Paint has recommended that Lowe's reduce facings of Loctite PL Premium 3x in favor of Flex 5x in its stores. (PX2200 at 112). And for the "best" products at the highest price points, Loctite's PL Premium Max, an SMP product, is frequently pitted against Liquid Nails Fuze*It Max, a "copycat" hybrid product that Liquid Nails also launched in 2023 specifically to target and "counter[]" PL Premium Max. (Ziegler Dep. 130:14-22, 131:7-24; PX1265 at 39; PX1534 at 1; PX2041 at 15). Henkel acknowledges that its higher-quality SMP products have lost share to recently introduced Liquid Nails SMP products like Fuze*It Max. (July 14 Tr. 327:19-329:23 (Reginelli Testimony); PX1715 at 4). At the same time, there are no bright lines separating "good, better, best" products, meaning that Loctite and Liquid Nails products at different price points with different purposes — that is, general versus project-specific — can and do compete with each other. (*See, e.g.*, PX2041 at 5 (A-Paint pitching Fuze*It Max as a replacement for Loctite's Power Grab Tub)).

The competition between Loctite and Liquid Nails manifests in at least two ways: shelf space at retailers and pricing. *First*, given that the retail channel constitutes the majority of construction adhesives sales, product presence and placement on retailers' shelves in brick-and-mortar stores are critical for construction adhesives suppliers. (*See, e.g.*, July 21 Tr. 1422:2-5 (Oakes Testimony)). Indeed, competition here matters because if Liquid Nails

gets more shelf space and an end consumer shopping at a big-box retailer sees a brand block of Liquid Nails in a prime position on the construction adhesives shelf, Loctite could lose sales to those Liquid Nails facings. (*Id.*; July 14 Tr. 343:1-8 (Reginelli Testimony); PX1348 at 13 (Henkel internal slide discussing objective to "take unit share away from Liquid Nails")). As the following illustration demonstrates, Loctite and Liquid Nails occupy different shares of and positions on retail shelves:




(PX1021 at 95 (showing Loctite facings in red, Liquid Nails facings in blue, and Gorilla Glue facings in orange at Home Depot and Lowe's)). Nevertheless, because those two brands alone account for roughly 90 percent of shelf space at home centers, one brand's increase in shelf space almost always comes at the expense of the other brand's existing presence and position. (*Id.*; *see, e.g.*,

PX3003 at 31 (Henkel lobbying Lowe's to swap Liquid Nails Paneling for Loctite Power Grab Molding and Paneling)).

*Second*, Loctite and Liquid Nails compete on price. Both brands keep close track of each other's as well as Gorilla Glue's prices in internal competitive reviews. (*E.g.*, PX1101 at 3 (Henkel analysis of Loctite, Liquid Nails, and Gorilla Glue prices); PX1467 at 38 (Henkel comparison of Loctite and Liquid Nails prices); PX2081 (A-Paint's Excel tracker of retail prices); PX2267 (A-Paint analysis of Loctite, Liquid Nails, and Gorilla Glue pricing)). Internally, Henkel has acknowledged that it faces "[c]ontinued pressure from lower-priced competitors such as Liquid Nails" and has in fact lost sales to Liquid Nails with Loctite price increases. (July 15 Tr. 267:10-15, 268:13-18 (Blackwell Testimony); PX1025 at 3). In those circumstances, [redacted] (PX1030 at 3). Similarly, A-Paint has conducted price elasticity studies of Loctite products in setting prices for new Liquid Nails products, including the Flex 5x hybrid product that A-Paint introduced in 2023. (PX2197 at 4, 6, 14, 20). The goal was to ensure that Liquid Nails's new product was adequately "priced to go head to head with [Loctite] PL3X." (PX2195 at 6).

**D. Distinct Features of the Construction Adhesives Industry**

The construction adhesives industry has several distinct features that impact the Court's antitrust analysis and therefore warrant further discussion. To start, brand loyalty drives purchasing decisions for construction adhesives.

In addition, construction adhesives suppliers must bid for shelf space at retailers in a process called the product line review ("PLR"), during which retailers decide what to put on shelves, where products should go on shelves, and whether any category changes should be made. (July 15 Tr. 553:24-554:13 (Schneider Testimony); July 20 Tr. 1179:8-19 (Waits Testimony); July 21 Tr. 1437:1-9, 1446:3-5 (Oakes Testimony)). At the same time, while the PLR process provides substantial leverage to retailers over suppliers, retailers do not necessarily share the same incentives as end consumers of construction adhesives. The Court addresses each in turn.

**1. Brand Is Key**

Brand equity is perhaps the most important factor in driving construction adhesives sales, meaning that brand can be a key barrier to robust competition among suppliers. (PX1021 at 97; PX2025 at 31; PX2197 at 17). Indeed, market research demonstrates that the "[b]rand of the construction adhesive has the most effect on purchase intent." (PX2197 at 17 (Farnsworth analysis)). At home centers, for example, brands outside of Loctite, Liquid Nails, and Gorilla Glue have failed to obtain any meaningful shelf space in the construction adhesives bay. (Luppino Initial Report ¶¶ 298-299, 301, 380; *see* PX1021 at 95). That is in large part because retailers know that end consumers resonate with those three brands but not with others. (July 15 Tr. 568:25-569:9 (Schneider Testimony) (explaining that brand is relevant to Menards's decisions about what to stock on their shelves); July 20 Tr. 1214:18-1215:2, 1219:13-1220:3, 1225:7-10, 1229:2-7, 1232:21-24 (Waits

Testimony); Waits Dep. 127:1-6; PX3006 at 3). In other words, the brands with "holding power" — such as Loctite and Liquid Nails — are able to keep their key shelf placements. (July 20 Tr. 1223:6-14 (Waits Testimony); PX3006).

Brand strength takes time and financial investment to build. (July 20 Tr. 1258:7-15 (Wirth Testimony) (explaining that brand is built "through good user experiences over time," such that end consumers "can rely on [the brand] and expect the results")). During Project Clipper's due diligence, Henkel explained that it was interested in acquiring A-Paint in part because "[i]t would be very difficult to organically replicate the brand equity Liquid Nails has established over 50 years," especially given Liquid Nails's "very loyal professional end user target group." (PX1005 at 4). Moreover, brand equity requires significant marketing expenditures and other financial investments. Gorilla Glue, a newcomer in the space that introduced its first construction adhesive product in 2015, spent approximately $100 million on advertising in 2023 — roughly seven times Henkel's advertising budget for the same year. (July 14 Tr. 365:17-366:1 (Reginelli Testimony); Parten Dep. 90:1-9; PX1033 at 16).

In addition, brand equity is specific to the construction adhesives industry. Brands with strong recognition in adjacent categories like caulks and sealants have not been able to leverage their brand strength and penetrate construction adhesives using brand alone. (*E.g.*, July 20 Tr. 1259:18-1260:11 (Wirth Testimony) (discussing DAP); July 16 Tr. 802:25-803:5, 804:2-5, 810:7-17 (Krebs Testimony) (discussing Sherwin-Williams); July 15 Tr. 686:23-687:9

(Brogan Testimony) (discussing Sika as part of PX1005 at 6)). As one example, DAP is a widely recognized brand in caulks and sealants, but its attempt to leverage brand equity in those adjacent categories by rebranding its construction adhesives packaging to more closely mirror those used for its caulks and sealants did not lead to increased placements at retailers. (July 20 Tr. 1259:18-21, 1260:24-1261:19, 1263:10-1264:10, 1266:9-23 (Wirth Testimony); PX3084). As another example, Sherwin-Williams's White Lightning brand is a global leader in caulks and sealants, but its brand awareness has not helped its latex-based construction adhesive, White Lightning Speed Grip, take off. (July 16 Tr. 801:25-803:5, 803:10-13, 804:2-5, 810:7-17 (Krebs Testimony)). In fact, even though Sherwin-Williams enjoys a strategic relationship with Lowe's, the latter eliminated White Lightning Speed Grip from its shelves in 2024 because White Lightning had little to no brand recognition as a construction adhesive and was performing poorly in terms of sales. (July 16 Tr. 805:3-809:3, 811:13-812:3 (Krebs Testimony); July 21 Tr. 1426:22-1428:5 (Oakes Testimony)). Even Henkel has decided to exit construction adhesives marketed under the OSI brand, which is "really strong" in sealants. (July 14 Tr. 440:19-21 (Reginelli Testimony); July 15 Tr. 682:11-24 (Brogan Testimony)).

Indeed, brand is so key to construction adhesives that none of the three largest home centers offers any product under its own label, which is also known as "private label." (July 15 Tr. 568:25-569:9 (Schneider Testimony); July 20 Tr. 1227:10-12, 1227:16-21 (Waits Testimony); July 21 Tr. 1440:1-6

(Oakes Testimony)). During his deposition, the Lowe's merchant explained that Lowe's does not sell private-label construction adhesives [redacted] (July 21 Tr. 1440:13-1441:2 (Oakes Testimony); Oakes Dep. 49:17-50:22). Similarly, at trial, the Menards merchant described the idea of launching a Menards private label as "starting over … in a sense … [because] the Henkel items and the Liquid Nails items resonate so well on the market today with our customer and other brands don't." (July 15 Tr. 568:25-569:9 (Schneider Testimony)).

### 2. Suppliers Bid for Shelf Space at Retailers' Product Line Reviews

Retailers organize shelf space in their brick-and-mortar stores according to the planogram, which provides direction for product placement and ensures consistency across stores. (July 13 Tr. 160:25-161:3 (Blackwell Testimony); July 21 Tr. 1429:13-20, 1429:25-1430:5 (Oakes Testimony)). In the construction adhesives industry, the planogram is set and updated every few years during the PLR process, which is usually run by each retailer's paint department. (July 13 Tr. 161:13-24 (Blackwell Testimony); July 15 Tr. 542:21-23, 545:3-5, 553:24-554:13 (Schneider Testimony); July 20 Tr. 1168:7-16, 1179:8-1180:9 (Waits Testimony); July 21 Tr. 1415:6-8, 1446:2-5, 1437:1-9 (Oakes Testimony); PX1021 at 1). Retailers may make minor changes to their shelf space between PLRs, but major changes to the planogram take place only during the PLR process. (July 21 Tr. 1437:1-9, 1448:5-14 (Oakes Testimony); *see* July 15 Tr. 554:5-13 (Schneider Testimony); July 20 Tr. 1181:1-11 (Waits

Testimony) (explaining that apart from PLRs, Home Depot sometimes conducts rapid business reviews to consider other suppliers and opportunities)).

From the retailers' perspective, the planogram should contribute to sales velocity or productivity — that is, retailers want to organize their shelves in such a way that products will fly off the shelves and the amount of retail sales will increase. (July 15 Tr. 567:5-7 (Schneider Testimony); July 20 Tr. 1221:5-10 (Waits Testimony); July 21 Tr. 1427:11-23, 1430:20-1431:8 (Oakes Testimony) ("[T]ypically speaking, you are going to allocate that space to … the proven winners and … the top-selling items.")). Similarly, from the suppliers' perspective, some of the most critical steps to increasing construction adhesives sales are getting on the shelf, increasing their shelf space, and occupying prime positions on the planogram. (July 13 Tr. 161:4-10 (Blackwell Testimony); PX1068 at 2).

Unsurprisingly, the PLR is a meticulous and competitive bidding process, during which construction adhesives suppliers make detailed presentations about their own products and suggest changes to the planogram as a whole, all of which impact shelf space, pricing, and market shares. (*E.g.*, July 20 Tr. 1179:25-1180:9 (Waits Testimony) (explaining that Home Depot's PLR takes place in 12 weeks, with nationwide reset completed over the course of four to six months); July 21 Tr. 1445:2-6 (Oakes Testimony) (explaining that Lowe's PLR can last around six to nine months); PX1467; PX1463; PX1613; PX2025; PX2179; PX3003). For example, Lowe's conducted its most recent PLR in 2024, during which Loctite, Liquid Nails, Gorilla Glue, Titebond, DAP, Flex

Seal, and Sherwin-Williams were invited to submit presentations. (July 21 Tr. 1414:18-21, 1425:1-12 (Oakes Testimony)). The results of the PLR were disappointing for every supplier except Loctite, Liquid Nails, and Gorilla Glue. Lowe's dropped existing Flex Seal and Sherwin-Williams products due to their poor performance. (July 16 Tr. 805:3-806:16 (Krebs Testimony); July 21 Tr. 1427:6-1429:6 (Oakes Testimony)). Moreover, Lowe's did not move forward with any products pitched by DAP, and it stocked only FRP buckets from Titebond despite the supplier's pitch of a full lineup of construction adhesives products. (July 21 Tr. 1425:13-1426:8, 1460:5-1461:3 (Oakes Testimony); DX297 at 42-44). Loctite and Liquid Nails, on the other hand, both won some and lost some in their competition with each other. Lowe's eliminated Liquid Nails Paneling and replaced it with Loctite Power Grab Molding and Paneling; but Lowe's also decided to continue stocking Liquid Nails's Fuze*It and Fuze*It Max despite Loctite's lobbying against them as duplicative offerings. (July 13 Tr. 177:7-14, 178:4-12, 179:13-22 (Blackwell Testimony); July 21 Tr. 1423:5-22 (Oakes Testimony); PX3012 at 3).

As another example, Menards conducted its most recent PLR in 2025. (July 15 Tr. 553:19-21, 564:21-25 (Schneider Testimony)). Similar to Lowe's, Menards invited a combination of incumbent suppliers — namely Loctite, Liquid Nails, and Gorilla Glue — as well as other suppliers who may or may not be in the construction adhesives space. (*Id.* at 554:14-557:10 (explaining that the other suppliers are on an administrative list that is considered more exploratory, meaning that Menards does not expect any of them to even make a

construction adhesive or supply the volume that Menards typically requires)). The only new supplier that Menards added as a result of the PLR process was Red Devil, which now has a commodity product on Menards's planogram. (*Id.* at 563:7-564:16; *see* PX3064 at 1). Most of the other changes were swaps, additions, and eliminations of Loctite and Liquid Nails products. (PX3064 at 1). For example, Menards removed Loctite's PL 100 in favor of Liquid Nails Drywall, swapped the 28-ounce Loctite PL 400 for Liquid Nails's subfloor product in the same size, and removed the 10-ounce Loctite PL 400 in favor of Liquid Nails's subfloor product in the same size. (July 15 Tr. 561:10-18, 563:22-564:5 (Schneider Testimony) (discussing PX3064)). As a result of the 2025 PLR, Loctite and Liquid Nails now constitute more than two-thirds of the Menards construction adhesives planogram, which features only one Red Devil product and three Gorilla Glue products outside of those two brands. (*Id.* at 563:7-564:16).

Through the PLR process, retailers can exert substantial leverage over construction adhesives suppliers. (*See* July 20 Tr. 1302:1-10 (Bailey Testimony)). Indeed, retailers and suppliers often engage in "multiple conversations" and "negotiations," during which retailers may tell suppliers about their competitors' proposals as well as pit suppliers against each other to secure lower wholesale costs. (July 14 Tr. 377:15-20 (Reginelli Testimony); July 21 Tr. 1446:3-19 (Oakes Testimony)). Moreover, suppliers do not have full visibility into other suppliers who are also participating in a given PLR, especially given that the PLR process is not limited to incumbents. (July 13

Tr. 210:24-211:6 (Blackwell Testimony); July 20 Tr. 1179:15-1180:9, 1175:11-15 (Waits Testimony) (explaining that Home Depot's PLRs are open "to anyone who's interested in presenting to the merchant and the team their products, their innovation, their pricing"); July 21 Tr. 1451:16-1452:5 (Oakes Testimony); Zambataro Decl. ¶ 52; Blackwell Decl. ¶ 21; Brogan Decl. ¶ 54). As a result, suppliers understand that suggestions of wholesale price increases may negatively impact their pitches during the PLR process. (*See* July 21 Tr. 1446:3-1447:6 (Oakes Testimony)). In fact, at Menards's latest PLR in 2025, Henkel lowered prices on its construction adhesives because Menards leveraged another unnamed supplier on pricing. (July 13 Tr. 144:5-145:4, 146:16-20, 156:21-157:1 (Jones Testimony); DX45 at 1).

**3. Retailer and End Consumer Incentives Are Not Aligned**

Despite the leverage that retailers have over construction adhesives suppliers through the PLR process and the broader importance of the retail channel, the incentives of retailers are not necessarily aligned with those of end consumers in at least two ways. *First*, unlike end consumers, retailers do not necessarily shun price increases because wholesale and retail pricing are two separate considerations. Wholesale prices — or wholesale costs to retailers for purchasing construction adhesives from suppliers — are monitored closely by retailers, which require suppliers to provide a detailed cost justification and engage in a sophisticated process if suppliers wish to increase wholesale prices. (July 15 Tr. 708:1-3 (Brogan Testimony); Borgan Decl. ¶¶ 44-45; Reginelli Decl. ¶¶ 40-41; Blackwell Decl. ¶¶ 57-58; Zambataro Decl. ¶¶ 24-25; Burroughs

Decl. ¶ 90; Gatesy Decl. ¶¶ 19, 35). In the past few decades, Henkel has never passed a price increase to Home Depot or Lowe's without an increase in cost. (July 15 Tr. 757:11-17 (Brogan Testimony)). And from Henkel's perspective, cost justification can be a "long and painful process" involving "months and months of negotiation back and forth with [retailers'] finance team" and often leading to disappointing results for Henkel. (July 14 Tr. 250:19-251:1 (Blackwell Testimony)). At Home Depot, for example, the cost justification process requires suppliers to submit information such as raw material costs as well as transportation and packaging costs, which information is analyzed closely by Home Depot's internal cost finance team. (July 20 Tr. 1171:6-12 (Waits Testimony); Zambataro Decl. ¶¶ 28, 34; DX57).

Retailers like the three largest home centers can and have rejected or made downward adjustments to price increase requests from Henkel and A-Paint in the past. Examples abound of Home Depot pushing back and decreasing the amount of Henkel's proposed price increases, rejecting A-Paint's requests altogether, and asking Henkel to lower prices when raw materials dropped in costs. (July 20 Tr. 1171:13-16 (Waits Testimony); Zambataro Decl. ¶ 37; Burroughs Decl. ¶ 79; DX192 at 10). In fact, Henkel has requested a price increase with Home Depot only five times since 2011, all because of cost increases due to COVID-19, tariffs, and other historic events. (Zambataro Decl. ¶¶ 25-26). Similarly, Lowe's accepted Henkel's tariff-justified price increase only after Henkel agreed to offsetting commitments in marketing contributions and rebates (Blackwell Decl. ¶¶ 69-73; DX63; DX64; DX67; DX68), and Lowe's

accepted a price increase from Liquid Nails that was lower than what the supplier had requested (Burroughs Decl. ¶ 83; DX110; DX190). Menards has similarly pushed Liquid Nails to reduce pricing on several products. (Burroughs Decl. ¶ 67; DX219; DX220).

Nevertheless, retailers have control over retail prices charged to end consumers and are incentivized to raise them when suppliers increase wholesale prices. Indeed, each of the three home centers enjoys healthy retail margins on construction adhesives sold to end consumers — 40 to 70 percent for Home Depot and Lowe's, and [redacted] percent for Menards. (July 14 Tr. 360:4-9 (Reginelli Testimony); DX277 at 1). To maintain or even boost their margins, retailers have passed on supplier wholesale price increases to end users by increasing retail prices of the products at issue or through portfolio price increases, which mean raising the prices of other products. (July 21 Tr. 1420:22-1422:1 (Oakes Testimony); *see, e.g.*, July 14 Tr. 360:19-362:2 (Reginelli Testimony); PX1668 at 3). When Lowe's accepted Liquid Nails's price increase requests on [redacted] products in 2024, for example, Lowe's increased retail prices for [redacted] products and improved its own retail margin per unit. (July 16 Tr. 977:21-978:13 (Luppino Testimony); PX6114). Moreover, [redacted] (*See, e.g.*, PX1499 at 70 ([redacted]); PX2025 at 38 ([redacted])).

*Second*, retailers and end consumers are not aligned on portfolio rationalization, a term used here to describe the evaluation and streamlining of product choices in the construction adhesives category. Unlike many end consumers, retailers prefer simple brand assortments. (July 20 Tr. 1389:3-16 (Bailey Testimony)). Because of limited shelf space in brick-and-mortar stores, retailers pursue a trade-up strategy to encourage end users to move from the opening price point to more premium products with higher margins and are therefore incentivized to reduce the number of stock keeping units ("SKUs") in favor of a more profitable portfolio. (July 13 Tr. 200:20-23 (Blackwell Testimony); July 14 Tr. 345:3-17 (Reginelli Testimony)). In fact, Henkel has encouraged retailers to trade up from Liquid Nails commodity products to Loctite's more premium offerings to the detriment of consumer choice. (PX1021 at 96; PX1210 at 6; PX1331 at 1; PX1463 at 54). At the same time, Henkel and A-Paint remain safe from portfolio rationalization because most retailers would never fully eliminate the Loctite and Liquid Nails product lines from their stores. (July 15 Tr. 597:21-598:7 (Schneider Testimony) (Menards merchant explaining that "the discontinuation of a brand like Liquid Nails … [would require] something significant … to happen to warrant that"); July 21 Tr. 1434:12-1435:2 (Oakes Testimony) (Lowe's merchant explaining that eliminating both brands "would create a tremendous amount of sales risk to the category")).

**E. Deal Rationale and Possible Effects of the Proposed Acquisition**

A primary rationale behind Henkel's acquisition of A-Paint is to "shore up all [construction] adhesive sets and eliminate/block all other brand positions." (PX1016 at 2). By acquiring Liquid Nails, Henkel would be able to [redacted] (July 14 Tr. 354:18-355:20 (Reginelli Testimony); Reginelli Dep. 220:20-221:8; PX1005 at 5-7, 9-10; PX1189 at 1). In addition, Henkel sees a "[b]ig opportunity to move the market out of OPP [opening price point]" and push for higher quality, price, and margin products through the trade-up strategy shared with retailers. (PX1016 at 2; PX1189 at 1).[12] Considering the evidence presented during trial, the Court agrees with the FTC that the possible effects of the Transaction include price increases and SKU eliminations from portfolio rationalization, though it does not believe that innovation will suffer.

To start, while Henkel's modeling and business plans for the Transaction do not currently include any wholesale or retail price increases (July 15 Tr. 638:1-9 (Dorn Testimony); July 15 Tr. 742:1-4, 749:15-19 (Brogan

---

[12] At trial, several witnesses suggested that the Transaction is motivated by Liquid Nails's underinvested status and Henkel's desire to save and grow an otherwise iconic brand. (*See, e.g.*, July 15 Tr. 627:16-21 (Dorn Testimony) ("I mean, the business thesis for us, we've seen an iconic brand which was underinvested, and by underinvested, we mean lack of resources for innovation, also not brand and marketing campaigns activation, training to the end user and the pros who use that product. We felt there that is something that we can rejuvenate.")). That may be an important rationale behind the Transaction, but it is not mutually exclusive with Henkel's motivation to shore up its construction adhesives portfolio and block other brands. In fact, by acquiring and growing Liquid Nails, Henkel may be able to better achieve its competition-driven goals.

Testimony); Dorn Decl. ¶ 42; Boone Dep. 91:24-92:11; DX8 at 19), there is a non-zero possibility that the combined Henkel entity, which would have greater bargaining leverage with retailers (*see* PX1189 at 1), may pursue such increases in the future. Precisely for this reason, smaller retailers like Menards are concerned that if "Henkel raises their price, [retailers like Menards] don't necessarily have a lot of recourse to go get something fast and quick to fill [their] shelves" and "might have to raise [their] prices to [their] consumers, which could have a ripple effect on other projects[.]" (July 15 Tr. 570:15-571:13 (Schneider Testimony)). To be sure, Home Depot, the largest home center, does not believe that the Transaction will have a negative impact on it or its shoppers. (July 20 Tr. 1174:8-24 (Waits Testimony)). But even Mr. Waits implied at trial that Home Depot may accept cost-justified price increases requested by the combined Henkel entity, and he said nothing about Home Depot's own plans for raising retail prices and margins. (*See id.* at 1174:25-1175:7). This risk of price hikes is more than speculative, because retailers understand that end consumers are unlikely to stop purchasing construction adhesives, even with a 40-percent price increase. (*E.g.*, July 21 Tr. 1423:9-22 (Oakes Testimony) (adopting Henkel's proposal to eliminate Liquid Nails product for a Loctite product that is $2 more expensive); PX3003 at 31).

Moreover, the Transaction is likely to impact portfolio rationalization in that it could reduce the number of SKUs and thus consumer choice in the construction adhesives category. Again, Henkel professes not to have any current plans to remove specific Loctite or Liquid Nails products after (and as a

result of) the Transaction. (Brogan Decl. ¶ 82; *see* July 15 Tr. 755:6-12 (Brogan Testimony) ("[N]o plan to eliminate any of the top performing items or even items our customers want to keep.")). And in general, Henkel has not removed a product without input from its major retail customers. (July 14 Tr. 437:1-4 (Reginelli Testimony)). However, given that retailers are incentivized to increase their returns through consolidated assortments (*id.* 345:7-17), SKU eliminations can easily take place with retailer approval after the Transaction is consummated. For example, internal discussions are already underway at Henkel about the possibility of streamlining the two brands' subfloor offerings and choosing one subfloor product over another. (July 14 Tr. 357:2-358:14 (Reginelli Testimony); PX1236 at 3). And Henkel routinely includes proposals for reducing SKUs in its PLR submissions, often at the request of retailers. (*E.g.*, July 13 Tr. 120:14-122:20, 122:21-124:4 (Jones Testimony) (discussing PX1467 at 38 and PX1613 at 33); PX3003 at 59; PX1463 at 86). The Court recognizes that Henkel has recommended eliminating its own Loctite products in favor of portfolio rationalization in the past. (*See, e.g.*, July 21 Tr. 1455:10-1456:7 (Oakes Testimony) (Henkel working together with Lowe's to remove PL375 and PL400)). But the possible effects of the Transaction include the risk that the combined Henkel entity may eliminate products beyond those that have become obsolete because of innovation or bad performance. (*See* Zambataro Decl. ¶ 67 (explaining that Henkel was already considering phasing out [redacted] because of poor profitability)).

By contrast, the evidence at trial suggests that innovation is *not* likely to be negatively impacted by the Transaction. Henkel's due diligence reflects that Liquid Nails is an underinvested and undermarketed brand owned by a company that is focused on its larger paint business. (July 15 Tr. 752:19-753:1 (Brogan Testimony); Brogan Decl. ¶ 79; DX7 at 2). Both its R&D and marketing groups have reduced in size under current management, which has "pull[ed] resources away from the [Liquid Nails] brand and the overall technology." (July 17 Tr. 1083:9-12 (Burroughs Testimony)). Consequently, Henkel plans to make capital investments in Liquid Nails's plant and double Liquid Nails's marketing spend. (July 15 Tr. 640:4-12 (Dorn Testimony) (explaining that Henkel sees "opportunities to invest both in innovation and marketing activities"); July 15 Tr. 753:2-4 (Brogan Testimony); Brogan Decl. ¶ 80; DX6; DX8 at 17). In fact, Henkel has earmarked approximately [redacted] and [redacted] for capital expenditure ("CapEx") investments and expansion, respectively, over the next decade. (DX8 at 20, 36). From a product perspective, such proposed CapEx increases could help Liquid Nails expand both its manufacturing capacity and its ability to manufacture construction adhesives of different technologies. (*See, e.g.*, July 17 Tr. 1111:12-24 (Condie Testimony) (explaining that Liquid Nails's solvent mixers at its Temple, Texas plant could be used to make latex products with "very little investment")).[13]

[13] As a preemptive strike, the FTC argues that any purported efficiencies or synergies resulting from the Transaction would be speculative. (FTC Post-Trial FFCL 72-73).

## CONCLUSIONS OF LAW

Applying the three-step *Baker Hughes* burden-shifting framework, the Court determines that the proposed acquisition must be enjoined at step two. That is, the FTC has established a *prima facie* case that Defendants fail to rebut. But even if the Court were to find that Defendants had advanced a successful rebuttal, the Transaction would still be enjoined at step three because the FTC has produced sufficient additional evidence of anticompetitive harm.

### A. The FTC Has Established a *Prima Facie* Case

At step one of the *Baker Hughes* burden-shifting framework, the FTC must establish a *prima facie* case that the merger is presumptively illegal by (i) defining a relevant market and (ii) showing that the effect of the merger is likely to be anticompetitive in that market. *Tapestry*, 755 F. Supp. 3d at 408; *IQVIA*, 710 F. Supp. 3d at 352. The Court determines that the FTC has carried its initial burden of production — that is, it has shown that the proposed acquisition creates a presumptively illegal increase in undue market concentration and eliminates substantial head-to-head competition in the market for construction adhesive cartridges sold in the retail channel in the United States.

---

However, because Defendants do not make any efficiency-based arguments, the Court does not address them here.

### 1. There Is a Relevant Market for Construction Adhesive Cartridges Sold in the Retail Channel in the United States

As the Supreme Court has explained, "determination of the relevant market is a necessary predicate to a finding of a violation of the Clayton Act because the threatened monopoly must be one which will substantially lessen competition within the area of effective competition," which can be determined "only in terms of the market affected." *Brown Shoe*, 370 U.S. at 324 (alteration adopted and internal quotation marks omitted) (quoting *United States* v. *E. I. du Pont de Nemours & Co.*, 353 U.S. 586, 593 (1957)). In particular, the "area of effective competition" includes two components — "a product market (the line of commerce) and a geographic market (the section of the country)." *Id.* (internal quotation marks omitted). In this case, the parties agree that the relevant geographic market is the United States. (PX1 at 1; PX4 at 5; *see* July 16 Tr. 943:3-24 (Luppino Testimony); *supra* Findings of Fact B.1). Therefore, the Court focuses its analysis on the relevant product market definition.

The "outer boundaries" of the relevant product market are determined by "the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe*, 370 U.S. at 325; *see also Regeneron Pharms., Inc.* v. *Novartis Pharma AG*, 96 F.4th 327, 339 (2d Cir. 2024) (explaining that cross-elasticity of demand measures whether "consumers would respond to a slight increase in the price of one product by switching to another product" (internal quotation marks omitted) (quoting *Todd* v. *Exxon Corp.*, 275 F.3d 191, 201-02 (2d Cir. 2001) (Sotomayor,

J.))). Within this broad market, "well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes." *Brown Shoe*, 370 U.S. at 325. The purpose of this exercise is "to identify the market participants and competitive pressures that restrain an individual firm's ability to raise prices or restrict output." *Geneva Pharms. Tech. Corp.* v. *Barr Lab'ys Inc.*, 386 F.3d 485, 496 (2d Cir. 2004); *see also FTC* v. *Staples, Inc.*, 970 F. Supp. 1066, 1074 (D.D.C. 1997) ("[T]he general question is 'whether two products can be used for the same purpose, and if so, whether and to what extent purchasers are willing to substitute one for the other.'" (quoting *Hayden Publ'g Co., Inc.* v. *Cox Broad. Corp.*, 730 F.2d 64, 70 n.8 (2d Cir. 1984))).

Moreover, courts consider "both quantitative and qualitative evidence in defining the relevant product market." *IQVIA*, 710 F. Supp. 3d at 353. For example, courts often look to the "practical indicia" of market boundaries, also known as the *Brown Shoe* factors, "to identify whether two products are economic substitutes and compete within the same antitrust market." *Regeneron Pharms.*, 96 F.4th at 339; *Tapestry*, 755 F. Supp. 3d at 414. In addition, "[a] common quantitative metric used by parties and courts to determine relevant markets is the Hypothetical Monopolist Test ('HMT')," *FTC* v. *Meta Platforms Inc.*, 654 F. Supp. 3d 892, 912 (N.D. Cal. 2023), which asks "whether eliminating the competition among the group of products by combining them under the control of a hypothetical monopolist likely would lead to a worsening of terms for customers" (Luppino Initial Report ¶ 59 (internal quotation marks omitted) (quoting U.S. Dep't of Just. & Fed. Trade

Comm'n, *Merger Guidelines* (the "2023 Merger Guidelines") § 4.3A (2023))).[14] There is "no requirement to use any specific methodology in defining the relevant market." *Optronic Techs., Inc.* v. *Ningbo Sunny Elec. Co., Ltd.*, 20 F.4th 466, 482 (9th Cir. 2021). "As such, courts have determined relevant antitrust markets using, for example, only the *Brown Shoe* factors, or a combination of the *Brown Shoe* factors and the HMT." *Meta Platforms*, 654 F. Supp. 3d at 912. Ultimately, "market definition is a deeply fact-intensive inquiry," *Todd*, 275 F.3d at 199, requiring courts to examine the details of each case and the "commercial realities of the industry" at issue, *Brown Shoe*, 370 U.S. at 336 (internal quotation marks and citation omitted).

Here, relying heavily on the expert testimony of Dr. Marc Luppino, the FTC proposes a product market for construction adhesive cartridges sold in the retail channel. (FTC Post-Trial FFCL 76; FTC Pretrial MOL 6). According to the FTC, both the *Brown Shoe* factors as well as Dr. Luppino's HMT analysis support this market definition. (FTC Post-Trial FFCL 81-86; FTC Pretrial MOL 8-13). Defendants disagree, putting forth the testimony of their own expert, Dr. Elizabeth Bailey, to show that the FTC's proposed product market definition is invalid. (Def. Pretrial MOL 6). Specifically, Defendants argue that the FTC's definition is overinclusive in that it improperly groups together nearly

---

[14] The Court recognizes that the Guidelines, as with any agency pronouncement, are not binding on the Court. Nevertheless, in line with Supreme Court precedent and in keeping with its sister courts, the Court finds them persuasive on the topics discussed in this Opinion. *See Skidmore* v. *Swift & Co.*, 323 U.S. 134, 140 (1944); *FTC* v. *Tapestry, Inc.*, 755 F. Supp. 3d 386, 412 n.3 (S.D.N.Y. 2024) ("In this opinion, the Court considers statements in the 2023 Merger Guidelines to the extent that the Court finds them persuasive — recognizing, of course, that the Guidelines are nonbinding.").

all construction adhesives into a single market (regardless of chemistry, application, price, or quality), and that it is also underinclusive because it is improperly limited to retailers. (Def. Post-Trial FFCL 96-106; Def. Pretrial MOL 15-22). The Court determines that there is a relevant market for construction adhesive cartridges sold in the retail channel based on both qualitative and quantitative evidence.[15]

#### a. Qualitative Evidence Supports the FTC's Proposed Market Definition

The Court starts by examining the *Brown Shoe* factors, namely the "practical indicia" consisting of "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Brown Shoe*, 370 U.S. at 325. The Court notes that the *Brown Shoe* factors are not meant to be "mandatory" or "exhaustive" — that is, "the presence of some, and absence of others, is not dispositive." *Alaska Elec. Pension Fund* v. *Bank of Am. Corp.*, 306 F. Supp. 3d 610, 620 (S.D.N.Y. 2018) (internal quotation marks omitted) (quoting *Se. Mo. Hosp.* v. *C.R. Bard, Inc.*, 642 F.3d 608, 614 (8th Cir. 2011)).

---

15 The FTC contends that there is also a broader relevant antitrust market for "all construction adhesives sold in the United States, irrespective of sales channel[.]" (FTC Post-Trial FFCL 85). Because the Court agrees that there is a narrower relevant market for construction adhesive cartridges sold in the retail channel, it also accepts the broader market encompassing the relevant submarket. *See, e.g.*, *FTC* v. *Sysco Corp.*, 113 F. Supp. 3d 1, 37, 40 (D.D.C. 2015) (finding both a broad market of "broadline distribution" as well as a narrower submarket of "broadline distribution to national customers").

*First*, the construction adhesives industry recognizes construction adhesive cartridges sold in the retail channel as a distinct market. (*See* FTC Post-Trial FFCL 84-85; FTC Pre-Trial MOL 10). Regarding the cartridge form, there is broad industry recognition of construction adhesive cartridges as a distinct product because of its popularity, specific application method (requiring a caulking gun), and the production of a precise bead. (*See supra* Findings of Fact B.1; July 16 Tr. 944:16-945:11 (Luppino Testimony); Bowen Dep. 35:14-37:1 (explaining that FRP products are not meant to be used interchangeably with construction adhesive cartridges because FRP requires the use of a trowel as well as complete surface coverage)).

In addition, the industry recognizes retail as its own market. Defendants themselves have long treated, analyzed, and strategized about retail as a distinct channel. (*E.g.*, July 13 Tr. 74:8-75:11 (Jones Testimony) (explaining that Henkel uses a third-party data source to track market shares in the retail channel); PX1403 at 43 (Henkel analyzing Liquid Nails's retail and pro sales split); PX1480 (discussing Henkel's retail sales channel strategy); PX2195 at 4 (A-Paint discussing the "retail category"); PX1622 at 3-4 (Henkel analyzing retail and pro as different channels); PX2045 (A-Paint tracking construction adhesives pricing among retailers)). Before Henkel's April 2026 global reorganization, both Henkel and A-Paint had sales teams dedicated to retail customers for construction adhesives. (*E.g.*, PX1662 at 17 (showing Henkel's sales organization for retail versus pro); PX2088 at 5 (showing A-Paint's "Retail Team")). Those sales teams employed retail-specific strategies, including store

visits with regional managers and store associates, that would not apply to lumberyards, distributors, and dealers without consumer-facing storefronts. (July 15 Tr. 692:5-13 (Brogan Testimony); PX2198; PX2270 at 10). Moreover, Defendants' view of retail as a separate market is shared by other construction adhesives players, including Gorilla Glue, Titebond, and DAP. (PX3002 (Gorilla Glue); PX3118 at 4-5 (Titebond); PX3008 at 3 (DAP)). The Court's factual findings further underscore the distinction between the retail and pro sales channels. (*See supra* Findings of Fact B.2).

*Second*, the proposed market has peculiar characteristics. (*See* FTC Post-Trial FFCL 82-83). Unlike lumberyards, distributors, and dealers in the pro channel, retailers sell construction adhesives in dedicated bays with limited shelf space in consumer-facing brick-and-mortar stores. (PX1467 at 89-96; PX3123 at 68; *supra* Findings of Fact B.2-3). Because of that retail-specific setup, the Court has found that one distinct feature of the construction adhesives industry is that suppliers must bid for shelf space on retailers' planogram through the PLR process. (*Supra* Findings of Fact D.2). There is no equivalent PLR process for determining shelf space, pricing, and other sales-related considerations in the pro channel, where customers operate lumberyards and warehouses instead of retail stores. (Dardick Dep. 37:17-22, 38:1-15, 47:8-48:3; Brosius Dep. 37:8-23, 38:11-20).

*Third*, the proposed market attracts distinct customers, namely DIYers as well as small and medium pros. (*See* FTC Post-Trial FFCL 83-84). Indeed, the Court has found that the retail and pro channels are distinguished by their

different end users. (*Supra* Findings of Fact B.2). DIYers are unlikely to shop outside of the retail channel because lumberyards, distributors, and dealers do not operate retail stores. And while there may be more crossover among pros, even they are differentiated by size and purpose. The Court acknowledges that large pros sometimes shop at retail for "fill in" and emergency supplies, but "[t]he law does not require an exclusive class of customers for each relevant submarket." *Photovest Corp.* v. *Fotomat Corp.*, 606 F.2d 704, 714 (7th Cir. 1979); *see also FTC* v. *Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1040 (D.C. Cir. 2008) (acknowledging that customers "cross-shop" and explaining that "[t]he fact that a customer might buy a stick of gum at a supermarket or at a convenience store does not mean that there is no definable groceries market" as long as there exists a core group of customers).

*Fourth*, the proposed market also has a distinct pricing structure and process. (*See* FTC Post-Trial FFCL 84). Again, because of the unique retail setup and the limited shelf space, retailers are incentivized to pursue the trade-up strategy that the Court has described above. (*Supra* Findings of Fact B.4; *see id.* D.3). Moreover, retailers approach the PLR process with the trade-up strategy in mind, rationalizing their portfolio and making changes to the planogram according to sales velocity and other retail-specific metrics. (*Supra* Findings of Fact D.2; *see id.* D.3). This strategy is not shared by pro distributors, who are not constrained by shelf space and stock a wide variety of construction adhesives, including ones specifically requested by their pro shoppers. (July 15 Tr. 692:14-19 (Brogan Testimony)).

On the *Brown Shoe* factors, Defendants make several arguments, none of which has traction. Defendants first argue that the practical indicia are centered on product characteristics, meaning that they do not apply to customer or channel definition. (Def. Post-Trial FFCL 104-05; *see* Def. Pre-Trial MOL 21). *See M.A.P. Oil Co.* v. *Texaco Inc.*, 691 F.2d 1303, 1308 (9th Cir. 1982) ("Those indicia are designed to compare the activities of two sellers to determine if their products or services compete in the same market or trade in separate markets."). But the FTC has used the indicia to define a market for construction adhesive cartridges, which is a product characteristic, and in any event, many courts have applied the *Brown Shoe* factors to define a relevant channel-based submarket. *See, e.g.*, *Staples*, 970 F. Supp. at 1075, 1080 (applying the indicia and defining a relevant market for consumable office supplies sold at office supply superstores despite the existence of "many different types of retailers [that] sell these products").[16]

Next, Defendants argue that three of the seven indicia undermine the FTC's proposed retail-only market. (Def. Post-Trial FFCL 105). That is, Defendants believe that construction adhesives sold to retail customers (i) do not have "special uses or characteristics," (ii) are not produced in "unique

---

16 Defendants make the same argument about the industry recognition factor, contending that it only applies to industry recognition of distinct products. (Def. Post-Trial FFCL 105). But as the Court has already explained, the industry recognizes that construction adhesive *cartridges* sold in the *retail* channel constitute a distinct market, not just that retail customers constitute a distinct sales channel. Moreover, in cases like *FTC.* v. *Staples, Inc.*, courts have applied this factor to analyze specific channels, including whether "superstores … [are] different from other sellers of office supplies." 970 F. Supp. 1066, 1075 (D.D.C. 1997).

facilities," and (iii) are not sold by "specialized vendors." (*Id.*). *See Brown Shoes*, 370 U.S. at 325. The Court disagrees on the "special uses or characteristics" factor, having found that construction adhesive cartridges sold in the retail channel do indeed have peculiar characteristics given the shelf space limitations and the unique PLR process for determining which brands, prices, and sizes of construction adhesives are allowed to be on the shelf. (*Supra* Findings of Fact D.2). As for the remaining two factors, they "need not be satisfied for the Court to conclude that the FTC has identified a relevant market." *IQVIA*, 710 F. Supp. 3d at 355.

Finally, Defendants contend that the *Brown Shoe* factors cannot replace direct evidence satisfying the interchangeability standard. (Def. Post-Trial FFCL 104; Def. Pre-Trial MOL 21). That may or may not be true, but as the Court will explain shortly, the FTC has produced abundant quantitative evidence to meet that standard.

**b. Quantitative Analysis Supports the FTC's Proposed Market Definition**

In addition to the *Brown Shoe* factors discussed above, the FTC's proposed market definition is also supported by quantitative evidence of interchangeability derived from the HMT test. (*See* FTC Post-Trial FFCL 85-86; FTC Pretrial MOL 12-13). Recall that the HMT is an economic tool that is often used in antitrust cases to define the relevant market. Specifically, it tests "whether a hypothetical profit-maximizing monopolist of a group of products, such as construction adhesive cartridge suppliers, would likely impose a small but significant and non-transitory increase in price or worsening of terms

("SSNIPT")." (Luppino Initial Report ¶ 101). *See also Tapestry*, 755 F. Supp. 3d at 414; *Regeneron Pharms.*, 96 F.4th at 339; 2023 Merger Guidelines § 4.3A. If the hypothetical monopolist could profitably impose such a price increase — usually five percent in this type of analysis — "then a relevant product market exists for antitrust purposes." *IQVIA*, 710 F. Supp. 3d at 369.

In this case, Dr. Luppino surveys qualitative evidence first and then conducts the HMT on a candidate market for construction adhesive cartridges sold in the retail channel. (Luppino Initial Report ¶¶ 52, 99-122). To implement the HMT, he relies on a summary statistic for demand for Defendants' construction adhesive cartridges sold in the retail channel, namely the aggregate own-price elasticity of demand. (*Id.* ¶ 102). This statistic measures "how quantity demanded for a group of products (*e.g.*, a candidate antitrust market) changes in response to changes in the prices of that same product group" and therefore indicates "the extent by which consumers switch away from that basket of products in response to a price increase." (*Id.* ¶¶ 104-105). The HMT works by comparing Defendants' aggregate own-price elasticities of demand to critical elasticity benchmarks, which are established by economics literature as the "level of sensitivity at which an increase in price leads to a sufficient decrease in the quantity demanded such that a hypothetical monopolist would likely not find it profitable to uniformly increase prices for all products in the candidate market." (*Id.* ¶ 112). If Defendants' summary statistics are lower than the critical elasticity benchmarks, then the proposed market satisfies the HMT as a relevant antitrust market. (*Id.* ¶ 114).

After calculating the requisite numbers, Dr. Luppino finds that for a five-percent SSNIPT, estimates of Defendants' aggregate own-price elasticity are "well below the critical elasticity thresholds" and "directly support the conclusion that [their] construction adhesive cartridges sold in the retail channel constitute a relevant antitrust market." (Luppino Initial Report ¶ 120). As a sensitivity analysis, Dr. Luppino runs the same test for a 10-percent SSNIPT, which is a more conservative estimate. (*Id.* ¶ 121). Even then, he finds that Defendants' construction adhesive cartridges sold in the retail channel continues to constitute a relevant antitrust market. (*Id.*). In other words, a hypothetical monopolist in this market would find it profitable to raise prices by 10 percent, which is more than necessary to show that this market definition meets the standard for antitrust analysis. (*Id.*). And because a market including Defendants' products as well as other manufacturers' products necessarily encompasses the narrower market of only Defendants' products, "all construction adhesive cartridges sold in the retail channel … constitutes a relevant antitrust market based on the HMT." (*Id.* ¶¶ 133-134). Moreover, "[t]he same economic logic applies to an even broader market that includes all construction adhesive cartridges sold in all channels." (*Id.* ¶ 135).

In her rebuttal report, Dr. Bailey, Defendants' expert, attacks Dr. Luppino's aggregate own-price elasticity calculations as "unreliable," which would render his entire HMT analysis ineffective. (Bailey Report ¶¶ 125-137; *see* Def. Post-Trial FFCL 30-31). According to Dr. Bailey, the price index on which Dr. Luppino conducts his econometric analysis does not measure actual

price changes, especially given that wholesale prices for construction adhesives are remarkably stable (July 20 Tr. 1298:6-13, 1339:16-1340:1, 1340:18-23 (Bailey Testimony)); rather, she posits that the price index reflects weekly variations in the composition of products shipped and the identity of retailers receiving deliveries. (Bailey Report ¶ 136; *see id.* ¶¶ 126-135 (providing more detailed explanation of why Dr. Luppino's price index is flawed); Def. Post-Trial FFCL 29-31 (recounting Dr. Bailey's criticisms)).

In addition, Defendants contend that Dr. Luppino failed to calculate cross-elasticity of demand, a critical metric in antitrust market definition that measures whether customers would "respond to a slight increase in the price of one product by switching to another product." *Regeneron Pharms.*, 96 F.4th at 339 (internal quotation marks omitted) (quoting *Todd*, 275 F.3d at 201-02); *see also Brown Shoe*, 370 U.S. at 325 (explaining that a product market is determined by "reasonable interchangeability of use or the cross-elasticity of demand"); *Hayden Publ'g*, 730 F.2d at 71 ("[A]s a general rule, the process of defining the relevant product market requires consideration of cross-elasticity of demand."). If customers would switch between products, then the products are in the same market. But in this case, Dr. Bailey opines that Dr. Luppino's methodology would generate cross-price elasticities near zero, which would indicate that Loctite and Liquid Nails products are not close substitutes for each other. (Bailey Report ¶ 137).

Dr. Bailey and Defendants' criticisms do not render Dr. Luppino's HMT conclusions invalid. To start, Dr. Luppino's price index — and thus his

aggregate own-price elasticity estimates and overall HMT analysis — "are not susceptible to incidental changes in product mix." (PX6102 ("Luppino Reply Report") ¶ 132). In fact, in response to Dr. Bailey's price-mix criticism, Dr. Luppino elected to run the HMT again, this time controlling for the share of every individual SKU. (*Id.* ¶ 138). He finds that the aggregate own-price elasticity results continue to be "well below the critical elasticity thresholds (both at the 5% SSNIPT level and the 10% SSNIPT level) and are statistically significant." (*Id.*; *see id.*, Table 1). In other words, "there is sufficient price variation to identify statistically significant estimates of aggregate elasticities even after controlling for product SKU mix." (*Id.* ¶ 141).

Moreover, Dr. Luppino need not have calculated cross-elasticity to run the HMT on Defendants' own construction adhesive cartridges sold in the retail channel. "Hard data concerning cross-elasticity is not the only means of proving a relevant market." *Tapestry*, 755 F. Supp. 3d at 414 (internal quotation marks omitted) (quoting *Emigra Grp., LLC* v. *Fragomen, Del Rey, Bernsen & Loewy, LLP*, 612 F. Supp. 2d 330, 355 (S.D.N.Y. 2009)). Indeed, the purpose of the *Brown Shoe* practical indicia and Dr. Luppino's review of the qualitative evidence is to enable him to narrow down a relevant market on which to run the quantitative HMT test. *See id.* The Court agrees with Dr. Luppino that construction adhesive cartridges made by Henkel and A-Paint — and by other suppliers in this space, for that matter — are substitutes for each other. (*See* Luppino Initial Report ¶¶ 136-203). That general understanding is supported by real-life examples — for instance, when Liquid Nails experienced

a supply shortage in 2022, consumer purchases of Loctite at Lowe's and Home Depot increased among lower priced items and then declined again once the shortage resolved. (July 13 Tr. 174:14-25, 176:3-16 (Blackwell Testimony) (discussing PX1070 at 3 and PX1105); July 14 Tr. 286:23-288:11, 289:22-291:10 (Zambataro Testimony) (discussing PX1221 and PX1222)). As for Dr. Bailey's specific opinion that cross-price elasticities would be zero (Bailey Report ¶ 137), Dr. Luppino explains that Dr. Bailey's estimates are likely the result of a "flawed, alternative methodology" (Luppino Reply Report ¶ 145 n.217).

In sum, the Court accepts the results of the HMT, which, combined with the *Brown Shoe* factors, indicate that there is a relevant antitrust market for construction adhesive cartridges sold in the retail channel.[17]

**c. The Court Rejects Defendants' Additional Market-Definition Arguments**

Defendants' attempt to dismantle the FTC's market definition by characterizing it as simultaneously overinclusive and underinclusive is unavailing. On the overinclusive front, Defendants argue that the FTC's definition improperly groups together nearly all construction adhesives into a single market regardless of their chemistry, application, price, or quality. (Def. Post-Trial FFCL 97-101; Def. Pretrial MOL 16-19). Products must be "reasonably interchangeable" to be grouped into the same relevant product

---

17 Dr. Luppino also runs a merger simulation, which predicts price effects, to confirm the results of his HMT analysis. (Luppino Initial Report ¶¶ 130-131). Because the merger simulation is not a necessary component of the HMT analysis, the Court does not discuss that separate analytical tool here and will instead address it at step three.

market, *E. I. du Pont de Nemours*, 351 U.S. at 395, and "price and quality differences may play an important role in defining market boundaries," *Tapestry*, 755 F. Supp. 3d at 418. Nevertheless, "this is a question of fact, not a question of law." *Id.* Indeed, "if the factual record does not justify such distinctions — if 'the differences are actually a *spectrum* of price and quality differences' within an otherwise indivisible market — then gradations based solely on price and quality will not be 'sufficient to establish separate relevant markets.'" *Id.* (quoting *In re Super Premium Ice Cream Distrib. Antitrust Litig.*, 691 F. Supp. 1262, 1268 (N.D. Cal. 1988) (collecting cases), *aff'd*, 895 F.2d 1417 (9th Cir. 1990) (memorandum disposition)).

Here, the factual record reflects that differences in price and quality are merely gradations along the spectrum of "good, better, best" options. To be sure, some construction adhesive cartridges are multi-purpose while others are project-specific, and some are more expensive than others because they are made of different technologies, but the FTC has provided both qualitative and quantitative evidence demonstrating that they are interchangeable. (*See supra* Conclusions of Law 1.a-b). In addition, the Court has found that Defendants, which manufacture all four technologies and span the entire pricing continuum, make product proposals and rationalization suggestions across the continuum during the PLR process. (*See supra* Findings of Fact C.2, D.2, E).

Given these commercial realities, there is no reason to narrow the relevant market even further.[18]

Separately, on the underinclusive end, Defendants argue that the market definition is improperly limited to retailers and should have included Defendants' pro-distribution customers. (Def. Post-Trial FFCL 101-06; Def. Pretrial MOL 19-22). Defendants cite a Ninth Circuit case for the general proposition that "the relevant market must be a *product* market" — that is, "consumers do not define the boundaries of the market; the products or producers do." *Newcal Indus., Inc.* v. *Ikon Off. Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008). In addition, Defendants provide examples of courts rejecting market definitions limited to specific customers and sales channels. (*See* Def. Post-Trial FFCL 102-03 (collecting cases); Def. Pretrial MOL 20-21 (same)). And Defendants further criticize the FTC for leaving out at least 33 percent of all construction adhesives sales in the United States by excluding the pro channel. (Def. Post-Trial FFCL 103; Def. Pretrial MOL 21). *See Endure Indus., Inc.* v. *Vizient Inc.*, 164 F.4th 405, 410, 415-16 (5th Cir. 2026) (affirming the district court's rejection of a market definition that left out 30 percent of the relevant market of hospital purchases).

---

18 Even though Defendants seem to argue that the relevant market definition should be limited by price and chemistry, they also accuse the FTC of failing to include foam products and FRP adhesives. (Def. Post-Trial FFCL 99; Def. Pretrial MOL 18-19). The accusation cuts against Defendants' argument for further narrowing the market definition. Moreover, as the Court has described above, foam and FRP adhesives require different tools and involve different application processes. (*See supra* Findings of Fact B.1). And in any event, all other forms of constructive adhesives accounted for less than four percent of annual sales of U.S. construction adhesives at major retailers in 2024, meaning that their inclusion would have a *de minimis* impact on the overall market size. (Luppino Initial Report ¶ 44, Table 1).

Contrary to Defendants' assertions, courts have routinely defined relevant antitrust markets based on specific channels, regardless of whether similar or identical products are also sold in other channels. *See, e.g.*, *Staples*, 970 F. Supp. at 1075 (defining relevant market for consumable office supplies sold at office supply superstores despite the existence of "many different types of retailers [that] sell these products"); *FTC* v. *Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 45-46 (D.D.C. 1998) (defining relevant market for wholesale distribution of prescription drugs despite the existence of other distribution channels); *Ansell Inc.* v. *Schmid Lab'ys, Inc.*, 757 F. Supp. 467, 471 (D.N.J. 1991) (determining that "sale of branded latex condoms to retail distributors" constitutes a relevant submarket). Even the Ninth Circuit ruled in the case cited by Defendants that at the pleadings stage, the plaintiffs adequately alleged a relevant submarket that includes only the defendant's customers. *See Newcal Indus.*, 513 F.3d at 1051. Those definitions passed legal muster because the Supreme Court has made clear in *Brown Shoe* that within a broad product market, the "outer boundaries" of which are indeed determined by product characteristics alone, "well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes." 370 U.S. at 325.

That is exactly what the FTC has established here using qualitative and quantitative evidence: a relevant antitrust market for the retail channel that exists within a broader product market for construction adhesive cartridges. (*See supra* Conclusions of Law A.1.a-b). In addition, unlike the factual record

in *Endure Industries*, there is no determinative evidence in this case that the retail and pro channels are reasonable substitutes for each other. *Cf.* 164 F.4th at 410 (determining that 30 percent of hospitals left the relevant channel and made purchases in other channels over the years, thereby suggesting that the other channels "represented a reasonably interchangeable substitute"). And in any event, even if customers cross-shop between channels, that is "entirely consistent" with the definition of a relevant market based on "a core group of … customers." *Whole Foods Mkt.*, 548 F.3d at 1040. Therefore, the Court confirms that the FTC's market definition is legally sound.

**2. The Transaction Is Likely to Produce Anticompetitive Effects in the Relevant Market**

Once the relevant antitrust market has been established, the FTC must then show that the effect of the merger is likely to be anticompetitive in that market. *Tapestry*, 755 F. Supp. 3d at 408; *IQVIA*, 710 F. Supp. 3d at 352. Here, in the market for construction adhesive cartridges sold in the retail channel, the FTC points to two types of anticompetitive harms that are likely to result from the Transaction — undue market concentration and elimination of head-to-head competition. (FTC Post-Trial FFCL 86-90; FTC Pre-Trial MOL 14-19). The Court addresses the effects in turn, determining that each can serve as an independent basis for *prima facie* antitrust liability.

**a. The Transaction Is Likely to Cause Undue Market Concentration**

The Supreme Court has said that "a merger which produces a firm controlling an undue percentage share of the relevant market, and results in a

significant increase in the concentration of firms in that market[,] is so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects." *Phila. Nat'l Bank*, 374 U.S. at 363. Put differently, a merger that significantly increases market concentration is "presumptively anticompetitive." *Deutsche Telekom*, 439 F. Supp. 3d at 205; *see also Tapestry*, 755 F. Supp. 3d at 456.

One common measure of market concentration is market share. *See Deutsche Telekom*, 439 F. Supp. 3d at 205. Indeed, "[w]ithout attempting to specify the smallest market share which would still be considered to threaten undue concentration," the Supreme Court has been "clear that 30% presents that threat." *Phila. Nat'l Bank*, 374 U.S. at 364; *see also IQVIA*, 710 F. Supp. 3d at 378 (confirming the "present-day validity" of the 30-percent threshold). Another measure is the Herfindahl-Hirschman Index ("HHI"), which the FTC "routinely use[s] to assess mergers and which is calculated by adding the squares of the individual firms' market shares." *Deutsche Telekom*, 439 F. Supp. 3d at 205-06; *see also Tapestry*, 755 F. Supp. 3d at 458 (explaining that squaring allows the HHI to account for the relative size and distribution of firms in a given market). "In determining whether the HHI demonstrates a high market concentration, courts consider both the post-merger HHI number and the increase in the HHI resulting from the merger." *Tapestry*, 755 F. Supp. 3d at 458 (alteration adopted and internal quotation marks omitted) (quoting *FTC* v. *Penn State Hershey Med. Ctr.*, 838 F.3d 327, 346-47 (3d Cir. 2016)). Under

the 2023 Merger Guidelines, an HHI of more than 1,000 indicates a "concentrated" market, an HHI of more than 1,800 indicates a "highly concentrated" market, and an increase of 100 points is considered a "significant increase." 2023 Merger Guidelines §§ 2.1, 2.4 n.21; *see also* *Tapestry*, 755 F. Supp. 3d at 458-59. (*See also* Luppino Initial Report ¶ 239).

In this case, the FTC presents quantitative evidence of undue market concentration — thus establishing the presumptive illegality of the Transaction — using both measures. *First*, Dr. Luppino calculates market share estimates using both wholesale and retail sales data and finds that the combined Henkel–A-Paint market share is well above the 30-percent threshold regardless of the data source. (Luppino Initial Report ¶¶ 231-235, 241-255). In terms of wholesale sales, Defendants' brands have a combined share of 78 percent by dollar sales and 90 percent by sales volume in the relevant market for construction adhesives sold in the retail channel. (*Id.* ¶ 243; *see id.* ¶ 242, Table 10). And using retail sales, the combined entity would have a market share of 84 percent by dollar sales and 92 percent by sales volume in the same relevant market, as illustrated by the following table:

**Table 12**
**Market Share Estimates Based on Retailer Data**
**Construction Adhesives Sold in Cartridges in the Retail Channel in the United States**
**2024**

| | Revenue | | Ounces | |
|---|---|---|---|---|
| **Vendor** | **Totals** | **Share** | **Totals** | **Share** |
| Henkel | [redacted] | 46.8% | [redacted] | 39.3% |
| A-Paint | [redacted] | 37.3% | [redacted] | 53.1% |
| Gorilla Glue | [redacted] | 14.3% | [redacted] | 5.9% |
| [redacted] | [redacted] | 0.4% | [redacted] | 0.5% |
| [redacted] | [redacted] | 0.3% | [redacted] | 0.1% |
| [redacted] | [redacted] | 0.3% | [redacted] | 0.4% |
| [redacted] | [redacted] | 0.2% | [redacted] | 0.1% |
| [redacted] | [redacted] | 0.2% | [redacted] | 0.4% |
| Other | [redacted] | 0.1% | [redacted] | 0.1% |
| Total | [redacted] | 100.0% | [redacted] | 100.0% |
| Pre-Merger HHI | | 3,785 | | 4,404 |
| Post Merger HHI | | 7,275 | | 8,582 |
| Delta HHI | | 3,491 | | 4,178 |

Notes:
[1] "Other" includes vendors with less than [redacted] in cartridges sales. These vendors are Great Stuff, Lanco Corp, Outwater, PrimeSource Building Products, Protective Coating Co, Quikrete, Soudal, Super Glue Corp/Pacer Tech, White Lightning, Wilson, and World's Toughest Fix.
[2] Note that Ace Hardware, Do It Best, and True Value data comprise sales to their respective member stores and thus were reported in wholesale dollars. The table adjusts Ace Hardware sales to be in retail dollars, by multiplying units sold by Ace's suggested retail price. Do It Best and True Value remain in wholesale dollars. As shown in Appendix II separating Ace, Do It Best, and True Value do not substantively alter shares.

Sources: Home Depot data, Lowe's data, Menards data, Ace Hardware data, Do It Best data, Walmart data, True Value data.

(*Id.* ¶ 251, Table 12). Therefore, for all units of measurement and sources of data, the combined Henkel–A-Paint entity would have a share of the market for construction adhesives sold in the retail channel that greatly exceeds 30 percent. In fact, even in the broader market for construction adhesive cartridges sold in all channels, Dr. Luppino estimates that the combined entity would have a market share of 64 percent by dollar sales and 62 percent by sales volume using wholesale data. (*Id.* ¶ 245; *see id.* ¶ 244, Table 11).

Moreover, Dr. Luppino's estimates are corroborated by third-party sources as well as Defendants' own internal estimates. (Luppino Initial Report ¶¶ 256-257). For example, the Farnsworth Group ("Farnsworth"), an independent market research firm, estimated that in 2023, Loctite and Liquid Nails held market shares of 39 percent and 32 percent, respectively, of the U.S. construction adhesives market as measured by retail sales to end consumers. (*Id.* ¶ 260). That means a 71 percent combined market share for the two brands, which is also above the 30-percent threshold. And prior to this Transaction, Henkel conducted ordinary-course market share calculations, which show the two brands accounting for somewhere between 46 percent to 75 percent of the total market with different market definition assumptions, methodologies, and data sources. (*Id.* ¶¶ 262-265; *see, e.g.*, PX1522 at 14 (Henkel's category update for global marketing team stating that "US – Market share is split between two top competitors (Loctite = 40% M.S. / Liquid Nails = 30% M.S.")).

While the market-sizing exercise that Henkel undertook for Project Clipper shows much lower market shares for the two brands (*see, e.g.*, PX1564 at 2 (Loctite at 6 percent share of a total addressable market of $1.8 billion); PX1400 at 7 (Liquid Nails holding fifth place in terms of market position)), those shares were calculated based on a much broader definition of the market (*see, e.g.*, PX1564 at 4 (showing a total addressable market of $1.3 billion that includes construction adhesives, sealants, and general adhesives)). As the Court has already discussed, the relevant market for evaluation in this case is

the market for construction adhesive cartridges sold in the retail channel, not a broader market for all types of adhesives in all forms and sold in all channels. (*See supra* Conclusions of Law A.1). And in any event, the Court prioritizes ordinary-course documents over any self-interested analyses conducted for the purpose of overcoming antitrust scrutiny. *See, e.g.*, *Tapestry*, 755 F. Supp. 3d at 487 n.44 ("Given the contrary ordinary-course documents, the Court does not credit the self-interested testimony[.]").

*Second*, using the market share estimates discussed above, Professor Luppino calculates the post-merger HHI and HHI delta, which are also well above the thresholds provided by the 2023 Merger Guidelines. (Luppino Initial Report ¶¶ 242-246, 251-252). Specifically, the Transaction would result in a post-merger HHI of 6,409 and a HHI delta of 3,043 based on wholesale dollar sales and a post-merger HHI of 7,275 and a HHI delta of 3,491 based on retail dollar sales. (*Id.*). The numbers are even bigger using wholesale and retail sales volume data. (*See id.*). In other words, no matter the unit of measurement and the data source, the Transaction's HHI numbers far exceed the 2023 Merger Guidelines' thresholds of 1,800 for a highly concentrated market and 100-point delta for a significant increase in market concentration. *See* 2023 Merger Guidelines §§ 2.1, 2.4 n.21. In addition, even in the broader market for construction adhesive cartridges sold in all channels, Dr. Luppino calculates that the Transaction would still result in a post-merger HHI of 4,458 and a delta HHI of 2,019, which more than meet the relevant thresholds. (Luppino Initial Report ¶ 245).

Defendants do not levy any meaningful attacks on Dr. Luppino's market share and HHI analyses, nor could they. His methodologies for calculating market share and HHI are correct, and he applies them correctly to the facts of this case. Furthermore, Dr. Luppino's estimates for the broader market show that even if the Court were to expand the relevant market beyond the retail channel, Defendants would still exceed the 30-percent threshold for combined market share as well as the 1,800 post-merger HHI threshold for a highly concentrated market and the 100-point HHI delta indicating a significant increase in market concentration. Indeed, Defendants concede "[i]f the Court accepts the FTC's market definition, Defendants do not dispute that the FTC can use their combined share to establish a presumption [of illegality] under the *Baker Hughes* framework." (Def. Pre-Trial MOL 22).

**b. The Transaction Is Likely to Eliminate Substantial Head-to-Head Competition**

Even though undue market concentration alone is sufficient to establish a *prima facie* case for antitrust purposes, many courts recognize that "the elimination of competition between the merging parties can strengthen the conclusion that the merger will have anticompetitive effects." *IQVIA*, 710 F. Supp. 3d at 382; *see also FTC* v. *Edwards Lifesciences Corp.*, No. 25 Civ. 2569 (RC), 2026 WL 228723, at *21-24 (D.D.C. Jan. 28, 2026) (determining that the FTC can make a fact-specific showing of anticompetitive effects through the proposed merger's elimination of head-to-head competition without the presumption of illegality based on market concentration). In evaluating this particular anticompetitive effect, "[c]ourts frequently rely on

ordinary[-]course documents and witness testimony illustrating that two merging parties view each other as strong competitors." *IQVIA*, 710 F. Supp. 3d at 383.

Here, the FTC posits that independent of its effects on market concentration, the Transaction is anticompetitive because it is likely to eliminate substantial head-to-head competition between Loctite and Liquid Nails. (FTC Post-Trial FFCL 89-90; FTC Pretrial MOL 16-19). Defendants, on the other hand, argue that the two brands have different commercial focuses and directly compete on only a small percentage of their sales. (Def. Post-Trial FFCL 108; *see* Def. Pretrial MOL 24). They emphasize that while Loctite is focused on premium products and technologies with higher price tags, Liquid Nails primarily offers opening-price-point products and more basic technologies. (Def. Post-Trial FFCL 108; Def. Pretrial MOL 24). In other words, the area of direct competition in which the two brands overlap is limited. (*See* Def. Post-Trial FFCL 108; Def. Pretrial MOL 24).

The Court agrees with the FTC that "Loctite and Liquid Nails compete closely, and fiercely, in construction adhesive cartridges sold in the retail channel in the United States." (FTC Post-Trial FFCL 90). Indeed, they are the only two construction adhesives suppliers with a full suite of multi-purpose and project-specific construction adhesives. (*See* PX2182 at 3-5). The Court has already found that the two brands compete all along the pricing continuum, identifying specific products in each of the "good, better, best" categories that go head to head against each other. (*Supra* Findings of Fact

C.2). And the Court has also found that the competition between Loctite and Liquid Nails manifests in bidding for limited shelf space at retailers as well as pricing. (*Id.*). Those factual findings support the conclusion that a merger between the two brands is likely to eliminate existing head-to-head competition in the relevant market. *See Sysco*, 113 F. Supp. 3d at 62, 65-66 (agreeing with the FTC's argument that the "potential for unilateral [anticompetitive] effects here is magnified because Defendants are particularly close competitors and many national customers consider them the top two choices for broadline distribution").

Moreover, ordinary-course documents and witness testimony at trial confirm that Henkel and A-Paint view each other as strong competitors. In internal reviews, both Henkel and A-Paint have called each other their respective number-one competitors. (*E.g.*, PX1722 at 10 (Henkel 2026 brand review presentation calling Liquid Nails its "#1 Competitor in Construction Adhesives"); PX2342 at 6 (A-Paint presentation describing "Liquid Nails: #1 competitor is Loctite")). And at trial, Henkel's Vice President of Sales agreed that "in the retail space, it's Loctite and Liquid Nails, one and two[.]" (July 14 Tr. 327:4-6 (Reginelli Testimony)). To be sure, Defendants have tried to minimize the significance of the ordinary-course evidence with other witnesses at trial and in their trial submissions (*e.g.*, DX324 (showing that Liquid Nails focuses on "good" while Loctite focuses on "better"/"best" when it comes to pricing), but on balance, the Court is "more persuaded by the plain import of their contemporaneous statements as reflected in the documentary record than

by Defendants' attempts to diminish the substantial evidence of head-to-head competition." *IQVIA*, 710 F. Supp. 3d at 385.

Because the Court determines that the FTC has established a relevant antitrust market for construction adhesive cartridges sold in the retail channel and demonstrated that the Transaction is likely to result in undue market concentration as well as the elimination of head-to-head competition in that market, the Court is satisfied that there is a *prima facie* case for antitrust liability.[19]

**B. Defendants Fail to Rebut the *Prima Facie* Case**

At step two of the *Baker Hughes* burden-shifting framework, the burden of production shifts to the defendants to present evidence that "the *prima facie* case 'inaccurately predicts the relevant transaction's probable effect on future competition' … or to 'sufficiently discredit' the evidence underlying the *prima facie* case[.]" *AT&T*, 916 F.3d at 1032 (quoting *Anthem*, 855 F.3d at 349); *see also IQVIA*, 710 F. Supp. 3d at 350. The defendants need not "clearly disprove [any] anticompetitive effect" and may simply make a "showing" that the FTC's *prima facie* case inaccurately captures the acquisition's probable effects on competition. *Baker Hughes*, 908 F.2d at 990-91 (internal quotation marks

19 The FTC argues, and the Court agrees, that it need not definitively show that prices will increase or that other anticompetitive effects will occur after the merger. (*See* FTC Post-Trial FFCL 75; FTC Pretrial MOL 19-20). *See, e.g.*, *United States* v. *Bertelsmann SE & Co. KGaA*, 646 F. Supp. 3d 1, 22 (D.D.C. 2022) ("Section 7 does not require proof that a merger … will cause higher prices or anticompetitive effects in the affected market." (alterations adopted and internal quotation marks omitted) (quoting *United States* v. *Anthem, Inc.*, 236 F. Supp. 3d 171, 192 (D.D.C. 2017))). Nevertheless, the Court will consider other possible consequences of the Transaction at step three of the burden-shifting framework as additional evidence of anticompetitive effects.

omitted). There are two ways in which the defendants can make the "required showing" — "by affirmatively showing why a given transaction is unlikely to substantially lessen competition, or by discrediting the data underlying the initial presumption in the government's favor." *Id.* at 991. Nevertheless, "[t]he more compelling the prima facie case, the more evidence the defendant[s] must present to rebut it successfully." *Id.*

Here, Defendants first try to dismantle the FTC's *prima facie* case by arguing that the relevant product market definition is invalid. (Def. Post-Trial FFCL 96-106; Def. Pretrial MOL 15-22). Defendants next argue that even accepting the FTC's market definition, Defendants have produced sufficient evidence rebutting the FTC's market-share analysis. (Def. Post-Trial FFCL 106-15; Def. Pretrial MOL 22-31). Specifically, Defendants offer rebuttal evidence on four points: (i) "the FTC's shares are misleading because they do not fully capture the nature of competition, which occurs through bidding processes and individual negotiations"; (ii) Defendants have limited head-to-head competition; (iii) low barriers to repositioning and the ongoing threat of replacement will constrain the combined Henkel entity and prevent the anticompetitive effects; and (iv) large and sophisticated retail customers will prevent Henkel's ability to raise prices following the Transaction. (Def. Post-Trial FFCL 106-07). The Court has already addressed and rejected Defendants' arguments about the FTC's market definition and the likelihood that the Transaction will eliminate substantial head-to-head competition in the previous section. It now turns to the three remaining rebuttal arguments.

**1. The FTC's Market-Share Analysis Appropriately Measures the Transaction's Anticompetitive Effects**

Defendants start by arguing that the FTC's use of market-share and HHI analyses to demonstrate undue market concentration is misleading because those analyses do not accurately predict future anticompetitive effects. (Def. Post-Trial FFCL 106-07; Def. Pre-Trial MOL 22-24). In general, it is true that "exclusive focus on market share percentages can produce a distorted picture of market power" — that is, "a true picture emerges only from consideration of additional market characteristics, among them, the strength of the competition, the probable development of the industry, and consumer demand." *Broadway Delivery Corp.* v. *United Parcel Serv. of Am., Inc.*, 651 F.2d 122, 128 (2d Cir. 1981). Moreover, "a substantial existing market share is insufficient to void a merger where that share is misleading as to actual future competitive effect." *United States* v. *Waste Mgmt., Inc.*, 743 F.2d 976, 982 (2d Cir. 1984) (citing *Gen. Dynamics*, 415 U.S. at 509-11 (upholding the merger between two leading coal producers because almost all of the production of one firm was tied up in long-term contracts)).

Here, Defendants contend that the FTC's market shares are misleading because they do not fully capture the nature of competition, which occurs via the PLR bidding process and subsequent individual negotiations. (Def. Post-Trial FFCL 106-07; Def. Pre-Trial MOL 22-24). Indeed, much of Dr. Bailey's expert testimony is focused on this "get on the shelf" level of competition, in which many brands compete even if they do not ultimately reach the shelf and where the "threat of being replaced" is a strong competitive constraint,

including on wholesale prices. (Bailey Report ¶¶ 50-96). Consequently, she opines that Dr. Luppino's market shares are unreliable measures of future competition because, among other things, they do not capture the competition to get on the shelf from suppliers who compete during the PLR process but who are currently not on the shelf. (*Id.* ¶¶ 97-123).

Defendants' criticism of the FTC's market-share analysis in this case misses the mark. After all, market shares are perhaps the most common analytical tool when it comes to assessing future competitive conditions. (Luppino Reply Report ¶¶ 156-162). *See IQVIA*, 710 F. Supp. 3d at 390 (explaining that "economists recognize that historical revenues are typically the best available predictor of future competitive significance" (internal quotation marks omitted)). In fact, cases like *General Dynamics* are the exception rather than the norm. In those rare circumstances, certain "changes render the market so unstable that the Court cannot rely on recent revenues and current market shares to guide its analysis." *IQVIA*, 710 F. Supp. 3d at 390.

This case does not fit the exceptional circumstances of *General Dynamics*. Indeed, market shares have been remarkably stable in the construction adhesives market, as evidenced by third-party sources such as Farnsworth's historical market share estimates. (Luppino Reply Report ¶ 171, Table 2 (displaying Farnsworth study that shows stable market shares for Loctite, Liquid Nails, Gorilla Glue, and other brands from 2021 to 2023)). More fundamentally, as Dr. Luppino explains, competition to "get on the shelf" is intertwined with competition between brands for end consumers. (Luppino

Reply Report ¶ 103). That is, brand strength and sales velocity on the shelf affect the "get on the shelf" level of competition for shelf space. (*Id.* ¶¶ 104-118). "It is a self-reinforcing loop in which a brand's success in sales to end-consumers makes it more likely for that brand to be placed on [retailers'] shelves again, which in turn, allows the supplier to make more sales." (*Id.* ¶ 103). Therefore, Dr. Luppino's market share estimates using both wholesale and retail data adequately capture this "get on the shelf" level of competition.

**2. The Threat of Replacement Is Insufficient to Prevent the Transaction's Anticompetitive Effects**

Defendants next argue that low barriers to repositioning and the ongoing threat of replacement by existing competitors will prevent any anticompetitive effects resulting from the Transaction. (Def. Post-Trial FFCL 108-113; Def. Pretrial MOL 24-29). The main case that Defendants rely on for this rebuttal argument is *Waste Management*, in which the Second Circuit determined that despite the Government's successful reliance on a high post-merger market share to establish *prima facie* illegality, "entry into the relevant product and geographic market by new firms or by existing firms … is so easy that any anti-competitive impact of the merger … would be eliminated more quickly by such competition than by litigation." 743 F.2d at 983. In *Waste Management*, where the relevant market was defined as the provision of waste disposal services to business and industrial customers in Dallas, the Second Circuit reasoned that the barriers to entry were low because "individuals operating out of their homes can acquire trucks and some containers and compete successfully with any other company" and because haulers in neighboring Fort Worth could "easily

establish themselves in Dallas if the price of trash collection rose above the competitive level." *Id.* at 979-81, 983 (internal quotation marks omitted). Low barriers to market entry or expansion by other firms, in turn, rendered any market power from the proposed merger "insubstantial" and thus ensure that it would not "substantially lessen competition in the relevant market[.]" *Id.* at 984; *see also Frank Saltz & Sons, Inc.* v. *Hart Schaffner & Marx*, No. 82 Civ. 2931 (JMC), 1985 WL 2510, at *10 (S.D.N.Y. Sept. 5, 1985) (explaining that under *Waste Management*, "even a relatively large market share is insufficient to show a violation when entry into the field is relatively open"); *Baker Hughes*, 908 F.2d at 987 ("In the absence of significant barriers, a company probably cannot maintain supracompetitive pricing for any length of time.").

Here, Defendants argue that this case presents an even more compelling "entry" case than *Waste Management* because competitors are already in the market and ready to expand. (Def. Post-Trial FFCL 109-11; Def. Pretrial MOL 25-27). Dr. Bailey's expert report, for example, lists 20 suppliers of construction adhesives that would compete with the combined Henkel entity (Bailey Report ¶¶ 12-26), and Defendants' briefing specifically calls out Gorilla Glue, DAP, Titebond, Sika, Quikrete, Red Devil, Flex Glue, and Leech as examples of suppliers "already sell[ing] competing construction adhesives to the retailer customers at the center of the FTC's relevant product market" (Def. Post-Trial FFCL 109; Def. Pretrial MOL 25). Defendants reason that many of those suppliers sell construction adhesives in the pro channel and could easily shift or expand into the retail channel (Def. Post-Trial FFCL 109; Def. Pretrial

MOL 25), [redacted][20] Moreover, because retailers have not signed long-term contracts with Defendants or provided guarantees for shelf placement, Defendants believe that retail customers like the three home centers can change their purchasing behavior at any time, such as during the periodic PLR process. (Def. Post-Trial FFCL 109; Def. Pretrial MOL 25).

Furthermore, Defendants contend that the lack of frequent entry or expansion in the past does not guarantee that entry or expansion will not happen moving forward, especially if the combined Henkel decides to raise prices in a material way after the merger. (Def. Post-Trial FFCL 109-10; Def. Pretrial MOL 26). To Defendants, "[t]he fact that such entry has not happened more frequently reflects only the [current] existence of competitive, entry-forestalling prices[.]" *Waste Mgmt.*, 743 F.2d at 983; *see also Baker Hughes*, 908 F.2d at 989 n.9 (explaining that "failed entry in the past does not necessarily imply failed entry in the future: if prices reach supracompetitive levels, a company that has failed to enter in the past could become competitive"). In other words, given the competitive dynamics at the "get on the shelf" level and the open bidding processes run by powerful retail customers, Defendants could easily lose shares to any of the other construction

[20] The FTC argues that manufacturing is a barrier to expansion. (FTC Post-Trial FFCL 69-72). The Court does not agree, and it has not found that manufacturing capacity is an issue for other suppliers.

adhesives suppliers if they stop maintaining competitive pricing. (Def. Post-Trial FFCL 110; Def. Pretrial MOL 26-27). Even more so than in *Waste Management*, where past entrants were "relatively small or disappeared as independent entities by going out of business or being acquired by larger companies," 743 F.2d at 982, Defendants point out that suppliers like Titebond and DAP are already significant suppliers in the pro channel (Def. Post-Trial FFCL 109-10; Def. Pretrial MOL 27).

Nevertheless, as the FTC correctly points out, expansion and repositioning by these existing competitors will not be "timely, likely, and sufficient" to constrain the combined Henkel entity. *Tapestry*, 755 F. Supp. 3d at 465. Indeed, "[e]ntry of competitors into a market or expansion of existing competitors can offset anticompetitive effects ... only if the entrance or expansion is timely, likely, and sufficient in its magnitude, character, and scope to deter or counteract the competitive effects of concern." *Id.* (alterations adopted and internal quotation marks omitted) (quoting *FTC* v. *Sanford Health*, 926 F.3d 959, 965 (8th Cir. 2019)). Unlike in the waste collection industry described in *Waste Management*, the Court finds that in the construction adhesives industry at the center of this case, the barriers to entry are sufficiently high that "potential entrants and expanders will not adequately 'fill the competitive void that will result'" if the Court allows Henkel and A-Paint to combine. *Id.* (quoting *United States* v. *H & R Block, Inc.*, 833 F. Supp. 2d 36, 73 (D.D.C. 2011)).

First and foremost, the Court determines that brand is the key barrier to entry in this space. As the Court has already found, brand equity is perhaps the most important factor in driving construction adhesives sales. (*Supra* Findings of Fact D.1). Third-party market research conducted by Farnsworth demonstrates that the "[b]rand of the construction adhesive has the most effect on purchase intent." (PX2197 at 17). Brand is highly relevant to retailers' decisions about which products to stock on their shelves (*see, e.g.*, July 15 Tr. 568:25-569:9 (Schneider Testimony)), meaning that brands with "holding power" — such as Loctite and Liquid Nails — are able to keep their key shelf placements (July 20 Tr. 1223:6-14 (Waits Testimony); PX3006). Moreover, brand equity is specific to the construction adhesives industry. Brands with strong recognition in adjacent categories like caulks and sealants — including DAP and Sherwin-Williams — have not been able to leverage their brand strength and penetrate construction adhesives using brand alone. (July 20 Tr. 1259:18-21, 1260:24-1261:19, 1263:10-1264:10, 1266:9-23 (Wirth Testimony); PX3084; July 16 Tr. 801:25-803:5, 803:10-13, 804:2-5, 810:7-17 (Krebs Testimony)). And even the home centers have refrained from offering any construction adhesives products under their own private labels [redacted] (July 21 Tr. 1440:13-1441:2 (Oakes Testimony); Oakes Dep. 49:17-50:22).

Given the importance of branding, the Court finds that the threat of replacement is untimely, unlikely, and insufficient to prevent the anticompetitive effects of this Transaction because brand strength — especially

construction adhesive-specific branding — takes time and significant financial investment to build. Both Loctite and Liquid Nails are decades-old brands that have acquired loyal customers because of the brands' consistency and quality over the years. (*See, e.g.*, PX1005 at 4 (Project Clipper due diligence reflecting that "[i]t would be very difficult to organically replicate the brand equity Liquid Nails has established over 50 years")).

Unlike in *Waste Management*, where the Second Circuit did not believe that "the existence of good will achieved through effective service" would be an impediment to competition among waste haulers, 743 F.2d at 984, the commercial realities of this industry reflect that brands do matter for consumer choice and behavior. After all, few Americans pick their waste haulers based on branding, but they do recognize and buy the iconic brands of construction adhesives while shopping at retailers. Indeed, the role of brand equity here is akin to that in *Tapestry*, in which a sister court found that "brand is a fundamental attribute of a handbag; one cannot ignore it any more than one could ignore the brand of [a] prescription drug … in defining the separate markets of two chemically identical substances." 755 F. Supp. 3d at 417. Critically, the strength of Defendants' brands is so high that retailers have testified at trial that even with future price increases, they are unlikely to remove either Loctite or Liquid Nails entirely from their shelves. (*See, e.g.*, July 21 Tr. 1434:12-1435:2 (Oakes Testimony) (Lowe's merchant explaining that eliminating both brands "would create a tremendous amount of sales risk

to the category”)). Defendants’ attempt to analogize this case to *Waste Management* is thus unavailing.

Separately, the Court is unpersuaded by Defendants’ use of *Waste Management* to dispute the “timely, likely, and sufficient” standard. (*See* Def. Post-Trial FFCL 111-112; Def. Pretrial MOL 27-28). To be sure, the D.C. Circuit in *Baker Hughes* rejected the Government’s reliance on *Waste Management* to impose a categorical “quick and effective” entry requirement. 908 F.2d at 987 (explaining that the Second Circuit’s determination of a successful rebuttal based on “easy” entry into the trash collection market did not mean that “successful rebuttal *requires* such a showing” (citation omitted)). But the “timely, likely, and sufficient” standard differs from the “quick and effective” requirement in that the former does not impose a specific timeline or require evidence of specific competitors and their plans. *See Tapestry*, 755 F. Supp. 3d at 470 (applying standard without specific timing or evidentiary requirements); *cf. Baker Hughes*, 908 F.2d at 987 (rejecting the “quick and effective” standard because it would “impose upon defendants the burden of proving that entry actually will occur,” which goes beyond Section 7’s standard of “probabilities, not certainties”).

While the Second Circuit has yet to affirmatively adopt the “timely, likely, and sufficient” standard, nothing in *Waste Management* prevents the application of this standard. Indeed, many district courts within this Circuit have used it to evaluate the strength of the rebuttal at step two. *See Tapestry*, 755 F. Supp. 3d at 465-70; *IQVIA*, 710 F. Supp. 3d at 393-95; *Deutsche*

*Telekom*, 439 F. Supp. 3d at 226-33; *see also United States* v. *Visa U.S.A., Inc.*, 163 F. Supp. 2d 322, 342 (S.D.N.Y. 2001). This Court follows the lead of its sister courts and determines that, applying the "timely, likely, and sufficient" standard, repositioning or expansion by other suppliers cannot adequately constrain the combined Henkel entity.[21]

### 3. Big-Box Retailer "Power Buyers" Are Unlikely to Protect End Consumers from the Transaction's Anticompetitive Harms

Finally, Defendants contend that large and sophisticated retailers obviate the combined Henkel entity's ability to increase prices post-transaction. (Def. Post-Trial FFCL 113-15; Def. Pretrial MOL 29-31). According to Defendants, "Henkel needs these retailers far more than they need Henkel." (Def. Post-Trial FFCL 113; *see id.* (explaining that about 80 percent of the combined entity's construction adhesives sales would be to Home Depot and Lowe's alone)). By Defendants' logic, then, those retailers will keep any attempts by Defendants to raise prices or reduce quality in check, especially because they "closely monitor prices, will only accept wholesale price increases that are justified by cost, and require extensive cost justification worksheets before they will accept such an increase." (*Id.* at 114).

To be sure, sophisticated buyers are "likely to promote competition even in a highly concentrated market." *Baker Hughes*, 908 F.2d at 986. Indeed, the existence of "power buyers" like the three largest home centers "is a factor that

---

21 In any event, even without the "timely, likely, and sufficient" standard, the Court finds that the role of brand equity is so important in the construction adhesives industry that this case can easily be distinguished from *Waste Management*.

can serve to 'rebut a prima facie case of anti-competitiveness.'" *FTC* v. *Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 70 (D.D.C. 2018) (quoting *Cardinal Health*, 12 F. Supp. 2d at 59); *see also United States* v. *Archer-Daniels-Midland Co.*, 781 F. Supp. 1400, 1416 (S.D. Iowa 1991) ("The existence of large, powerful buyers of a product mitigates against the ability of sellers to raise prices."). In some cases, courts have determined that one or a few of such power buyers may contribute to preventing significant competitive harms. *See United States* v. *Booz Allen Hamilton Inc.*, No. 22 Civ. 1603 (CCB), 2022 WL 9976035, at *7 (D. Md. Oct. 17, 2022) (determining that there are "strong countervailing incentives to maintain a competitive bid" for contracts with a single government entity); *United States* v. *Country Lake Foods, Inc.*, 754 F. Supp. 669, 674 (D. Minn. 1990) (explaining that "[c]ompetition is ensured in the market by the power of" three large distributors accounting for more than 90 percent of industry sales).

The Court agrees with Defendants that retailers like the three largest home centers have substantial leverage over Defendants (*see supra* Findings of Fact D.2), but such a "power buyer" defense is insufficient to rebut the FTC's *prima facie* case on its own. As a sister court in this District has explained, "courts have not typically held that power buyers alone enable a defendant to overcome the government's presumption of anticompetitiveness." *IQVIA*, 710 F. Supp. 3d at 396 (internal quotation marks omitted) (quoting *Wilh. Wilhelmsen Holding*, 341 F. Supp. 3d at 70); *see also Chi. Bridge & Iron Co. N.V.* v. *FTC*, 534 F.3d 410, 440 (5th Cir. 2008) ("[C]ourts have not considered the 'sophisticated

customer' defense as itself independently adequate to rebut a *prima facie* case.").

Moreover, the "power buyer" defense is especially weak in this case given that the combined Henkel entity would exercise greater leverage vis-à-vis the retailers, instead of the other way around. Indeed, the "key question is what choices are available to buyers and how those choices would change post-merger." *IQVIA*, 710 F. Supp. 3d at 396. The answer here is that elimination of head-to-head competition between Loctite and Liquid Nails would decrease "the number of leading firms at the top of market" and leave retailers "with fewer choices when selecting" suppliers of construction adhesives. *Id.* As the Menards merchant testified at trial, if the merger goes through and "Henkel raises their price, [retailers like Menards] don't necessarily have a lot of recourse to go get something fast and quick to fill [their] shelves" and "might have to raise [their] prices to [their] consumers, which could have a ripple effect on other projects[.]" (July 15 Tr. 570:15-571:13 (Schneider Testimony)). The Court therefore doubts that even with their sophisticated PLR and cost-justification processes, large retailers would singlehandedly be able to prevent Defendants from raising prices.

And even with a stronger "power buyer" defense, Defendants cannot overcome the Court's finding that retailers are ultimately not incentivized to protect end consumers from potential price increases and other anticompetitive harms. Indeed, the antitrust laws do not contemplate that the Government would outsource its market-supervision responsibilities to retailers, especially

retailers whose interests do not align with those of end consumers. Rather, the antitrust laws "assume that a retailer faced with an increase in the cost of one of its inventory items 'will try so far as competition allows to pass that cost on to its customers in the form of a higher price for its product.'" *FTC* v. *H.J. Heinz Co.*, 246 F.3d 708, 719 (D.C. Cir. 2001) (quoting *In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 605 (7th Cir. 1997)). Such is the case here: The Court has found that retailers control prices charged to end consumers and have passed on wholesale price increases in the past to retail customers as a way of protecting their own margins. (July 21 Tr. 1420:22-1422:1 (Oakes Testimony); *see, e.g.*, July 14 Tr. 360:19-362:2 (Reginelli Testimony); PX1668 at 3). In addition, because of limited shelf space in brick-and-mortar stores, retailers are also incentivized to reduce the number of SKUs in favor of a more profitable product portfolio. (July 13 Tr. 200:20-23 (Blackwell Testimony); July 14 Tr. 345:3-17 (Reginelli Testimony)). As a result, retailers are likely unable and unwilling to prevent price increases, and they may even work together with Defendants to reduce consumer choice in the construction adhesives product category.

In sum, because Defendants cannot show that the FTC's market-share analysis is inapplicable or that the threat of replacement and the "power buyers" are able to constrain the combined Henkel entity, Defendants have failed to rebut the presumptive illegality of this Transaction.

### C. Even If Defendants Could Successfully Rebut the *Prima Facie* Case, the FTC Would Still Satisfy Its Ultimate Burden of Persuasion

Based on the foregoing analysis, the Court must enjoin the Transaction at step two. But even if Defendants were successful in their rebuttal, the FTC would still be able to persuade the Court to stop the Transaction at step three by showing additional evidence of anticompetitive effects, including significant upward price pressure, elimination of substantial head-to-head competition, and reduction in consumer choice through portfolio rationalization. *See IQVIA*, 710 F. Supp. 3d at 351 (explaining that "if the defendant is successful, the burden of producing additional evidence of anticompetitive effects shifts back to the government and merges with the ultimate burden of persuasion").

*First*, the FTC has produced additional evidence that the Transaction would create significant upward pressure on prices. (Luppino Initial Report ¶¶ 315-355). Using the same inputs for his HMT analysis, Dr. Luppino runs a merger simulation of predicted price effects and calculates that the Transaction would "generate price increases of over 10% for each of the Defendants' construction adhesive cartridge products sold in the retail channel even under the most conservative estimates of aggregate own-price elasticity." (*Id.* ¶ 320). He also conducts an alternative assessment of the price pressure caused by the merger called the gross upward pricing pressure index ("GUPPI"), which measures the internalization of any diversions between the two brands from price increases and thus the combined Henkel entity's "incentives to offer higher prices." (*Id.* ¶¶ 324-325). His analysis shows that Henkel and A-Paint's

"GUPPIs are higher than the predicted price increases from [his] merger simulation." (*Id.* ¶ 328).

Contrary to Defendants' contentions, the Court does not believe that Dr. Luppino's merger simulation and GUPPI analysis are "faulty." (Def. Post-Trial FFCL 88-90). Regarding the merger simulation, the Court has already discussed and rejected Defendants' arguments about the unreliability of Dr. Luppino's aggregate own-price elasticity estimates. (*See supra* Conclusions of Law A.1.b). Moreover, Dr. Luppino addresses Dr. Bailey's criticisms about the lack of competitive restraints in his model, explaining that his merger simulation "in fact uses real world data to infer the substitution effects of third-party suppliers." (Luppino Reply Report ¶ 187). The Court agrees. It also determines that the predicted price increases are not so "unprecedented" even if they are larger than historical price increases, as Loctite and Liquid Nails are currently locked in "vigorous price competition" with each other, and historical price increases are not indicative of "the post-merger competitive landscape." (*Id.* ¶ 203). Furthermore, because Defendants' attacks on Dr. Luppino's GUPPI analysis are largely derivative of their criticisms of his merger simulation (*see* Def. Post-Trial FFCL 90), the Court rejects those arguments as well.

*Second*, as the Court has already discussed, the FTC has established that the Transaction is likely to eliminate substantial head-to-head competition. (*Supra* Conclusions of Law A.2.b). Because the FTC can rely on undue market concentration alone to establish a *prima facie* case at step one, the Court considers elimination of head-to-head competition as an alternative

basis of illegality and as additional evidence of anticompetitive effects. Indeed, many "[c]ourts have recognized that a merger that eliminates head-to-head competition between close competitors can result in a substantial lessening of competition." *Sysco*, 113 F. Supp. 3d at 61 (collecting cases). Therefore, following the examples of those courts, this Court finds that the Transaction would create "unilateral anticompetitive effects" due to elimination of competition between close competitors. *Tapestry*, 755 F. Supp. 3d at 486.

*Third*, the FTC has shown that the Transaction is likely to result in a reduction in consumer choice through portfolio rationalization. The Court has found that because retailers are incentivized to pursue a trade-up strategy and increase their returns from a consolidated product portfolio, they are likely to work together with the combined Henkel entity to eliminate SKUs and decrease the number and variety of construction adhesives offerings in the retail channel. (*Supra* Findings of Fact E). The Second Circuit has recognized that "reduced consumer choice can constitute harm to competition." *MacDermid Printing Sols. LLC* v. *Cortron Corp.*, 833 F.3d 172,186 & n.57 (2d Cir. 2016) (collecting cases). The Court thus determines that in this case, portfolio rationalization causing a reduction in consumer choice constitutes another anticompetitive harm resulting from this Transaction.

All those additional anticompetitive effects would help the FTC carry its ultimate burden of persuading the Court to enjoin the Transaction at step three.

**CONCLUSION**

For the foregoing reasons, the Court hereby enters a permanent injunction prohibiting Henkel from acquiring A-Paint.

On or before **September 11, 2026**, the parties shall file a joint letter under seal suggesting redactions to the Court's Findings of Fact and Conclusions of Law.

SO ORDERED.

Dated: August 14, 2026
New York, New York

Katherine Polk Failla

KATHERINE POLK FAILLA
United States District Judge